# EXHIBIT 2

**April 12, 2018, correspondence containing decision on appeal (Liberty/Hosseinpour 090-104)**

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213

JULIE MERSCH
LAW OFFICE OF JULIE A. MERSCH
701 S. 7TH ST.
LAS VEGAS NV 89101

Liberty Mutual INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5703

April 12, 2018

Julie A. Mersch
Law Office of Julie A. Mersch
701 S. 7TH ST.
LAS VEGAS, NV 89101

RE: Long Term Disability (LTD) Benefits
Safeway, Inc.
Claim #: 5482725
Claimant: Abolfazl Hosseinpour

Dear Julie Mersch:

We reviewed your appeal request for Long Term Disability ("LTD") benefits on behalf of Abolfazl Hosseinpour and maintained the decision to deny benefits beyond August 4, 2017.

**Initial Claim Decision**

Mr. Hosseinpour submitted a claim for his absence from work as of July 15, 2015, as a result of neck pain, back pain and pain in his hands. He was also diagnosed with anxiety and panic attacks. LTD benefits were approved from January 20, 2016, through August 4, 2017. Benefits beyond August 4, 2017, were denied as the evaluation concluded he was no longer disabled as defined by the Policy.

The basis for the decision was outlined in a letter dated August 4, 2017. Mr. Hosseinpour was provided an opportunity to request an appeal review of the denial, stating the reasons why he felt that his claim should not have been denied, and submit additional information to support his claim. Specifically, he was advised to submit the following information: *In his request for review please include the following documentation: all office treatment notes, diagnostic test results, procedure reports, pharmacy records, and therapy records from Dr. Tafreshi, Dynamic Futures, or any other treating providers, for the period of March 2017 through the present date.*
*You should also provide any additional information that you feel will support his claim.*

**Appeal**

Correspondence was received from your office on August 14, 2017, asking for a copy of Mr. Hosseinpour's claim file. Mr. Hosseinpour's claim file was forwarded to your office for review on August 17, 2017. On January 26, 2018, we received a call from your office requesting a 30 day extension due to difficulty obtaining Mr. Hosseinpour's medical documentation. We faxed a letter to your office on February 19, 2018, confirming the extension deadline of February 28, 2018. On

February 26, 2018, a call was received from your office advising that the extension letter had not been received. The letter was refaxed; however, an error report was received. Robin was contacted and the letter was e-mailed.

On February 28, 2018, the letter of appeal along with supporting medical documentation was received for review.

In your letter of appeal dated February 27, 2018, you indicated Dr. Kim did not factor into his opinions the effect of Mr. Hosseinpour's chronic pain on his ability to maintain the physical and cognitive duties of a pharmacist. It was noted that the report only addressed his physical limitations and any side effects from medications. You also acknowledged that the report did not discuss whether Mr. Hosseinpour would be able to sustain both the physical stamina and mental acuity required over the course of an eight hour work day as a result of his chronic pain and the restrictions set forth in the functional capacity evaluation (FCE) report. You noted the FCE report indicated that Mr. Hosseipour noted that he has to lay down at times due to his back pain. You further noted that Mr. Ellis documented in his FCE report that "*It should be noted that this client demonstrated limited tolerance for activity as assessed during this evaluation. He was noted to change his position on a frequent basis. He did demonstrate alterations in his sitting posture. The client was consistent in his demonstrated inability to perform functional activities as noted during this evaluation. He reported pain as the limiting factor. The result of this evaluation have been determined to be reliable".*

You recognized Liberty Mutual's acknowledgment of the internal inconsistencies in Dr. Kim's report regarding his need to change positions. In a letter dated July 17, 2017, from Dr. Kim, you noted that Dr. Kim did not explain what "any general change in position" meant. You noted that based on the FCE report such change in position would include Mr. Hosseinpour's ability to lay down. You noted the only other option would include standing which Mr. Hosseinpour could only do for brief periods of time, not to exceed 15-20 minutes.

You further noted that Liberty did not pose a question to Dr. Kim asking if it would be reasonable for Mr. Hosseinpour to pace himself over the course of a workday; go lay down as needed as part of his "general position changes"; and his opinion regarding Mr. Hosseinpour's ability to sustain a competitive work pace over 8-10 hour workdays (what would the effect of the chronic pain and restrictions and limitations be on his ability to perform the material duties of a pharmacist / pharmacy manager for both a physical and cognitive standpoint).

You noted in the FCE report sitting and standing intervals over the day would lead to increased pain and result in poor work performance and would be akin to a light duty occupation, not a sedentary one. You noted the FCE documented: *Standing / walking: This client did ambulate with an altered gait pattern as previously described. Upon direct questioning, he did report that his present tolerance for standing and walking is 15-20 minutes. This client did not stand or walk at any one time during this evaluation for more than 10-12 minutes. He was noted to change his position frequently. There was a deterioration of his gait observed when performing higher level activities, as well as following the evaluation…."*

You documented that the FCE report was "replete" with references to Mr. Hosseinpour's pain and his "limited tolerance" to sitting, standing and walking.

You opined that Dr. Kim's summary conclusions should be disregarded as he did not discuss the duties of Mr. Hosseinpour's occupation as a pharmacist or pharmacy manager, discuss his credible pain complaints and the deterioration of his cognitive and physical abilities over the course of a workday or discuss how he can perform the cognitive demands of his occupation with such crippling and chronic pain. You also noted that Liberty must consider Mr. Hosseinpour's subjective pain complaints and reports of impairment in the analysis in whether Mr. Hosseinpour can perform his own occupation.

You concluded that due to Mr. Hosseinpour's pain, he simply cannot attend long enough to work consistently and accurately. You further note that Mr. Hosseinpour's anxiety and panic attacks are a side effect of his physical condition, not a separate cause of disability. You noted that Mr. Hosseinpour does not have a mental / nervous condition unrelated to his physical condition and he does not wish to argue that he had an independent cause of disability unrelated to his physical conditions. It was noted that he has cervical and lumbar stenosis which is worsening over time and causes *inter alia* (among other things), "chronic pain, left upper limb weakness and impaired spinal range of motion".

In support of Mr. Hosseinpour's claim, you submitted updated medical records from Dr. Tafreshi and Dr. Garber. You noted that a recent cervical and lumbar MRI showed "multilevel lumbar stenosis, severe nature with possible adhesive arachnoiditis" and "spondylitic disease from C4-7 with clinical radiculopathy down his bilateral upper extremities". It was noted that Dr. Garber is recommending an anterior cervical discectomy fusion and internal fixation at C5-7.

You further referenced that surveillance was conducted on Mr. Hosseinpour and showed no activity on several days.

The following medical documentation was received to support Mr. Hosseinpour's appeal:

> *Medical documentation was received from Dr. Tafreshi from March 14, 2017 to February 1, 2018. Mr. Hosseinpour was seen for follow ups with reports of severe anxiety, persistent neck pain, low back pain, left arm and hand weakness with a burning sensation, difficulty concentrating, palpitations, poor memory, panic attacks, difficulty standing, sitting and walking due to pain, insomnia, heartburn, abdominal pain and bloating. His diagnoses included cervical disc degeneration, severe recurrent major depressive disorder without psychotic features, anxiety disorder, spinal stenosis of the lumbar region, pure hyperglyceridemia, cervical radiculopathy and lumbar radiculopathy. As of February 1, 2018 his physical examination noted he was in no acute distress with tender paracervicals, normal heart and lung examinations, normal abdomen, decreased range of motion of his back, tender paralumbars and decreased grip of the left hand. He had no abdominal pain.*
>
> *Medical documentation was received from Dr. Garber including a January 16, 2018 office visit and diagnostic reports. The January 16, 2018 visit noted Mr. Hosseinpour presented for transition care. His lumbar MRI showed multilevel lumbar stenosis and severe nature with possible adhesive arachnoiditis. It was noted that he had clinical symptoms of neurogenic claudication and an inability to ambulate for more than 50 feet without sitting. His cervical MRI showed spondylitic disease from C4-7 and clinical radiculopathy down the bilateral upper extremities. It was noted that he had not had any injections and he did not wish to have any injections performed. His physical examination noted normal strength*

*and tone. His diagnosis included bulge of the cervical and lumbar disc without myelopathy. Imaging from 2015 was received for review. Surgical intervention was recommended, anterior cervical discectomy and fusion and internal fixation at C5-7.*

**Appeal Evaluation**

A surveillance report was received dated October 30, 2015, noting Mr. Hosseinpour was observed moving smoothly and with no indications of discomfort. He was not using an assistive device. He did at one point put his hand on the small of his back. He was observed walking to a vehicle and sitting down in the right front seat without difficulty.

On February 3, 2016, Mr. Hosseinpour reported he had not seen Dr. Garber since September 2015. He noted it was a combination of neck pain and anxiety that was keeping him out of work. He stated he was having panic attacks 1-5 times per day and taking Xanax as needed, approximately three times per day. He also reported taking Remeron and Gabapentin. He reported his neck pain causes migraine headaches and he is not able to stand for more than 10 minutes or bend his head forward. He noted he could not return to work in the state that he was in.

An addendum was prepared for Mr. Hosseinpour's claim on February 25, 2016, by Dr. Howard Grattan, an independent physician who is board certified in physical medicine and rehabilitation and pain management. The prior review dated October 19, 2015, supported the diagnoses of degeneration of the lumbar or lumbosacral intervertebral disc, spinal stenosis of the lumbar spine, degeneration of cervical intervertebral disc, anxiety and pure hyperglycemia. Mr. Hosseinpour's findings were noted to be mild in severity and given the absence of any quantifiable measurements, instability or findings on MRI, it was determined that there was no functional impairment and no restrictions and limitations related to his complaints of back pain, neck pain and intermittent left arm weakness. His examination findings noted normal sensation and strength and some decreased grip strength and limited range of motion. Based on his review of the updated medical records, Dr. Grattan concluded Mr. Hosseinpour had full time sedentary work capacity. His treatment plan has included physical therapy, medication management and activity modification. It was indicated that Mr. Hosseinpour rated his pain level 10/10; however, he was observed moving smoothly and with no indications of discomfort. He did not use visible assistive devices such as canes, crutches, or braces. There was also no evidence for any deformities or acute neurological features on clinical examination nor was there dangerous pathology on diagnostics. Therefor the accompanying surveillance information did contradict the review of medical documentation and conflicted with his self-reported limitations.

Dr. Grattan spoke to Lisandra in Dr. Jason Garber's office who reported Dr. Garber last saw Mr. Hosseinpour in June 2015 and he had nothing to add to his disability claim.

A psychiatric review was completed March 14, 2016 on Mr. Hosseinpour's claim by Dr. Belliveau, an independent physician who is board certified in neuropsychology. Dr. Belliveau's prior review supported psychiatric impairment through November 15, 2015. Based on his review of the updated medical records, Dr. Belliveau concluded the interim records did not include an updated assessment of the scope or severity of depressive symptoms beyond his report of depressed mood, sleep disturbance (which may also be associated with chronic pain), and cognitive problems. Although Mr. Hosseipour reported anxious moods with frequent panic attacks, the records did not provide any description of any associated behavioral changes or psychiatrically based functional impairment. The

medical record documentation did not include any mental status or cognitive assessment data that would support the presence of cognitive impairment. No evaluation or treatment records from mental health specialists were available for review. The medical record documentation provided insufficient support for the presence of continued psychiatrically-based functional impairment or associated need for occupational restrictions or limitations beyond approximately November 15, 2015.

It was noted that further appropriate review may be considered if any subsequent records were received including relevant information about the scope and severity of recent depressive symptoms; the scope of symptoms experienced during panic attacks and any subsequent, associated behavioral changes; valid cognitive assessment data that would support the presence of cognitive impairment; and further delineation of the nature of any psychiatrically-based functional impairment that would necessitate occupational restrictions or limitations.

The surveillance report was reviewed and it was determined that the surveillance did not convey much reliable information about Mr. Hosseinpour’s cognitive or emotional state beyond the fact that he was observed interacting with other people in the community without any outward expressions or manifestations of emotional distress.

In March 2016 Mr. Hosseinpour’s claim was denied due to the conclusions of the prior medical reviews not supporting disability beyond November 15, 2015. Mr. Hosseinpour’s claim was appealed after review of his entire claim file and pertinent information. Ms. Hosseinpour’s claim was forwarded for a psychiatric and physical medicine and rehabilitation review.

A review was completed on Mr. Hosseinpour’s claim dated December 5, 2016 by Dr. Devendra Thakur, an independent physician who is board certified in psychiatry. Based on her review of the medical records, Dr. Thakur concluded the medical supported major depressive disorder with anxious distress with depressed mood, impaired sleep and appetite, subjective cognitive impairment in memory and concentration, anhedonia, psychomotor agitation and anxiety with acute episodes (panic attacks). There was insufficient evidence to support the diagnoses of panic disorder or posttraumatic stress disorder.

Dr. Thakur noted the medical did not support impairment due to a mental illness from July 15, 2015, to the present. Most of the data for the period in question comes from Dr. Tafreshi's notes. He documents significant subjective concerns (panic attacks, impaired concentration, depression and anxiety), however, his notes do not contain psychiatric exams; there is no objective correlation or support for the subjectively reported symptoms. On December 11, 20/15, Mr. Hosseinpour first saw Dr. Collins (psychiatrist); he again reported various subjective symptoms. In this case, a psychiatric exam was documented and there were some abnormalities, but their functional consequence was not discussed. For example, there was a noted deficit in delayed recall and Mr. Hosseinpour could not name the vice president, but there was no discussion of whether or how memory impairments affect him practically. There was no observation of him being unable to give a proper history due to memory impairment. There was no collateral information from third parties regarding his memory disturbance. There was also no further cognitive testing or consideration of referral for neuropsychological testing. This was all notable particularly because with anxiety and depression it is common for individuals to estimate their own cognitive abilities as worse than they are objectively, and it is possible for poor effort (not necessarily intentionally) to negatively affect performance on cognitive testing. Although reasonable medication changes were considered, no

other treatment options were considered (such as inpatient treatment, referral for neuropsychological testing, consideration of neuroimaging, etc). Mr. Hosseinpour was seen once in December 2015 and once in February 2016, and there were no more recent visits. In summary, the medical evidence as provided does not objectively support impairment due to his psychiatric condition.

Dr. Thakur attempted to reach Dr. Collins on three separate occasions, no contact was established.

A review was completed on Mr. Hosseinpour's claim dated December 5, 2016, by Dr. Fargo Khoury, an independent physician who is board certified in physical medicine and rehabilitation with added expertise in pain medicine. Based on his review of the medical records, Dr. Khoury concluded from July 15, 2015, to the present Mr. Hosseinpour had cervical and lumbosacral spondylosis resulting in functional impairment. Reasonably supported restrictions an limitations would include: no lifting, carrying, pushing, and/or pulling more than 10 pounds on occasion and frequently with the right upper extremity. Given documented left upper extremity weakness, restrictions for the left upper extremity included no lifting, carrying, pushing, and/or pulling more than 5 pounds occasionally and/or frequently. It was noted that lifting heavier objects could exacerbate chronic pain in the setting of imaging-evidence of multilevel cervical and lumbosacral spondylosis. He should occasionally bend, crawl, stoop and crouch and avoid climbing ladders and/or twisting about the cervical spine due to his chronic neck pain with associated painful cervical spine range of motion. He could stand for 30 minutes at a time with rest breaks (up to 4 minutes) as needed for comfort and repositioning for a total of four hours per work day. He can walk for 30 minutes at a time with rest breaks (up to 4 minutes) as needed for comfort and repositioning for a total of four hours per day and he would have no sitting restrictions. He could frequently reach at desk level and below waist level and could occasionally perform overhead reaching. Dr. Khoury opined with the above restrictions and limitations, Mr. Hosseinpour could work in a full time sustained basis on a permanent basis due to his chronic pain. It was further noted that the medical evidence did not support obvious side effects from prescribed medications.

The functional capacity evaluation dated August 26, 2016, by D. Ellis, physical therapy, noted Mr. Hosseinpour exhibited limited work activity tolerance and he had frequent changes in position. It was recommended that Mr. Hosseinpour be limited to occasional lifting of less than 10 pounds, frequent lifting of 5 pounds and no lifting of 21" form the floor or over 66" off the floor. He also would need limited reaching above the shoulders to less than occasional and it was noted that he would be unable to rise from a kneeled down position and he was unable to perform a full squat.

Dr. Khoury was able to speak to Dr. Tafreshi on November 28, 2016, and Dr. Tafreshi agreed with the functional capacity evaluation (FCE) findings from August 2016. He agreed with the findings in Dr. Khoury's report in full with the duration of the impairments being permanent given Mr. Hosseinpour's ongoing chronic neck and back pain complaints.

On the activities questionnaire dated January 17, 2017, Mr. Hosseinpour noted he sits 4-5 hours, stands one hour and walks 30 minutes to one hour a day. He reported requiring an assistive device sometimes due to severe pain in his lower back and hips. He reported being able to sit in the car for two hours and he can drive for 1-2 hours. He documented leaving the house 2-3 times during the week and 1-2 times on the weekends. He runs errands 1-3 times a day depending on his pain. His errands include going to the mailbox, getting fast food, going to the store, pharmacy and doctor's appointments and picking up pizza. He documented he was able to do light carrying of groceries, laundry with assistance, open and respond to mail, manage his finances, balance his checkbook,

bathe, style his hair and get dressed. He noted he could not stand on his feet due to severe pain in his lower back going into his hips, legs and knee. He reported his pain causes him to fall down or trip and the pain takes away his strength with reports of weakness in his legs and causing him to lean on something to avoid falls. He reported neck pain radiating to his head and causing an inability to think or concentrate. He also noted his neck pain causes worsened anxiety and radiation to his left hand and weakness. He reported anxiety 3-4 times a day causing a lack of desire, palpitations and hotness in his face for several hours. He reported his condition causes him to be very depressed and to feel useless for his kids. He noted his problems with his back, hip, leg weakness, neck pain, anxiety and depression make it impossible for him to concentrate and have normal focus. He documented that he could not perform his pharmacy job with 100% accuracy.

On March 23, 2017, a call was received from Robin noting Mr. Hosseinpour was only treating with Dr. Tafreshi.

An investigative report was received dated April 30, 2017, for dates of surveillance including April 25, 2017, April 26, 2017 and April 27, 2017. Mr. Hosseinpour was not observed during these three days of surveillance.

During the claim evaluation of ongoing benefits, Mr. Hosseinpour's was scheduled for an independent medical examination (IME) on May 17, 2017, by Dr. Andrew Kim, an independent physician who is board certified in physical medicine and rehabilitation with a subspecialty in pain medicine. Based on his review of the medical records through March 14, 2017, and the independent medical examination findings, Dr. Kim concluded Mr. Hosseinpour has been suffering from worsening lower back pain, neck pain, anxiety and depression since 2014. It was noted that he was independent with his activities of daily living, able to drive independently and he reported he was only able to ambulate approximately one city block before experiencing severe pain. He reported his symptoms started in 2014 and he denied any inciting trauma, accident or injury. He acknowledged low back pain that radiated to his lower extremities and neck pain radiating to his upper extremities. He reported his symptoms were associated with headaches, anxiety and depression. He further noted cramping and jerking while laying down at night and associated weakness in his lower extremities and hands.

Mr. Hosseinpour participated in physical therapy without benefit and he denied surgical intervention or interventional injections. His current complaints included daily pain in his neck and back with radiation into his extremities and some reported numbness in the arms and feet and weakness in his hands. He reported standing and walking made his pain worse and sitting, lying down, medication and the use of a cervical collar made the pain better. Mr. Hosseinpour stated the medication helped decrease his pain by 10-15%. Mr. Hosseinpour reported taking Tramadol, Lyrica and Fioricet. He noted Fiorcet helped with his headaches and Lyrica helped with the numbness in his extremities. He reported he did not have any significant side effects from his medications. It was noted that he is independent with his activities of daily living and he is able to drive independently.

His physical examination noted he was alert and in no distress. His psychiatric examination noted he was cooperative with good eye contact and clear speech. He appeared euthymic. Neurologically he was alert and oriented with grossly normal cognition. His gait examination noted decreased cadence, slowed gait and ambulation without and assistive device. Examination of his neck and upper extremities revealed no atrophy, redness or edema in the cervical region, multiple areas of tenderness of the cervical paraspinals, trapezii, tenderness noted over the cervical articular pillars

bilaterally, guarded, active and passive cervical range of motion, normal muscle testing, intact sensation and positive compression sign. Examination of the back and lower extremities noted no atrophy, redness or edema, tenderness over the lower lumbar paraspinals bilaterally L4-S1, full active lumbar flexion, decreased active and passive lumbar extension at approximately 20 degrees, normal muscle testing, intact sensation, downtrending Babinski sign and positive lumbar facet loading bilaterally. There was no evidence of overreaction and he was observed to remove both socks and shoes independently and bend at the waist to 90 degrees.

Dr. Kim concluded the medical evidence supported the diagnoses of lumbar spondylosis, lumbar stenosis, cervical spondylosis, cervical stenosis, major depressive disorder and generalized anxiety disorder. Dr. Kim noted based on the functional capacity evaluation (FCE) performed on August 26, 2016, the following restrictions and limitations were recommended: occasional lifting and carrying less than 10 pounds, frequent lifting of less than 5 pounds., no lifting from below the height of 21" above the floor, no lifting above the height of 66" above the floor, no squatting, kneeling or crawling, continuous standing or walking should not exceed 15-20 minutes and continuous sitting should not exceed 20 minutes and occasional bending at the waist.

It was determined that Mr. Hosseinpour had the capacity to perform at a sedentary work capacity on a full time basis based on his physical limitations.

It was noted that Dr. Tafreshi responded to a questionnaire on August 3, 2015, indicating that Mr. Hosseinpour could "sit and stand no more than 30 minutes at a time and lift and carry no more than 15 pounds. It was opined that he appeared to understate Mr. Hosseinpour's physical limitations as compared to the FCE performed in August 2015. It was noted that Dr. Kim's physical examination findings did not indicate any contradictions to the aforementioned restrictions.

In regards to Mr. Hosseinpour's reports of 10/10 pain, he did not appear to be in visible pain during the history portion and during the physical examination certain passive range of motion did elicit some pain. Mr. Hosseinpour was able to bend at the waist to remove his socks and shoes and put them back on without visible difficulty. It was also further noted that there was no overreaction noted on examination.

There was documentation that the prescribed medications may have some cognitive side effects affecting Mr. Hosseinpour's concentration; however, upon interviewing Mr. Hosseinpour he denied any significant side effects. There was some concern in the long term use of Fioricet for cervicogenic headaches as long term usage may create some dependency. It was also noted the use of Xanax in combination with opioid therapy is generally not recommended due to the increased risk of adverse events.

A clarification letter was sent to Dr. Kim from Sheena Maggard, IME Department Supervisor, dated July 3 2017, noting Dr. Kim had outlined sedentary work capacity on a full time basis; however, in question number 2 Dr. Kim also indicated that Mr. Hosseinpour was not able to sit for 20 minutes or stand and walk for 15-20 minutes. It was asked if Dr. Kim could confirm if Mr. Hosseinpour needed to change positions from sitting to standing every 20 minutes.

A clarification was received from Dr. Kim dated July 17, 2017, noting based on the reporting, Mr. Hosseinpour would need to "change positions" every 20 minutes. The FCE did not specifically detail it being from "sitting to standing" so any general change in position would be appropriate.

A copy of Mr. Hosseinpour's closure letter was faxed to your office on August 4, 2017.

In the additional medical documentation provided by Dr. Tafreshi it was noted that he had complaints of severe anxiety, difficulty concentrating, poor memory, panic attacks and insomnia. No mental status examinations were documented in the medical documentation describing his anxiety, panic attacks, concentration or memory deficits or description of his abnormal sleep patterns. Mr. Hosseinpour's assessment with Dr. Kim noted he was cooperative and appeared euthymic. He was alert and oriented with a grossly intact cognition.

We reviewed the information contained in the file, including the information submitted with his appeal. We determined that we should refer his file for an additional physician review. Therefore, we referred his file to Cyrus Kao, M.D., board certified in Physical Medicine and Rehabilitation sub specialty certificate in Pain Management, for review. Following a review of his file, Dr. Kao concluded:

> *The medical evidence supports that the claimant is able to sustain full-time capacity without any restrictions or limitations.*
>
> *While there are complaints of neck and low back pain, this is not corroborated with physical exam findings. More specifically, physical exam findings show that there are within normal limit neurological exam findings as well as within normal limit motor exam findings. While there are provocative maneuvers which support the diagnosis, the physical exam findings largely do not substantiate any functional impairment. There is indication of left upper extremity grip strength weakness in one follow-up visit by a treating provider, however, this is the only mention of this decreased strength testing, and the documentation is vague in supporting this finding.*

Dr. Kao noted that there is no medication side effects noted that would impact your functional ability and you would be able to perform at a full-time sustained capacity.

Mr. Hosseinpour's claim was previously reviewed by a vocational consultant, who completed an occupational analysis in order to identify the material and substantial duties of his occupation as it is normally performed in the national economy. The analysis showed his occupation is most often performed at the sedentary and light levels of physical demand based on the Department of Labor descriptions found in the DOT.

The Department of Labor defines sedentary work as,

> *"**S-Sedentary Work** - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."*

For the sedentary physical demand level the positional requirements are as follows:

> ***Frequent*** *handling, fingering and sitting*
> ***Occasional*** *reaching, (reaching can be reduced or eliminated by moving objects an ergonomically correct distance from the body), walking and standing*
> ***No*** *bending, stooping, climbing, twisting, kneeling, crawling, crouching and squatting*

The Department of Labor defines light work as,

> *"**L-Light Work** - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible."*

For the light physical demand level the positional requirements are as follows:

> ***Constant*** *standing*
> ***Frequent*** *walking, reaching, handling and fingering*
> ***Occasional*** *sitting, bending, stooping, crouching, squatting, climbing and twisting*
> ***No*** *kneeling or crawling*

Stools may be provided for accommodating standing in light environments; however, weight lifted may still rise above the sedentary level (i.e. up to 20 lbs. occasionally).

**COGNITIVE DEMANDS**

The DOT and a 2013 O*NET survey of incumbents and analysts were consulted regarding the mental/cognitive demands of the occupation. The DOT and O*NET survey data identifies the following tasks to be of importance for this occupation: attaining precise set limits, tolerances and standards; performing a variety of duties; the ability to recognize and solve problems; the ability to apply general rules to specific problems; the ability to combine pieces of information to form general rules; the ability to arrange things or actions in a certain order or pattern; the ability to concentrate on a task over a period of time; the ability to quickly and accurately compare similarities and differences among information; the ability to update and use relevant knowledge; evaluate information to determine compliance with standards; communicating with others; establishing and maintaining interpersonal relationships; providing consultation and advice to others; organizing, planning, and prioritizing work; analyzing data or information; training and teach others; resolving conflicts and negotiating with others; thinking creatively; developing objectives and strategies; the ability to work with a work group or team; and the ability to meet time deadlines.

In your letter of appeal you noted that Mr. Hosseinpour's occupation is a light duty physical demand occupation, not a sedentary occupation, as Liberty Mutual asserted in the termination letter. You cited the definition of "own occupation". You noted that Mr. Hosseinpour when he went out of work was working in a light duty occupation. You further noted that Liberty Mutual failed to mention the cognitive demands of a pharmacist and whether Mr. Hosseinpour would be able to even begin to meet those demands given his chronic pain, medical diagnoses and increasing debility for sustained functional activities. You acknowledged that Amanda Voce, vocational consultant, did set forth the cognitive demands of a pharmacist; yet, the determination letter failed to mention these demands.

You further noted that an employer does not have to provide the employee with a sit/ stand desk as the determination letter implicitly inserts stating that a sit / stand desk could be accommodated and is readily available in the national economy.

It is important to note that Mr. Hosseinpour is insured for his own occupation, so job specific tasks or schedules are only relevant insofar as they assist the expert in identifying the appropriate occupation. There are a myriad of jobs in the national economy that have occupations that do not match with regard to physical demands where the job may be heavier than the occupation. It is the tasks and essential functions that are paramount and lead a vocational expert in identifying the correct occupation. The job and occupational physical requirements do not need to match. Given what appears to be a loose interchange of the terms job and occupation, it may be helpful to clarify them. They are described in detail in The Quick Desk Reference for Forensic Rehabilitation Consultants (Elliott & Fitzpatrick, Inc., 2005). It reads,

> *"A **job** is a group of positions within an establishment which are identical with respect to their major or significant tasks and sufficiently alike to justify their being covered by a single analysis. There may be one or many persons employed in the same job.*
>
> *An **occupation** is a group of jobs, found at more than one establishment, in which a common set of tasks are performed or are related in terms of similar objectives, methodologies, materials, products, worker actions, or worker characteristics." (page 48).*

It is also important to circle back to the purpose of the vocational review. The vocational review is to determine the duties of the **occupation** as it is normally performed in the national economy (not the **job** at Safeway Inc.).

Our role in reviewing Mr. Hosseinpour's file is to determine whether his medical condition and the medical documentation contained in his file supports that he was unable to perform the material and substantial duties of his own occupation beyond August 4, 2017. We are not required to ensure the availability of this occupation or that he return to active employment with his former employer in the same or different position.

In your appeal letter you indicated that Liberty Mutual had not performed an "any occupation" review as benefits were terminated before the expiration of the "own occupation" period of 24 months. You asked that Liberty immediately pay Mr. Hosseinpour for the own occupation period or through January 19, 2018. Of note, this appeal review is to determine if Mr. Hosseinpour is disabled

from performing the demands of his own occupation as performed in the national economy. Mr. Hosseinpour had not satisfied the 24 month own occupation period and the determination is based on whether he was able to perform the demands of the occupation as of August 4, 2017.

In our review of Mr. Hosseinpour's claim, Liberty Life did fully consider the Social Security Administration's ruling to approve Social Security Disability Income benefits. It should be noted, however, that while we fully considered the Social Security Administration's ruling, the decision by the Social Security Administration does not determine entitlement to benefits under the terms and conditions of the Safeway Inc.'s Group Disability Income Policy. Moreover, Liberty Life has obtained and considered medical and vocational assessments that were not considered by the Social Security Administration in its determination process.

**Conclusion**

We conducted a thorough and independent review of Mr. Hossenpour's entire claim. In summary, we acknowledge that he may have continued to experience some symptoms associated with his condition beyond August 4, 2017. However, the available information does not contain exam findings, diagnostic test results or other forms of medical documentation supporting his symptoms remained of such severity, *frequency and duration* that they resulted in restrictions or limitations rendering him unable to perform the duties of his occupation after that date.

Having carefully considered all of the information submitted in support of your claim, our position remains that proof of your continued disability in accordance with the Policy provisions after August 4, 2017, has not been provided. Therefore, no further benefits are payable.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

**Policy Provisions**

In order to continue receiving benefits, you must satisfy the requirements of all Policy provisions that state, in part:

> ***"Disability"*** *or* ***"Disabled"****, with respect to Long Term Disability, means:*
>
> *For persons other than pilots, co-pilots, and crewmembers of an aircraft:*
>
> *i.* *if the Covered Person is eligible for the 24 Month Own Occupation benefit,* ***"Disability"*** *or* ***"Disabled"*** *means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*
>
> *ii.* *thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*
>
> ***"Own Occupation"****, with respect to Long Term Disability, means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.*

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, Mr. Hosseinpour was entitled to appeal the decision made by Liberty Life Assurance Company of Boston (Liberty), and to submit any additional information he wished to be considered as part of the appeal. Liberty has conducted a full and fair review of Mr. Hossenpour's appeal and accompanying materials, and has concluded that the denial of benefits will be maintained.

At this time, Mr. Hosseinpour's administrative right to review has been exhausted; no further review will be conducted by Liberty and his claim will remain closed. You may request to receive, free of charge, copies of all documents relevant to this claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Liberty Life Assurance Company of Boston are based on the provisions outlined in Safeway Inc.'s Policy. These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities.

If you require language translation assistance, please contact Liberty Life to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłį́į' dóó ná'ookąąh nííní'ą́ągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtį́įł nínízingo doo bą́ąh ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact his assigned Disability Case Manager at the number below.

Sincerely,

Charles Johnson
Appeal Review Consultant
On Behalf Of: Jerronda King
Phone No.: (888) 437-7611 Ext. 14674
Secure Fax No.: (603) 334-5703