# EXHIBIT 3, part 2

**Administrative Record (Liberty/Hosseinpour 360-526)**

medical documentation thereafter if his disability continued. STD MDS Note dated 08/20/2015 11:26 am by Donna Paine. Based on nurse Paine's recommendation, Liberty approved the STD claim through October 1, 2015.

In the meantime, Mr. Hosseinpour attended physical therapy at Kelly Hawkins Physical Therapy throughout August, 2015. Initial exam findings on August 10, 2015 included +4/5 bilateral lower extremity muscle strength testing; 4/5 left upper extremity muscle testing; +4/5 right upper extremity muscle testing; cervical and lumbar area tenderness on palpation; and cervical ranges of motion limited to 30 degrees in extension; 50 in flexion; 40 left rotation; and 30 right rotation. He reported symptoms of left hand pain and numbness and tingling in all fingers. Lumbar ranges of motion were documented on August 26, 2015 as 14 degrees in extension; 45 flexion; and 20 degrees bilateral side bending.

Mr. Hosseinpour followed up with Dr. Tafreshi on September 9, 2015 with ongoing complaints of neck and back pain; left arm pain, numbness, and weakness; left knee pain with difficulty walking or standing for long periods; anxiety and panic attacks; difficulty concentrating; and overall lack of improvement in his condition. Objective findings included depressed mood; paracervical tenderness; decreased lumbar range of motion; decreased left hand grip strength; and left knee tenderness on flexion. Dr. Tafreshi recommended left knee x-ray; follow up with Dr. Garber; and psych referral. He discontinued Zoloft and started Mr. Hosseinpour on Paxil.

On September 17, 2015, Dr. Garber reviewed the cervical and lumbar x-rays with Mr. Hosseinpour, noting straightening of the cervical spine consistent with spasm; cervical disc degeneration present most notably at C4-5, C5-6, and C6-7; idiopathic rotatory lumbar scoliosis; and some lower lumbar disc degeneration. He asked Mr. Hosseinpour to return for further recommendations after completing the nerve conduction studies.

Mr. Hosseinpour returned to see Dr. Tafreshi on September 23, 2015, reporting no improvement in his neck and back pain or left hand symptoms with physical therapy and in fact, he told Dr. Tafreshi that at times, his neck and back pain was severe enough to "bring tears to his eyes." He was also having bitemporal headaches and continued anxiety and difficulty concentrating. Objective findings remained unchanged from his last visit. Dr. Tafreshi increased the Paxil to 40mg and started him on Fiorcet with codeine for the headaches. He further noted that Mr. Hosseinpour was "still not fit to return to work."

Mr. Hosseinpour contacted Liberty that day, September 23, 2015, to report that Dr. Tafreshi was continuing to support his off-work status and to ask what type of documentation would be necessary to continue his claim into the long-term phase. He was advised by Liberty representative Ethan Kernek to submit updated medical records from his attending physician. STD Phone Note 9 dated 09/23/2015 2:55 pm by Ethan Kernek.

On October 7, 2015, Liberty's Disability Case Manager Nicole Schulke reviewed updated records from Dr. Tafreshi for treatment dates through September 23, 2015 documenting no improvement in Mr. Hosseinpour's condition and noting upcoming consults with Dr. Garber and with psychiatry. STD Claim Note 18 dated 10/07/2015 11:31 am by Nicole Schulke. On October 8, 2015, Ms. Schulke referred the file for neuropsychological and medical peer reviews. In the meantime, Liberty escalated the claim to "severe" based on "TCTM RECC" (see STD Claim Note 23 dated 10/09/2015 10:17 am by Ryan Tucker), and forwarded the file to its long-

term disability case manager Jessica Austin. STD Claim Note 25 dated 10/19/2015 10:18 am by Jessica Austin (noting "ext[end] ben[efits] while awaiting results of peer reviews")

Timothy Belliveau, PhD performed a psychiatry Clinical Case Review at Liberty's request on October 19, 2015. As part of the review, Liberty asked Dr. Belliveau to contact Dr. Tafreshi. Dr. Belliveau spoke to Dr. Tafreshi on October 12, 2015, and provided a summary of the call:

> In response to my inquiry, Dr. Tafreshi reported that Mr. Hosseinpour's panic attack symptoms include palpitations, light-headedness, and shortness of breath, and that when these happen at work he can't concentrate. In response to my question, Dr. Tafreshi clarified that this is based on Mr. Hosseinpour report of having difficulty with concentration. Dr. Tafreshi reported that Mr. Hosseinpour's antidepressant medication was changed on 09/09/15, confirmed that psychiatric treatment was recommended, and explained that it had not yet occurred. We briefly reviewed the medical record note of 09/23/15, at which time Mr. Hosseinpour's score on the PHQ-9 (19) was in the moderately severe range of depressive symptoms, and that Dr. Garber was following him for pain management. In response to my question about Dr. Tafreshi's 08/05/15 documentation to Liberty Mutual (i.e., fax rom Donna Paine, BSN, RN, CRRN, CCM) which indicates **both anxiety and spinal stenosis as impairing diagnoses, Dr. Tafreshi reported that both conditions cause impairment, that he can't sit down or stand for long periods due to spinal stenosis, and that his depression and anxiety effect his work as a pharmacist**. Dr. Tafreshi reported that Mr. Hosseinpour's next visit would be in a couple of weeks.

Clinical Case Review date October 19, 2015 by Timothy Belliveau, PhD at 4 ("Belliveau review")(emphasis added). Based on his conversation with Dr. Tafreshi and review of medical records from Drs. Tafreshi and Garber (including Dr. Tafreshi's August 3rd handwritten responses to nurse Paine's questions), Kelly Hawkins, and the MRI reports, Dr. Belliveau concluded that Mr. Hosseinpour was unable to work from a psychiatric standpoint due to *depression* at least through November 15, 2015. Rationale for his opinion included:

> The available records and supplementary AP report on 10/12/15 provide reasonable support for the presence of psychiatrically-based impairment that would probably interfere with the claimant's ability to consistently maintain pace and persistence on work-related tasks. The medical records and information from the claimant's primary care physician provide reasonable support for the need for complete occupational restriction through approximately 11/15/15, due to psychiatrically-based impairment. The medical record documentation provides stronger support for case formulation as functional impairment due to depression, rather than panic attacks.
>
> .
> .
> .
>
> The July 2015 medical records indicate that the claimant reported anxious and depressed moods, sleep disturbance, panic attacks, and difficulty concentrating. The 09/09/15 note reflects no change in his psychiatric symptoms in response to medication. The claimant's 09/23/15 score on a depression screening questionnaire (PHQ-9 = 19) reflects a scope and severity of mood symptoms which are generally consistent with the clinical diagnosis of

> Major Depression.
>
> During AP contact on 10/12/15 the claimant's primary care physician described the claimant's report of anxiety symptoms that are generally consistent with the diagnostic criteria for panic attacks, but seem to be primarily occurring, or limited to the work setting. Although the medical records indicate that the claimant has reported having difficulty concentrating, no objective mental status assessment has been completed that would support the presence of cognitive impairment.

Belliveau report at 1-2. Based on Dr. Belliveau's review, Liberty approved STD benefits through November 15, 2015. STD Claim Note 28 dated 10/20/2015 8:49 am by Jessica Austin.

Howard Grattan, MD (Board certified in Physical Medicine and Rehabilitation and Pain Management), on behalf of Liberty's vendor MLS Peer Review Services, completed a physical medicine and rehabilitation ("PM&R") peer review also on October 19, 2015. Despite multiple documented attempts to reach Drs. Tafreshi and Garber, he was unable to speak to either doctor. Dr. Grattan prepared a summary of medical documentation, citing to the "impression" portion of the cervical and lumbar MRI reports noting "moderate central canal stenosis" at L3-4 and "multilevel moderate foraminal stenosis" on the cervical MRI. He listed Dr. Tafreshi's multiple objective exam findings, including paracervical and paralumbar tenderness; decreased lumbar range of motion; and decreased left hand grip strength. He cited to Dr. Garber's review of cervical and lumbar x-rays showing "straightening of the cervical spine consistent with spasm; cervical disc degeneration at C4-7; idiopathic rotatory lumbar scoliosis; and lumbar disc degeneration." He cited the abnormal (4/5 and +4/5) muscle testing findings and decreased cervical and lumbar range of motions findings documented in the Kelly Hawkins physical therapy records. Finally, Dr. Grattan accurately recounted the subjective complaints Mr. Hosseinpour reported to his providers. In his conclusions, Dr. Grattan acknowledged that the medical evidence supported diagnoses of cervical and lumbar intervertebral disc degeneration and lumbar spinal stenosis. However, he opined that these findings were "mild in severity" and lacked any "quantifiable objective measurements, instability, or findings on MRI that would place the claimant at increased risk of injury." He opined that, incredibly, Mr. Hosseinpour was "not functionally impaired" and recommended no restrictions and limitations *at all*. He further opined that Mr. Hosseinpour's medications (Tramadol, Xanax, Lyrica, and Skelaxin) "would not be expected to impact his functional capacity." Independent Peer Review dated October 19, 2015 by Howard Grattan, MD ("Grattan review").

Liberty file notes indicate that Jessica Austin sent a copy of the "PM&R peer review" to Dr. Tafreshi for response. STD Claim Note 30 dated 10/21/2015 10:38 am by Jessica Austin. However, the October 21, 2015 letter to Dr. Tafreshi enclosed a copy of *Dr. Belliveau's* 4-page Clinical Case Review, not Dr. Grattan's report. See Letter dated October 21, 2015 to Dr. Tafreshi from Jessica Austin.[1] On October 27, 2015, Dr. Tafreshi faxed a letter To Whom It May Concern to Liberty, advising that Mr. Hosseinpour's condition "has not improved and in my

---

[1] The 2-page 10/21/15 letter to Dr. Tafreshi contained in Liberty's file is preceded by a fax cover page indicating that a total of seven (7) pages are being sent, and is followed by Dr. Belliveau's 4-page review (1 fax cover page + 2-page letter + 4-page review = 7 pages). Dr. Grattan's report is six (6) pages long, and does not appear to have been attached to the letter to Dr. Tafreshi.

opinion he is still unable to work." The letter further advised that Mr. Hosseinpour had an appointment to see a therapist on November 3, 2015, and would thereafter be referred to psychiatry. Ms. Austin reviewed the letter and extended STD benefits through December 5, 2015 "as the [claimant] is still out of work and has just begun treatment with therapist." STD Claim Note 31 dated 11/24/2015 2:49 pm by Jessica Austin. Ms. Austin then extended STD benefits through the January 19, 2016 STD maximum benefit period and closed out the STD claim. STD Claim Notes 32 and 33.

In the meantime, Liberty's LTD adjuster Stephen Levitt initiated investigation into Mr. Hosseinpour's eligibility for LTD benefits. On October 9, 2015, Mr. Levittt sent claim forms and an activity questionnaire to Mr. Hosseinpour, and a request for medical records to Dr. Garber. On October 12, 2015, Liberty reassigned the LTD file back to Jessica Austin. LTD Claim Note 7 dated 10/12/2015 at 12:36 pm. On October 21, 2015, Ms. Austin referred the file to its vendor, Claims Verification, Inc. (CVI), with instructions to conduct three days of surveillance of Mr. Hosseinpour to "determine whether he is working and level of physical function he maintains." Confidential Investigative Report dated October 30, 2015 by CVI at 1. Surveillance conducted over October 28, 29, and 30, 2015 produced a total of 46 seconds of images of Mr. Hosseinpour, 32 seconds of which he is seen standing outside the front of his house and is only in view from the height of his chest upwards. From these 32 seconds of grainy, distant video of Mr. Hosseinpour's chest and head, the investigator determined that he "seemed to move smoothly and with no indications of discomfort" and was not using an assistive device. The other 14 seconds of video show Mr. Hosseinpour walking slowly from his house towards the street to enter the passenger side of a vehicle parked in front of his house. The investigator reported from these 14 seconds of video that Mr. Hosseinpour "ha[d] no difficulty in this maneuver." He is seen at one point during the 14 seconds placing his right hand on the small of his back. Liberty's claim file does not contain documentation of any assessment of the video.

On October 25, 2015, Dr. Belliveau wrote to Dr. Tafreshi, asking Dr. Tafreshi to ensure that Dr. Belliveau had accurately summarized their conversation regarding Mr. Hosseinpour's symptoms, diagnoses, and impairments. Dr. Tafreshi responded on October 27, 2015, stating that he had.

Mr. Hossseinpour completed the claim forms and activities questionnaire and returned them to Liberty on November 22, 2015, indicating that he was only able to sit for 30 minutes to 2 hours; stand 5-10 minutes, and walk 10-15 minutes although at times he needed to lean or grab onto something when walking to avoid losing control and falling. He stated he was unable to work due to anxiety attacks 3-4 times per day limiting his ability to focus and concentrate which he feared would affect his ability to properly fill patients' prescriptions; depression causing tiredness, loss of energy, and difficulty concentrating with racing thoughts; neck pain radiating into his head and causing severe migraines and interfering with concentration and focus; pain into his left arm and hand causing numbness and tingling in his fingers; and severe low back pain radiating into his hips and thighs preventing him from standing or walking more than 5 minutes.

On November 30, 2015, Ms. Austin wrote to Kelly Hawkins Physical Therapy requesting medical records; to Drs. Tafreshi and Garber requesting updated records and completion of a Restrictions Form; and to Dynamic Futures, LLC (Mr. Hosseinpour's mental health providers)

requesting medical records and completion of a Functional Mental Status Evaluation Form.[2] On January 26, 2016, Ms. Austin confirmed receipt of records from Kelly Hawkins.

On February 3, 2016, Ms. Austin spoke to Mr. Hosseinpour regarding his medical status and the status of Liberty's medical records request. He advised that he had not seen Dr. Garber since 9/15, and was in any case looking for a second opinion regarding possible surgery. He explained to Ms. Austin that the combination of neck pain and anxiety was keeping him out of work; that he was having panic attacks 1-5 times a day and taking Xanax three times a day for anxiety; was also taking Remeron for depression and gabapentin for pain; that his neck pain was so bad that it radiated through his body and caused migraine headaches; and that he was not able to stand for more than 10 minutes or bend his head forward due to neck and back pain. He stated he did not know if he would return to work, given his current state. Ms. Austin's Phone Note 9 documenting the call indicates that she "confirmed Extension thru 2/10," but advised Mr. Hosseinpour that Liberty would need to make a decision at that point. <u>LTD Phone Note 9 dated 2/3/2016 at 3:30 pm</u>.

On February 4, 2016, Ms. Austin confirmed receipt of updated records from Dr. Tafreshi for dates of service October 27, 2015, December 21, 2015, and January 28, 2016. Subjective reports in the October 27th OVN included continued panic attacks with associated heart racing 3-4 times a day; unhappiness; lack of desire; persistent neck and back pain at 9/10 pain level; and difficulty sleeping due to pain. Objective exam findings were unchanged from his last visit. Dr. Tafreshi noted on December 21, 2015 that Mr. Hosseinpour had seen his psychiatrist, Mark Collins, who prescribed Remeron for depression. Subjective and objective findings remained unchanged. In his January 28, 2016 office visit note, Dr. Tafreshi again noted "no changes" in Mr. Hosseinpour's subjective reports, with persistent severe anxiety and depression; panic attacks; insomnia; difficulty concentrating; neck and back pain; left arm and hand weakness and dropping things; and headaches. He noted that Mr. Hosseinpour's prognosis was "poor," and recommended follow-up care with psychiatry. Dr. Tafreshi did not complete the Restrictions Form.

A February 17, 2016 file note by Ms. Austin indicates that Liberty consultant physician "Monti" performed a PM&R review of the file and opined that the medical records did not support impairment from working. <u>LTD Claim Note 29 dated 2/17/2016 at 10:15 am by Jessica Austin</u>. Although Liberty's claim file includes a curriculum vitae of David A. Monti, Jr., MD, **there is no documentation in the file of any review by Dr. Monti himself.** In an Action Plan of the same date (LTD Claim Note 30), Ms. Austin referred the file back to Dr. Grattan for PM&R peer review addendum for "comment on additional records and current level of impairment." She also referred the file for psychiatry addendum, despite having only received updated records from Dr. Tafreshi *but not* from Mr. Hosseinpour's mental health providers at Dynamic Futures. Liberty did attempt to obtain records from Dynamic Futures several times (faxed requests on November 30, 2015, December 18, 2015, and January 25, 2016, and phone call on February 3, 2016), but did not wait to receive those records prior to referring the file for psychiatry peer review addendum. Furthermore, Liberty failed to notify Mr. Hosseinpour that it was sending the file for psych review *without* those records. <u>See</u> <u>Letter to Abolfazl Hosseinpour dated February 17, 2016 from Jessica</u>

[2] However, it does not appear (from the page count on the fax cover pages) that Ms. Austin included a signed HIPAA authorization from Mr. Hosseinpour in any of her November 30th letters to his providers. All of the requests were re-faxed on December 18, 2015, each with an additional page, presumably the signed HIPAA authorization.

Austin (advising that the file had been referred "for a medical review and assessment by a Board Certified physician," but not otherwise discussing the fact that the file was also being sent for psychiatry review despite not having received his mental health records).

Ms. Austin also referred the file for occupational analysis. Amanda Voce, Liberty's Vocational Case Manager (VCM), prepared an Occupational Analysis on February 17, 2016 for Mr. Hosseinpour's job as a Pharmacy Manager, identifying the Dictionary of Occupational Titles's (DOT's) job description for "Pharmacist" as the occupation most closely related to a Pharmacy Manager. She cited the full "job description" portion of the Job Description for Pharmacy Manager from Mr. Hosseinpour's employer (but did not list "physical demands" listed on the same job description which include, *inter alia*, constant standing and frequent walking). Ms. Voce stated that she reviewed the O*Net 2013 survey of incumbents regarding the physical demands of the occupation (i.e., the "work context" list in the Details Reports for "Pharmacists"). She did not, however, discuss those physical demands. She stated that an internet labor market search identified a "variety of Pharmacists" including Order/Remote Pharmacist; Managed Care and Pharmacy Benefit Management Pharmacist; Medication Management Center Pharmacist; and Informatics Pharmacist (all considered "Consultant Pharmacists"), as well as Pharmaceutical Industry Pharmacist; Clinical Pharmacist; and Community Pharmacist. She stated that these jobs "span from the sedentary and light physical demand levels." She listed the cognitive demands of a Pharmacist. She then concluded that the typical physical demands of a Pharmacist "are most often sedentary and light in physical demand." She further stated that part-time opportunity exists for the occupation.

On February 22, 2016, Mr. Hosseinpour called Liberty and left a message inquiring whether Liberty had received the missing records. Ms. Austin returned his call the same day and left him a message advising that the Dynamic Futures records had not been received, but "since the deadline has expired, we are having [the] file reviewed based on the info currently on file." LTD Phone Note 11 dated 2/22/2016 at 1:37 pm by Jessica Austin. On February 26, 2016, Mr. Hosseinpour left another message for Ms. Austin regarding the missing records, and she again returned his call and left him a message, this time stating that "if information was received [from Dynamic Futures], it would be forwarded to CP for review." LTD Phone Note 12 dated 2/26/2016 at 10:45 am by Jessica Austin.

Liberty referred the file back to Dr. Grattan for PM&R addendum, asking him to review updated records and opine whether Mr. Hosseinpour currently had "full-time **sedentary** work capacity." 02/17/16 Peer Review Referral (emphasis added). Dr. Grattan prepared an Addendum to his October 19, 2015 Peer Review on February 25, 2016 ("Grattan Addendum"). His list of records reviewed includes a progress note from Dr. Tafreshi dated August 5, 2015; notes from Dr. Garber dated July 16, 2015 and September 17, 2015; updated records from Kelly Hawkins; the claim forms completed by Mr. Hosseinpour; the Job Description; Dr. Tafreshi's October 27, 2015 letter; and the CVI surveillance report. He attempted a peer-to-peer call to Dr. Garber, but was told by "Lisandra" at Dr. Garber's office that Mr. Hosseinpour was last seen "back in 06/15", and that Dr. Garber had "nothing to add...". Dr. Grattan's Addendum contains no discussion of Dr. Tafreshi's updated treatment notes from October, December, and January. He did not contact Dr. Tafreshi. Based on his review, Dr. Grattan opined that Mr. Hosseinpour had "full time sedentary work capacity" with no restrictions or limitations. He provided no rationale for his opinion. He further opined that the surveillance information conflicted with Mr. Hosseinpour's self-reported limitations (in standing and walking), as it showed him "moving smoothly and with no indications of discomfort." He did not discuss the cervical and lumbar MRI findings.

On March 14, 2016, Dr. Belliveau prepared an Addendum to his October 19, 2015 review ("Belliveau Addendum"). Dr. Belliveau reviewed Dr. Tafreshi's office visit notes from October, December, and January and acknowledged Dr. Tafreshi's reports that Mr. Hosseinpour's condition remained "unchanged." He wrote that the "interim history is notable for the claimant's report of continued anxious and depressed moods, panic attacks, pain, sleep problems, and concentration problems." Nonetheless, Dr. Belliveau opined that the records provided "insufficient support for the presence of continued psychiatrically-based functional impairment or associated need for occupational restrictions / limitations beyond approximately 11/15/15" due to the lack of "any documented behavioral changes" or "mental status or cognitive assessment data that would support the presence of cognitive impairment." Belliveau Addendum at 2-3. He recommended further review if subsequent mental health records were received.

Liberty denied Mr. Hosseinpour's LTD claim in a letter dated March 22, 2016 based on Ms. Voce's occupational analysis classifying his own occupation as "sedentary to light"; Dr. Grattan's opinion that Mr. Hosseinpour has full-time sedentary work capacity; and Dr. Belliveau's addendum addressing the lack of mental health records to support a psychiatric impairment. Liberty's denial letter cites the policy's provision with regard to the time frame for providing Proof of loss ("90 days after the end of the Elimination Period"); cites its multiple unsuccessful attempts to obtain psychiatric records; then cites Dr. Belliveau's Addendum pointing to the absence of such records as lack of support for any psychiatric impairment. Liberty readily admits in its denial letter that it is "unable to assess [Mr. Hosseinpour's] level of impairment from a psychiatric standpoint." Denial letter at 4.

**B. Liberty's Investigation was Inadequate**

*i.* ***Liberty relied on Dr. Grattan's flawed review to determine that Mr. Hosseinpour had no physical restrictions and limitations* at all**

Sadly, Dr. Grattan's review is flawed in several ways. He incorrectly states that "motor strength is 5/5" (based only on Dr. Garber's findings but ignoring the Kelly Hawkins findings). Despite including in his summary of records the abnormal cervical and lumbar ranges of motion listed in the Kelly Hawkins physical exam findings, he claims there to be no "quantifiable objective measurements" to place Mr. Hosseinpour "at increased risk of injury." Dr. Grattan provides no rationale for his conclusion that Mr. Hosseinpour's physical exam and MRI findings are so "mild in severity" as to render him "not functionally impaired" or not "at increased risk for injury" such that restrictions and limitations were not warranted. No reasonable reading of the MRI reports – even from a layman's point of view – would suggest that the findings were in any way "mild," and, when coupled with Mr. Hosseinpour's reported pain levels, the MRI findings support his impairments in prolonged standing and walking, repetitive neck movements, and lifting/ carrying.

The lumbar MRI showed *moderate central canal stenosis* at the L3-L4 level. This is not an insignificant finding and explains what is likely affecting Mr. Hosseinpour's ability to be on his feet for long periods: in essence, the passageway through which his spinal column passes at the L3-L4 level is narrowed by degenerative changes, compressing the neural elements of the spinal cord and reducing the blood flow to the nerves that provide sensation and motor control to the legs. See www.mdguidelines.com/spinal-stenosis (**Exhibit 1**)(MD Guidelines' overview of spinal stenosis). Cardinal symptoms of lumbar stenosis (per the MD Guidelines) include low

back pain, pain radiating into the legs, and intolerance for walking – the very complaints Mr. Hosseinpour consistently reports to his providers. Furthermore, as discussed in the Guidelines, physical examination for patients with lumbar stenosis will generally be unremarkable for neurologic findings, except in cases of severe stenosis. Id. And whether Mr. Hosseinpour is at "increased risk for injury" as Dr. Grattan remarks is irrelevant; Mr. Hosseinpour has pain symptoms emanating from a spinal condition evidenced on imaging studies that prevent him from performing an essential duty of his job. No one asked Dr. Grattan to assess his injury risk.

Perhaps most disturbing of all is Dr. Grattan's contention that there is "no evidence of definitive neural compromise on MRI." Again, even a layman's reading of the MRI belies such statement. Cervical MRI findings at the cervical C4-5 level revealed "**moderate to marked** narrowing of both neural foramen with possible encroachment on the exiting C5 nerve roots...". Here, the passageway (foramen) through which the C5 nerves leaving the spinal cord at both sides of the C4-5 vertebral level are narrowed – *in this case to a moderately or marked degree* – causing localized neck pain and pain, weakness, and numbness into both arms and particularly into his left arm and hand – hallmarks of cervical foraminal nerve compression (i.e., "encroachment"). MRI findings at the C5-6 level similarly showed evidence of "moderate narrowing of both neural foramen, slightly worse on the right side with possible mild impingement on the exiting right C6 nerve root," and "moderate narrowing of the right neural foramen" at the C6-7 level. To read these findings as "no evidence" of neural compromise is quite simply to ignore plain facts, and Dr. Grattan's opinion that Mr. Hosseinpour is not functionally impaired based on these finding cannot be relied upon to support claim denial.

To treat the pain related to his spinal conditions, Mr. Hosseinpour is prescribed Tramadol, an opioid pain medication with common side effects of decreased alertness, dizziness, and rash/itching among others. He also takes Xanax, an anti-anxiety medication. Common effects of Xanax include drowsiness, fatigue, dizziness, and difficulty concentrating. Lyrica is prescribed for him to treat neuropathic pain. Commonly reported side effects of Lyrica include blurred vision, ataxia, dizziness, headache, diplopia, drowsiness, tremor, fatigue, and visual field loss. Skelaxin is a muscle relaxant producing common side effects of drowsiness, dizziness, headache, and nervousness. Dr. Grattan contends that these medications "would not be expected to impact [Mr. Hosseinpour's] functional capacity." Perhaps not, if Dr. Grattan had been asked to assess Mr. Hosseinpour's functional capacity for say, testing chair cushions. Dr. Grattan knows however that Mr. Hosseinpour is a Pharmacist, an occupation with considerable cognitive skill requirements where focus and concentration are crucial to the safety of patients. Any one of these medications has the potential to reduce his cognitive abilities; one can only imagine the cumulative effect of taking them in combination.

Any fair assessment of the surveillance video, as suggested on page 7 *supra*, would have to conclude at a minimum that Mr. Hosseinpour was only surveilled for 46 seconds over three (3) days and that surveillance did not undermine in any way his reported limitations. One could also readily conclude that the surveillance supports his limitations in that it shows a slow gait and weakness in his back. For Dr. Grattan to rely on this surveillance to assert that Mr. Hosseinpour was "moving smoothly and with no indications of discomfort" (see page 9, *supra*) means he either did not see this video or simply refused to acknowledge what it plainly showed.

*ii.* ***Liberty failed to perform an adequate occupational analysis. Recent FCE findings demonstrate that Mr. Hosseinpour cannot perform his job duties over an 8-hour workday.***

Liberty referred the file for Occupational Analysis on February 17, 2016 with instructions to filter for *sedentary* capacity *prior* to the completion of Dr. Grattan's addendum in which he was asked to determine Mr. Hosseinpour's physical capacity! As Liberty was aware from the job description already received from Mr. Hosseinpour's employer, his occupation as "Pharmacy Manager" was clearly not a sedentary job, listing physical requirements of, *inter alia,* constant standing; frequent walking; constant neck rotation, bending of the head, and twisting; occasional bending/stooping; constant lifting of 1-10 pounds and occasional lifting of 11-20 pounds; frequent carrying of 1-10 pounds; frequent pushing/pulling of 1-10 pounds; constant knee- to shoulder-level reaching; and occasional at- or above-shoulder level and overhead reaching – hardly a sedentary-level occupation.

Nonetheless, Liberty's VCM Amanda Voce was tasked with the job of trying to classify Mr. Hosseinpour's job as a sedentary position. She started by conspicuously failing to list the physical requirements in the employer's job description for "Pharmacy Manager." She then matched Mr. Hosseinpour's job as "Pharmacy Manager" to "Pharmacist" in the Dictionary of Occupational Titles (DOT), but conveniently failed to mention that the DOT description for "Pharmacist" lists the strength rating for the job as "light," not sedentary. See **Exhibit 2** (DOT Job Description for "Pharmacist"). She then states that she reviewed the O*Net 2013 survey regarding the physical demands for a Pharmacist, but again failed to discuss those demands in her analysis. Had she done so, she would have found that the O*Net Details Report for a "Pharmacist" indicate that 63% of respondents state the job requires "continually or almost continually" standing (in addition to numerous other physical work activities that clearly extend beyond a sedentary demand). See **Exhibit 3** (O*Net Details Report for Pharmacist listing "continual standing" in "work context" heading). A typical occupational analysis under the "own occupation" review would have ended there. However, Ms. Voce, having failed to fulfill her mission to somehow classify Mr. Hosseinpour's job as sedentary as per Liberty's mandate, took her review one step further with her own *undocumented* internet "labor market research" to identify a subset of "consultant" and "clinical" pharmacists whose strength ratings "span from the sedentary and light physical demand levels." Bingo. Mission accomplished.

Liberty clearly went out of its way to expand Mr. Hosseinpour's job title to include a sub-set of pharmacist occupations far removed from his actual job as a Pharmacy Manager in order to decrease the strength requirement to sedentary to achieve its goal of claim denial. It completely ignored the physical requirements of Mr. Hosseinpour's Own Occupation. Furthermore, Liberty made no consideration whatsoever for the high level of *cognitive* requirements of the job, especially important here where Mr. Hosseinpour has expressed concern for making mistakes in filling prescriptions due to difficulty with focus and concentration caused by his pain symptoms and panic attacks.

In an effort to assess and document his physical abilities, Mr. Hosseinpour underwent a formal Functional Capacity Evaluation with Doug Ellis, PT at ATI Physical Therapy on August 26, 2016. During testing, Mr. Ellis noted that Mr. Hosseinpour exhibited limited tolerance for sitting, frequently changing his position and sitting with an altered posture. He was noted to walk slowly and favor his left leg, which increased with increasing levels of activity. Cervical ranges of motion were measured using an angle inclinometer/Goniometer, and were recorded at 40 degrees in forward flexion (50-60 considered normal); 20 extension (55-60 normal); 20 bilateral lateral bending (40-45 normal); and 45 in bilateral rotation (80 considered normal), with pain reported as the limiting factor. Lumbar flexion was measured at 35 degrees (of 60 normal); extension 25 (near normal); bilateral lateral bending 20 (of 25-30 normal); and rotation 25 degrees

bilaterally (near 30 normal). Following extensive physical ability testing, Mr. Ellis made the following recommendations:

> This client demonstrated the ability to perform limited work activities. This would include occasional lifting and carrying of less than 10 pounds. He would be able to perform frequent lifting and carrying of less than 5 pounds. He was unable to perform any lifting from below the height of 21" above the floor. He was unable to perform any lifting above the height of 66" above the floor. He was able to perform occasional pushing and pulling producing average forces of up to 50 pounds. This client was unable to perform full squatting. He was able to perform less than occasional one-half squatting activities at best. This client should avoid any kneeling or crawling. Any kneeling or crawling should be performed only with the use of a support to enable him to obtain and return from these positions. This client was able to perform less than occasional rotational activities involving his thoracic/ lumbar spine. He was unable to perform any constant cervical rotation. He was able to perform less than occasional bending to reach to work to the height of 27" above the floor. He was able to perform less than occasional reaching to work to the height of 69" above the floor. This client should avoid the climbing of stairs. Any stairs to be ascended or descended should be done only with the use of a hand railing for safety. This client should be restricted from performing any climbing of ladders, structures or stools. He should be allowed to change his position on an as needed basis. Continuous standing or walking should not exceed 15 to 20 minutes. Continuous sitting should not exceed 20 minutes. This client should be restricted from performing constant sitting, standing or walking. It is questionable as to whether or not this client would be able to maintain a competitive work pace over an 8 hour work shift. It is questionable as to whether or not this client would be able to maintain a competitive work pace over a 40 hour work week. These questions should best be addressed by his present primary care physician. There are no other recommendations to limit his work activities at this time.

See Functional Capacity Evaluation by Doug Ellis, PT dated August 26, 2016 at 1-2 ("FCE") **(Exhibit 4)**. A functional capacity evaluation constitutes objective proof of disability. See e.g., Calvert vs. Firstar Finance, Inc. 409 F.3d 286, 296 (6th Cir 2015). As to validity, Mr. Ellis noted that Mr. Hosseinpour "was consistent in his demonstrated inability to perform functional activities as noted during this evaluation," and that "[t]he results of this evaluation have been determined to be reliable." FCE at 2. In sum, Mr. Ellis recommended the following physical restrictions and limitations:

> Lifting and Carrying: occasional less than 10 pounds, frequent less than 5 pounds
> No lifting from below the height of 21" from the floor or over 66" from the floor
> Pushing and Pulling: occasional up to 50 pounds
> No squatting, kneeling, crawling, or climbing ladders, structures or stools
> Rotational activities involving thoracic/ lumbar spine: less than occasional
> No constant cervical rotation
> Bending: less than occasional
> Reaching above shoulders: less than occasional
> Change position on an as-needed basis
> Continuous standing or walking limited to 15 to 20 minutes
> Continuous sitting not to exceed 20 minutes
> NO constant sitting, standing or walking

These R&L's restrict Mr. Hosseinpour from performing nearly all of the physical duties of his job, including constant lifting of 1-10 pounds and occasional lifting of 11-20 pounds; frequent carrying of 1-10 pounds; constant neck rotation, bending of the head, and twisting; use of a step stool; occasional reaching at- or above-shoulder level and overhead reaching; and most importantly, constant standing and frequent walking.

As if the foregoing documentation was not enough to show that Mr. Hosseinpour is functionally disabled from his own occupation, Liberty's Amanda Voce only concluded he could perform *part-time* work, not *full-time* work. If Mr. Hosseinpour is only capable of part-time work, *as Liberty itself asserts*, then he is totally disabled from his own occupation under Liberty's policy definition.

*iii.* ***Liberty ignored Mr. Hosseinpour's own report of subjective complaints in support of disability.***

Although Liberty asked Mr. Hosseinpour to describe in the claimant questionnaire the impairments that prevented him from working, Liberty did not lend any credence to his reports of pain and impairment, which is another factor warranting reversal of its termination of benefits. See White vs. Coblentz, Patch and Bass LLP Long Term Disability Insurance Plan, 2011 WL 2531193, *5, citing Patrick vs. Hewitt-Packard Co. Emp. Benefits Org. Income Protection Plan, 638 F.Supp.2d 1195, 1215 (S.D.Cal.2009)(ERISA insurer's approach of "disregarding subjective evidence of pain is disapproved in Ninth Circuit precedent"). Liberty has been repeatedly criticized for ignoring subjective reports of pain. See, e.g., James vs. Liberty Life Assurance Co. of Boston, 582 F. Appx 581, 589 (6th Cir 2014); Sikkema vs. Liberty Life at *9-10 (W.D. Mich Sept. 6, 2016)(Hon. Paul Maloney)(citing *James* with approval). As discussed in Section A *supra*, Mr. Hosseinpour reported in the claimant questionnaire that due to his pain symptoms he was only able to sit for 30 minutes to 2 hours; stand 5-10 minutes, and walk 10-15 minutes (and sometimes needed to lean on or grab something to avoid falling); that he suffered anxiety attacks 3-4 times per day limiting his ability to focus and concentrate and interfering with his ability to properly filling patients' prescriptions; he suffered neck pain radiating into his head and causing severe migraines, also interfering with concentration and focus; he had pain into his left arm and hand causing numbness and tingling in his fingers; and he suffered severe low back pain radiating into his hips and thighs interfering with his ability to walk for more than 5 minutes.

As discussed in the following section, the Social Security Administration (SSA) also asked Mr. Hosseinpour to describe how his condition limits his ability to work but in its case, the SSA *did* consider his reports as evidence of disability. In the SSA Function Report, Mr. Hosseinpour explains that his low back pain transfers to his hip, legs, and knees making it impossible for him to stand all day at the pharmacy, with pain so severe at time he loses his balance or control when walking. He states that his neck pain "shoots to his head" causing migraine headaches and making it impossible to focus on the preparation of his patients' prescriptions. He worried that his difficulty concentrating would interfere with his accuracy in filling prescriptions and that he might make a mistake and possibly harm or kill a patient. He also described having anxiety attacks 3-4 times a day at work with symptoms of overheating and peart racing, causing him to lose focus and concentration. He sometimes thought he was about to die from the attacks. He reported depressive symptoms with racing thoughts and flashbacks of the death of his parents, his best friend, and a cousin in an auto accident. He had visions of himself having a panic attack while driving over bridges. He was concerned for the safety of his patients due to these multiple distractions. The SSA Function Report is enclosed for review as **Exhibit 6**.

C. **Social Security Administration's finding of total disability**

The Liberty LTD policy requires that Mr. Hosseinpour apply for Social Security Disability (SSD) insurance benefits. Mr. Hosseinpour applied for and was awarded SSD benefits *after only his initial application.* The Social Security Administration (SSA) notified him of the award in a letter dated July 1, 2016, with an established onset date of July 14, 2015. See Notice of Award (Exhibit 5). Mr. Hosseinpour's monthly SSD benefit was calculated at $2,171.00, which Liberty will apply as an offset to its monthly benefit should it reverse its decision.

In making its decision to award SSD benefits, the SSA considered the *same set of medical records* Liberty relied upon to *deny* Mr. Hosseinpour his LTD benefits. In addition, the SSA considered the subjective complaints detailed by Mr. Hosseinpour in a Function Report as evidence of his disability (**Exhibit 6**). Following physical and psychological evaluations of Mr. Hosseinpour commissioned by the SSA after considering his subjective complaints and his doctors' reports, the SSA determined that he was disabled from a primary diagnosis of **Discogenic and Degenerative Disorder of the Back** and a secondary diagnosis of **Affective Mood Disorder**. See Disability Determination and Transmittal ("DDT")(**Exhibit 7**).[3]

While it is true that the criteria for an award of Social Security Disability differ from the requirements necessary to meet the definition of disability in the subject policy, Liberty cannot ignore the *evidence* upon which the SSA bases its decisions. As Liberty most assuredly knows, the Social Security Administration only considers a claimant disabled:

> if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. §1382c(a)(3)(A). Indeed, the SSA notified Mr. Hosseinpour in the Award letter that his claim would not even be reviewed again for another 5-7 years! Further, the interpretive guidelines clarify that payment of benefits will occur only after sufficient medical evidence has been presented showing that the claimant is totally disabled:

> The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this definition, you must have a severe impairment(s) that makes you unable to do your past relevant work (see § 404.1560(b)) or any other substantial gainful work that exists in the national economy. If your severe impairment(s) does not meet or medically equal a listing in appendix 1, we will assess your residual functional capacity as provided in §§404.1520(e) and 404.1545. (*See* §§404.1520(g)(2) and

---

[3] Please note: Box 34 of the DDT under "remarks" states: "Claimant capable per [psychologist] Lisa Foerster report..." My office was advised by "Ms. Long" of the Social Security Administration's local Las Vegas office that this remark refers to Mr. Hosseinpour's ability to "handle money." If necessary, feel free to confirm this information directly with the SSA or with your own SSA unit.

404.1562 for an exception to this rule.)

See 20 Code of Federal Regulations § 404.1505(a) (regulations interpreting 42 U.S.C. §1382c(a)(3)(A)). See also, e.g., *Glenn v. MetLife,* 461 F.3d 660, 668 (6th Cir.2006) (a plan administrator's decision to deny benefits where Social Security disability benefits have been awarded under a more stringent definition than the policy definition can be considered arbitrary and capricious); see also *Pierce v. American Waterworks Co.*, 683 F.Supp. 996, 1000 (W.D.Pa.1988), (rejecting the conclusions of a doctor who performed a paper review of the medical record over the credible conclusions of the primary treating physician and a Social Security Administrative Law Judge). Here, Mr. Hosseinpour's claim is in the own occupation stage, not even the "any occupation" stage. The fact that the SSA awarded him total disability benefits under its narrow standards, on his first time and without representation by a vendor or an attorney, is compelling evidence that Liberty cannot dismiss but must consider. Again, Mr. Hosseinpour only has to prove to Liberty by a preponderance of the evidence that he is disabled from his occupation as a Pharmacy Manager, not disabled from any occupation, as he successfully did *on his own* to the Social Security Administration.

**D. Additional medical documentation supporting disability**

Enclosed are updated medical records from Dr. Tafreshi (**Exhibit 8**) and the records from Mr. Hosseinpour's mental health provider at Dynamic Futures (**Exhibit 9**). Dr. Tafreshi also completed a functional assessment. A summary of these records follows:

Mr. Hosseinpour presented for psychiatric initial evaluation with Mark Collins, DO of Dynamic Futures on December 11, 2015 with reports of neck and low back pain; trouble sleeping; loss of appetite; loss of interest; significant panic attacks and anxiety; "subtle post-traumatic stress disorder symptoms"; hearing buzzing noises; and poor memory. He was currently taking Gabapentin 300mg 3x/day; Xanax 1 mg 3x/day; Tramadol (an opioid pain medication) as needed; Paxil 40mg/day; and Finasteride 5mg/day (for prostate issues). Dr. Collins' findings on a mental status exam included: significant psychomotor irritability/agitation; questionable flashbacks; depressed mood; anxious affect; short-term memory 3/3 immediate and 0/3 recent; knows president is Obama but does not know who the vice-president is; abstract thinking intact; and fair insight and judgment. Dr. Collins assessed Axis I diagnoses of: Major Depression, Recurrent, Moderate; rule out psychosis; Panic Disorder without Agoraphobia; Generalized Anxiety Disorder; rule out PTSD; rule out cognitive disorder, NOS. He assessed Mr. Hosseinpour's GAF (Global Assessment of Functioning) at 50 (indicative of serious impairment in social, occupational, or school functioning). He referred Mr. Hosseinpour for labwork; added Remeron 15mg at bedtime (anti-depressant); and increased Gabapentin to 600mg in the AM, 300mg at noon, and 600mg at 5:00 PM for a week and then 600mg 3x/day after a week for anxiety and pain. He suggested a possible trial of Cymbalta; switching Xanax to Klonopin; adding Namenda for cognition, pain, and mood; or a trial of Tegretol or Lamictal for pain and mood.

Mr. Hosseinpour began taking Remeron as directed and returned to see Dr. Collins on February 19, 2016 with reports of continued neck and back pain; hearing buzzing noises; and neurovegetative depressive symptoms (not further described by Dr. Collins). He reported a subtle improvement in his sleep. Exam showed him to be anxious and somewhat irritable, with depressed mood, questionable flashbacks, and stable cognitive functions. Labwork showed mild CBC abnormalities. Dr. Collins assessed a GAF of 52 (GAF scores of 51 - 60 indicate "moderate

symptoms", for example, flat affect and circumlocutory speech, and occasional panic attacks, or moderate difficulty in social, occupational, or school functioning). He noted a diagnosis of Cognitive Disorder "secondary to medical issues." He discontinued Paxil and started Effexor XR 150mg/day.

Mr. Hosseinpour has remained under the regular care of his primary care physician, Dr. Tafreshi, for medication management. In follow-up on March 29, 2016, he presented with subjective complaints of persistent neck and back pain; left arm and hand weakness; pain radiating into both legs; severe anxiety and depression; panic attacks; insomnia; and difficulty concentrating. He was using a lumbar brace. Exam findings included depressed mood; paracervical tenderness; decreased lumbar range of motion; and decreased left hand grip. Diagnoses included severe recurrent Major Depressive Disorder; cervical disc degeneration; lumbar spinal stenosis; and pure hyperglyceridemia. Dr. Tafreshi recommended he continue his meds; referred him for pain management; and recommended he follow up with psychiatry. One month later, on April 28, 2016, Mr. Hosseinpour returned to see Dr. Tafreshi advising that he had been unable to see a pain management specialist due to lack of insurance. Subjective reports remained the same. He was now using a neck brace at home. He requested a refill of Effexor. Findings were similar in follow-ups with Dr. Tafreshi on May 30, 2016 and again on July 11, 2016. Dr. Tafreshi continued to prescribe Xanax for anxiety; Fioricet/Codeine for headaches; Cymbalta for depression; Tramadol for pain; Ambien for sleep; and Paxil/Effexor for mood.

As suggested by Mr. Ellis in his Functional Capacity Evaluation, see *supra* at 12-13 for this discussion, his findings were forwarded to Dr. Tafreshi for review and comment regarding whether Mr. Hosseinpour could maintain a competitive work pace over an 8-hour work shift/40-hour work week. On September 15, 2016, Dr. Tafreshi completed a Physical Impairment Residual Functional Capacity Questionnaire and Non-Exertional Function Assessment based on his physical exam and observations of Mr. Hosseinpour, objective testing, and Mr. Ellis's findings (**Exhibit 10**). In the questionnaire, Dr. Tafreshi states Mr. Hosseinpour is physically impaired by severe pain in his neck and back (with pain radiating into his hips and legs), and is unable to perform the listed duties of his job over an 8-hour work day, 40 hours per week due to his inability to sit, stand, bend, or concentrate and because of his difficulty with focus and decision-making. Exhibit 10 (responses to Questions Nos. 9 and 10). He notes medication side effects of drowsiness and inability to drive. He recommends physical R&L's similar to Mr. Ellis's. In addition, Dr. Tafreshi states that Mr. Hosseinpour has marked impairment in his ability to maintain attention and concentration for extended periods; is unable to tolerate normal levels of stress; and would have moderate difficulty understanding, remembering, and carrying out detailed instructions, all of which would clearly have a negative impact on his ability to accurately fill prescriptions and manage a pharmacy.

## E. Conclusion

As you know, a fiduciary of an ERISA plan must adequately investigate a claim; ask the plaintiff for necessary evidence; and credit a claimant's reliable evidence. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 968 - 969 (9th Cir.2006)(emphasis added); *accord,* Boonton v. Lockheed Medical Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997). This duty mandates that the plan administrator engage in "meaningful dialogue" with the beneficiary. Id. "If the administrator believes more information is needed to make a reasoned decision, they must ask for it." Id.; see also Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 538 (9th Cir. 1990). The Tenth Circuit

has stated that ERISA fiduciaries "cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement." Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 773 (10th Cir. 2004) (citations omitted).

Based on the evidence submitted here – the FCE report; the SSA determination; Liberty's own conclusion that he can only perform part-time work; the opinion of his treating doctor based on his medical treatment and first-hand observations; and his own subjective complaints – as well as the points made here analyzing Liberty's initial decision, and the relevant case law, please review this claim anew and pay Mr. Hosseinpour his past due LTD benefits and ongoing monthly benefits, subject to ongoing proof.

If Liberty or any of its peer reviewing doctors, as part of Liberty's appeal review, wishes to speak with or otherwise contact Dr. Tafreshi or any other of Mr. Hosseinpour's treating physicians, please be sure to provide a proper authorization to the treating physician prior to making contact. Also, if Liberty or any of its peer reviewers encounter any difficulty *whatsoever* in speaking with his doctors, please contact my office to facilitate that contact. I and my paralegal Robin are readily available to assist you.

Very truly yours,

Julie A. Mersch, Esq.

JAM/rmj

| | | |
|---|---|---|
| enclosures: | Exhibit 1: | MD Guidelines article on spinal stenosis |
| | Exhibit 2: | DOT's description for Pharmacist |
| | Exhibit 3: | O*Net Details Report for Pharmacist |
| | Exhibit 4: | Functional Capacity Evaluation by Doug Ellis, PT |
| | Exhibit 5: | SSA Notice of Award |
| | Exhibit 6: | SSA Function Report |
| | Exhibit 7: | SSA Disability Determination and Transmittal |
| | Exhibit 8: | Updated medical records from Dr. Tafreshi |
| | Exhibit 9: | Medical records from Dynamic Futures |
| | Exhibit 10: | Physical Impairment Residual Functional Capacity Questionnaire and Non-Exertional Function Assessment by Dr. Tafreshi |

W:\HOSSEINPOUR\LTRS\Austin.Liberty.Appeal.091916.wpd

7Q266160020

# EXHIBIT 1

EXHIBIT 1

010101 Visit the NEW MDGuidelines® site Tutorial | Help

ReedGroup MDGuidelines

Search by keyword or medical code

User Name: Password: Sign in

Directory Print Email Advanced Search SHARE



Apply For Disability Now

Social Security Disability Benefits Take Our Free 1 Minute Evaluation

# Spinal Stenosis

**Medical Codes**

**ICD-9-CM:** 723.0, 724.00, 724.02, 724.09, 724.9

**Overview**

Spinal stenosis is a narrowing of the spinal canal, the passageway in the spinal column, made of stacked vertebrae, through which the spinal cord and nerves pass. Spinal stenosis primarily occurs in the low back (lumbar spine) but may also occur in the middle back (thoracic spine) and the neck (cervical spine).

Stenosis is classified as primary or secondary stenosis. Primary stenosis, which is also called congenital stenosis, is a developmental abnormality that results in narrowing of the canal. It is usually diagnosed in younger individuals who develop symptoms of stenosis. Secondary stenosis is a degenerative condition associated with changes in the spine that occur as part of the natural aging process. Changes may include bone spur or osteophyte formation, facet hypertrophy, bulging discs, and ligamentous hypertrophy. Secondary stenosis can also occur as a result of back surgery or trauma (acquired stenosis). Secondary stenosis is the most common type of spinal stenosis.

Individuals may also have a combined form in which primary stenosis is worsened by the development of secondary stenosis. The combined form occurs in individuals who are born with narrow spinal canals, which undergo further narrowing as a result of degenerative or postoperative changes.

In lumbar stenosis, narrowing of the spinal canal compresses the neural elements and reduces the blood supply to the nerves that supply sensation and motor control to the legs. Individuals most commonly present with complaints of fatigue or heaviness in their legs that occurs with walking and is relieved by sitting. In severe cases, even the nerves controlling bowel and bladder emptying may be affected. There are three places where the spinal nerves might be compressed, and the stenosis may be described by location: in the central canal of the spinal column (central stenosis), as the nerves leave the spinal column (foraminal stenosis), or just after the nerve has left the canal (lateral stenosis). Foraminal stenosis is the most common and typically affects the roots that comprise the sciatic nerve.

**Incidence and Prevalence:** Five in 1,000 individuals over age 50, or about 250,000 to 500,000 individuals in the US, have symptoms of spinal stenosis (Hsaing). Because most individuals with mild spinal stenosis have no symptoms, the incidence can only be approximated. Symptoms do not occur until narrowing of the spinal canal has progressed enough to impinge on the nerve root(s) or the spinal cord. Seventy-five percent of spinal stenosis cases occur in the lumbar spine (Ray). Because the US population is aging, prevalence is expected to increase, growing by 18 million within the next decade (Hsaing).

Source: Medical Disability Advisor

www.yescomusa.com

**Factors Influencing Duration**

The severity of pain, the severity of the neurologic deficit, comorbid vascular disease, the individual's age and overall health, and the type and success of treatment will influence the length of disability. Once severe spinal stenosis with neurologic deficit becomes evident, the individual is rarely capable of heavy or very heavy work. Following lumbar spinal stenosis decompression surgery, heavy and very heavy work are usually no longer appropriate.

Apply For Disability Now
Social Security Disability Benefits Take Our Free 1 Minute Evaluation

**Related Terms**

- Cervical Stenosis
- Lumbar Stenosis
- Narrowing of Spinal Canal

AdChoices
1 Disability Benefits
2 Spinal Stenosis Pain

**Differential Diagnosis**

- Diabetes
- Inflammatory spondyloarthropathy (e.g., ankylosing spondylitis)
- Paget's disease of the bone
- Peripheral neuropathy (paralysis)
- Peripheral vascular disease
- Single level lumbar disc herniation
- Spinal cord tumor
- Vascular insufficiency (atherosclerosis of the aorta and/or leg arteries)
- Vertebral disc disease

AdChoices
1 Stenosis Treatment
2 Cervical Stenosis

**Specialists**

- Neurologist
- Neurosurgeon
- Orthopedic (Orthopaedic) Surgeon

- Physiatrist (Physical Medicine and Rehabilitation Specialist)
- Physical Therapist

AdChoices
1 Lumbar Spinal Fusion
2 Spinal Arthritis

### Comorbid Conditions

- Cardiopulmonary disorders
- Depression
- Diabetes
- General debility
- Obesity
- Osteoarthritis
- Osteoporosis
- Rheumatoid arthritis

### Causation and Known Risk Factors

The average age of onset of symptoms of degenerative stenosis is 60 years, and men are afflicted twice as often as women. Primary or congenital stenosis may present by 30 years of age, and the risk of symptoms increases with age because of superimposed degenerative changes associated with aging. Individuals with osteoarthritis, rheumatoid arthritis, scoliosis, spondylolisthesis, achondroplastic dwarfism, and Paget's disease are at an increased risk of developing spinal stenosis.

Source: Medical Disability Advisor

### Diagnosis

**History:** The cardinal symptoms of spinal stenosis are numbness and pain. In lumbar stenosis, individuals also report lower back pain, radiating leg pain, and an intolerance for walking. The individual typically describes pain in the calf, buttocks, or back of the thigh when walking (neurogenic claudication) or standing. Pain, which frequently affects both legs (bilateral), is commonly characterized as aching but may also present as numbness or weakness. The pain is often sufficiently intense to force individuals to stop walking and to sit in order to seek relief. Others may report greater comfort walking uphill than downhill or that they can walk farther while bending forward. Depending on severity, individuals may also describe sensations of hot or cold, tingling, leg fatigue, and dysfunction of the bladder or bowel associated with lumbar stenosis. A complete health history is obtained, including current and prior illnesses and a history of injuries.

**Physical exam:** Having the individual arch the back to extend the spine may reproduce or worsen the symptoms. Flexing the spine (e.g., sitting, bending over) typically reduces the symptoms. Generally, except in cases of severe stenosis, physical examination will be unremarkable for neurologic findings. Raising the leg while it is straightened may cause pain. Leg deep tendon reflexes may be depressed. A general physical exam may be conducted to assess health status, especially signs and symptoms of chronic illness.

**Tests:** Imaging studies are absolutely necessary to establish a diagnosis. Either MRI or CT myelogram can accurately show the degree and extent of stenosis. MRI is preferred because CT myelogram is invasive, even though it provides better delineation of bony anatomy and nerve root involvement. A plain lumbar x-ray will not conclusively show spinal stenosis, though severe degenerative changes may be suggestive.

Source: Medical Disability Advisor

### Treatment

Conservative, nonsurgical treatment using analgesics, spinal (epidural) or oral steroids, physical therapy (aerobic conditioning, muscle strengthening, flexibility enhancement, and optimization of body mechanics), and bracing may provide symptom relief in milder cases without neurological symptoms. Cervical traction may provide relief of radicular pain stemming from nerve root compression in the cervical spine but will not relieve the pain of soft tissue injury. A soft cervical collar may provide short-term relief of soft-tissue injury; for radiculopathy caused by foraminal stenosis, the collar is placed in a manner that allows neck flexion and extension and to open the intervertebral foramina. Only decompressive surgery can actually enlarge the spinal canal of the lumbar and cervical spine. If signs and symptoms of myelopathy, segmental instability, or cauda equina syndrome (nerve compression affecting bladder and bowel function) are present, emergency surgical decompression of the spinal cord or nerve roots is indicated. Surgery is also indicated for individuals with moderate to severe symptoms that are not relieved by conservative measures and time.

The goals of surgery are to reduce pain, decompress affected nerves, provide more room for the spinal cord, and restore spinal stability. The method of surgical decompression employed depends on the location, cause, type, and severity of spinal stenosis; the age and overall condition of the individual; and the preference of the surgeon. If a sufficient portion of the joint is removed or the individual has advanced degenerative disease, then it may also become necessary to perform arthrodesis (with or without stabilizing internal fixation) to stabilize the spine.

Lumbar decompressive surgery, which may consist of one or more procedures, is performed through an incision in the back. Most frequently, the lamina of a vertebra are removed (laminectomy), often at multiple levels. Other surgical options include removal of bone from around a nerve root (foraminotomy), removal of an intervertebral disc (discectomy), and/or fusion of two or more vertebrae (arthrodesis).

Cervical spine surgery may consist of foraminotomy to open the foramen and decompress the affected nerve; laminotomy to create a hole in the lamina and reduce pressure on the spinal cord; laminectomy, which removes part or all of the lamina to reduce pressure on the cord; or laminoplasty, which reshapes the lamina surgically, creating more room for the spinal cord. Cervical procedures can be performed from the front (anterior) of the spine or at the back of the neck (posterior). Cervical stenosis is frequently the result of anterior compression due to osteophyte formation, requiring the more difficult anterior surgical approach, which also involves higher risk and may require fusion. Fusion is not indicated for patients with poor health status or reduced bone density.

Source: Medical Disability Advisor

## ACOEM

AMERICAN COLLEGE OF OCCUPATIONAL AND ENVIRONMENTAL MEDICINE

ACOEM's Practice Guidelines, the gold standard in effective medical treatment of occupational injuries and illnesses, are * provided in this section to complement the disability duration guidelines.*

Low Back Disorders
Neck and Upper Back Disorders

** The relationship between the MDGuidelines (MDA) content and ACOEM's guidelines is approximate and does not always link identical diagnoses. The user should consult the diagnostic codes in both guidelines, as well as the clinical descriptions, before assuming an equivalence.*

Source: ACOEM Practice Guidelines

## Prognosis

Spinal stenosis often runs a gradual course, and it may be stable and asymptomatic or minimally symptomatic for several years. Conservative treatment is effective in reducing pain for half of affected individuals, provided their symptoms are mild to moderate. Surgical decompression usually succeeds in improving or eliminating leg pain and improving the individual's ability to walk but does not stop the degenerative process, and the symptoms may recur. In lumbar stenosis, symptoms may recur about 4 to 5 years after the decompression surgery because the condition is progressive.

Source: Medical Disability Advisor

## Rehabilitation

The focus of rehabilitation for spinal stenosis is to promote function and to teach individuals how to manage the symptoms independently. Spinal stenosis, a progressive condition, may be managed nonoperatively or operatively (Amundsen; Atlas).

Nonoperative: In conjunction with pharmacological management and local injections, heat and cold may be used to provide temporary relief of symptoms (Braddom). Gentle exercises that emphasize flexion of the trunk can be taught with careful supervision and attention to tolerance by the individual. General aerobic conditioning exercises should be taught, preferably walking on level surfaces, bicycling, or swimming.

Operative: Following the operation for spinal stenosis, the surgeon may prescribe therapy, with the specific type of therapy determined by the nature of the surgery (decompression alone, or with fusion, one level or multilevel). Most individuals undergoing surgery are older, and their rehabilitation must take into account the likelihood of comorbidity. Following surgery, some individuals may benefit from occupational therapy to assess the need for devices to promote independence in daily activities. Once indicated, exercise should proceed as for nonoperative treatment.

Individuals should be instructed in proper body mechanics and a home exercise program to complement the supervised rehabilitation. An ergonomic assessment may be beneficial to ensure that the work tasks do not unnecessarily stress the spine.

**FREQUENCY OF REHABILITATION VISITS**

| | |
|---|---|
| **Nonsurgical** | |
| Specialist | Spinal Stenosis |
| Physical Therapist | Up to 15 visits within 6 weeks |
| **Surgical** † | |
| Specialist | Spinal Stenosis |
| Physical Therapist | Up to 15 visits within 6 weeks |

† Note on Surgical Guidelines: Rehab usually begins after tissue healing, about 6 to 8 weeks after surgery.

*The table above represents a range of the usual acceptable number of visits for uncomplicated cases. It provides a framework based on the duration of tissue healing time and standard clinical practice.*

Source: Medical Disability Advisor

### Complications

Secondary spinal stenosis is the result of degenerative changes in the spine and may be complicated by cauda equina syndrome, which is caused by compression of the nerves that go to the lower extremities, bowels, and bladder. Complications of surgical treatment may include wound infection, leakage of spinal fluid, or injury to neural structures. Spinal instability may be a long-term consequence of surgery. The anterior surgical approach used for cervical spinal stenosis has a greater risk of complications, including vascular injury, laryngeal nerve injury with vocal cord paralysis, esophageal injury and swallowing difficulties, instrumentation failure, and, since fusion is the most common procedure, failed fusion. If fusion is performed, the risk of nonunion is higher in long-term smokers and when multilevel fusion is done. The risk of complications is greater in patients with chronic disease or who have used steroids for long periods.

Source: Medical Disability Advisor

### Ability to Work (Return to Work Considerations)

Mild and moderate spinal stenosis on imaging studies may be asymptomatic, and without evidence of neurologic impairment, there should be no restriction in work abilities. Work restrictions and special accommodations need to be established on an individual basis. Activities involving standing or walking may need to be limited. Work station modification to permit good posture or seated work may be helpful. Overhead work (spine extension) should be avoided. To reduce the risk of complications (e.g., nonunion of an arthrodesis), the individual who was treated surgically may not be allowed to work during the early recovery period. Use of analgesics and other medications can affect dexterity and alertness. Drug-testing policies will need to be evaluated.

Source: Medical Disability Advisor

### Failure to Recover

If an individual fails to recover within the expected maximum duration period, the reader may wish to consider the following questions to better understand the specifics of an individual's medical case.

#### Regarding diagnosis:

- Has diagnosis of spinal stenosis been confirmed?
- Is the stenosis shown on imaging mild or moderate and thus unlikely to explain the failure to work or function?
- Is the stenosis shown on imaging severe, so that reduced activity tolerance correlates with severe pathology?
- Has individual experienced any complications from the spinal stenosis, such as sciatica, claudication, intractable buttock and leg pain, or bladder or bowel dysfunction?
- Does individual have an underlying or chronic condition that may affect recovery?

#### Regarding treatment:

- Have conservative measures been effective? If not, is surgery indicated?
- Was spinal fusion performed?
- If surgery was unsuccessful in relieving leg pain, does a postoperative MRI or EMG document persisting nerve compression?
- If individual has persistent back pain and/or leg pain after lumbar decompressive surgery do postoperative flexion extension x-rays document spinal instability?

#### Regarding prognosis:

- Are symptoms and neurologic deficits severe enough to impair function?
- If surgery was not successful in restoring function, what other treatment options are available to individual?

Source: Medical Disability Advisor

### References

#### Cited

Amundsen, T., et al. "Lumbar Spinal Stenosis: Conservative or Surgical Management?: A Prospective 10-year Study." *Spine* 25 11 (2000): 1424-1435.

Atlas, S. J., et al. "Surgical and Nonsurgical Management of Sciatica Secondary to a Lumbar Disc Herniation: Five-Year Outcomes from the Maine Lumbar Spine Study." *Spine* 26 10 (2001): 1179-1187.

Atlas, S. J., et al. "Surgical and Nonsurgical Management of Sciatica Secondary to a Lumbar Disc Herniation: Five-Year Outcomes from the Maine Lumbar Spine Study." *Spine* 26 10 (2001): 1179-1187.

Braddom, Randolph L. *Physical Medicine and Rehabilitation*. 3rd ed. Philadelphia: W.B. Saunders, 2006.

Hsiang, John. "Spinal Steonsis." *eMedicine*. Eds. Paul L. Penar, et al. 13 Dec. 2007. Medscape. 3 Mar. 2009 <www.emedicine.com/med/topic2889.htm>.

Ray, Charles Dean. "Spinal Stenosis Symptoms, Diagnosis and Treatment." *Spine-health.com*. 3 Apr. 2007. 3 Mar. 2009 <http://www.spine-health.com/conditions/spinal-stenosis/spinal-stenosis-treatment>.

Source: Medical Disability Advisor

Feedback

Send us comments, suggestions, corrections, or anything you would like us to hear. If you are not logged in, you must include your email address, in order for us to respond. We cannot, unfortunately, respond to every comment. If you are seeking medical advice, please contact your physician. Thank you!

Send this comment to:

○ Sales ○ Customer Support ○ Content Development

Submit

*This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is published with the understanding that the author, editors, and publisher are not engaged in rendering medical, legal, accounting or other professional service. If medical, legal, or other expert assistance is required, the service of a competent professional should be sought. We are unable to respond to requests for advice. Any Sales inquiries should include an email address or other means of communication.*

Copyright © 1991-2016 Reed Group | Terms of Use | Privacy Statement

LeaveAdvisor™

Reed Group, Medical Disability Advisor, MDGuidelines and each of the associated logos are either registered trademarks or trademarks of Reed Group, Ltd. in the United States and/or other countries.

*CPT® copyright 2012 American Medical Association. All rights reserved.*

*Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT®, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.*

*CPT® is a registered trademark of the American Medical Association.*

7Q266160020

# EXHIBIT 2

EXHIBIT 2

A B C
D E F
G H I
J K L
M N O
P Q R
S T U
V W X
Y Z ?

<Previous | Next > | Search | Contents | ONET NEW | Link to this page | About

Like 0 | G+1 | Search

CODE: **074.161-010** **Buy the DOT:Download**
TITLE(s): **PHARMACIST (medical ser.) alternate titles: druggist**

Compounds and dispenses prescribed medications, drugs, and other pharmaceuticals for patient care, according to professional standards and state and federal legal requirements: Reviews prescriptions issued by physician, or other authorized prescriber to assure accuracy and determine formulas and ingredients needed. Compounds medications, using standard formulas and processes, such as weighing, measuring, and mixing ingredients. Directs pharmacy workers engaged in mixing, packaging, and labeling pharmaceuticals. Answers questions and provides information to pharmacy customers on drug interactions, side effects, dosage and storage of pharmaceuticals. Maintains established procedures concerning quality assurance, security of controlled substances, and disposal of hazardous waste drugs. Enters data, such as patient name, prescribed medication and cost, to maintain pharmacy files, charge system, and inventory. May assay medications to determine identity, purity, and strength. May instruct interns and other medical personnel on matters pertaining to pharmacy, or teach in college of pharmacy. May work in hospital pharmacy and be designated Pharmacist, Hospital (medical ser.)
**GOE: 02.04.01 STRENGTH: L GED: R5 M5 L5 SVP: 7 DLU: 87**
ONET CROSSWALK: 32517 Pharmacists

# EXHIBIT 3

EXHIBIT 3

O*NET OnLine

Updated 2016

# Details Report for:
## 29-1051.00 - Pharmacists

Dispense drugs prescribed by physicians and other health practitioners and provide information to patients about medications and their use. May advise physicians and other health practitioners on the selection, dosage, interactions, and side effects of medications.

**Sample of reported job titles:** Clinical Pharmacist; Hospital Pharmacist; Outpatient Pharmacy Manager; Pharmacist; Pharmacist in Charge (PIC); Pharmacist in Charge, Owner (PIC, Owner); Pharmacy Informaticist; Registered Pharmacist; Staff Pharmacist; Staff Pharmacist, Hospital

**View report:** Summary | Details | Custom

Tasks | Tools & Technology | Knowledge | Skills | Abilities | Work Activities | Detailed Work Activities | Work Context | Job Zone | Education | Credentials | Interests | Work Styles | Work Values | Related Occupations | Wages & Employment | Job Openings | Additional Information

## Tasks
Save Table (XLS/CSV)

10 of 20 displayed (20 important)

| Importance | Category | Task |
|---|---|---|
| 99 | Core | Review prescriptions to assure accuracy, to ascertain the needed ingredients, and to evaluate their suitability. |
| 92 | Core | Provide information and advice regarding drug interactions, side effects, dosage, and proper medication storage. |
| 90 | Core | Maintain records, such as pharmacy files, patient profiles, charge system files, inventories, control records for radioactive nuclei, or registries of poisons, narcotics, or controlled drugs. |
| 86 | Core | Plan, implement, or maintain procedures for mixing, packaging, or labeling pharmaceuticals, according to policy and legal requirements, to ensure quality, security, and proper disposal. |
| 84 | Core | Assess the identity, strength, or purity of medications. |
| 83 | Core | Collaborate with other health care professionals to plan, monitor, review, or evaluate the quality or effectiveness of drugs or drug regimens, providing advice on drug applications or characteristics. |
| 82 | Core | Order and purchase pharmaceutical supplies, medical supplies, or drugs, maintaining stock and storing and handling it properly. |
| 80 | Core | Analyze prescribing trends to monitor patient compliance and to prevent excessive usage or harmful interactions. |
| 79 | Core | Advise customers on the selection of medication brands, medical equipment, or healthcare supplies. |
| 78 | Core | Compound and dispense medications as prescribed by doctors and dentists, by calculating, weighing, measuring, and mixing ingredients, or oversee these activities. |

back to top

## Tools & Technology

Save Table (XLS/CSV)

20 of 49 displayed

Tools used in this occupation:

- **Bar code reader equipment** — Barcode scanning/prescription tracking systems
- **Electronic toploading balances**
- **Glucose monitors or meters** — Glucometers
- **Label making machines** — Label-making machines
- **Laminar flow cabinets or stations** — Horizontal air flow laminar hoods; Laminar flow hoods; Vertical air flow laminar hoods
- **Liquid scintillation counters** — Multiple channel well scintillation counters; Single channel well scintillation counters
- **Medical radiological shielding freestanding or portable screens** — Lead transport shields; Radiation shields for syringes and vials
- **Pestle or mortars** — Mortars; Pestles
- **Sterile or aseptic processing or filling machines** — Automated drug dispensing equipment
- **Tablet counters** — Capsule counters

Technology used in this occupation:

- **Accounting software** — Insurance claim processing software
- **Analytical or scientific software** — TPNassist software; TTP LabTech comPOUND
- **Computer based training software** — MedTeach software
- **Data base user interface and query software** — Computer records systems; Healthprolink MedAtlas; Pharmaceutical Care Network software; Recordkeeping software
- **Electronic mail software** — Microsoft Outlook 🔥
- **Label making software** — Label-making software; RxKinetics UD Labels for Windows
- **Medical software** — Epic Systems software 🔥 ; MEDITECH software 🔥
- **Office suite software** — Microsoft Office software
- **Spreadsheet software** — Microsoft Excel 🔥
- **Word processing software** — Microsoft Word

🔥 Hot Technology — a technology requirement frequently included in employer job postings.

back to top

## Knowledge

Save Table (XLS/CSV)

10 of 33 displayed (12 important)

| Importance | Knowledge |
| --- | --- |
| 82 | **Medicine and Dentistry** — Knowledge of the information and techniques needed to diagnose and treat human injuries, diseases, and deformities. This includes symptoms, treatment alternatives, drug properties and interactions, and preventive health-care measures. |
| 77 | **Customer and Personal Service** — Knowledge of principles and processes for providing customer and personal services. This includes customer needs assessment, meeting quality standards for services, and evaluation of customer satisfaction. |

71 **Mathematics** — Knowledge of arithmetic, algebra, geometry, calculus, statistics, and their applications.

69 **Chemistry** — Knowledge of the chemical composition, structure, and properties of substances and of the chemical processes and transformations that they undergo. This includes uses of chemicals and their interactions, danger signs, production techniques, and disposal methods.

66 **Biology** — Knowledge of plant and animal organisms, their tissues, cells, functions, interdependencies, and interactions with each other and the environment.

66 **English Language** — Knowledge of the structure and content of the English language including the meaning and spelling of words, rules of composition, and grammar.

69 **Law and Government** — Knowledge of laws, legal codes, court procedures, precedents, government regulations, executive orders, agency rules, and the democratic political process.

67 **Administration and Management** — Knowledge of business and management principles involved in strategic planning, resource allocation, human resources modeling, leadership technique, production methods, and coordination of people and resources.

67 **Therapy and Counseling** — Knowledge of principles, methods, and procedures for diagnosis, treatment, and rehabilitation of physical and mental dysfunctions, and for career counseling and guidance.

66 **Computers and Electronics** — Knowledge of circuit boards, processors, chips, electronic equipment, and computer hardware and software, including applications and programming.

back to top

## Skills

Save Table (XLS/CSV)

10 of 35 displayed (21 important)

| Importance | Skill |
|---|---|
| 78 | **Reading Comprehension** — Understanding written sentences and paragraphs in work related documents. |
| 75 | **Active Listening** — Giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate, and not interrupting at inappropriate times. |
| 72 | **Critical Thinking** — Using logic and reasoning to identify the strengths and weaknesses of alternative solutions, conclusions or approaches to problems. |
| 72 | **Instructing** — Teaching others how to do something. |
| 72 | **Monitoring** — Monitoring/Assessing performance of yourself, other individuals, or organizations to make improvements or take corrective action. |
| 72 | **Service Orientation** — Actively looking for ways to help people. |
| 72 | **Speaking** — Talking to others to convey information effectively. |
| 72 | **Writing** — Communicating effectively in writing as appropriate for the needs of the audience. |
| 69 | **Judgment and Decision Making** — Considering the relative costs and benefits of potential actions to choose the most appropriate one. |
| 69 | **Science** — Using scientific rules and methods to solve problems. |

back to top

## Abilities Save Table (XLS/CSV)

10 of 52 displayed (21 important)

| Importance | Ability |
|---|---|
| 81 | **Oral Comprehension** — The ability to listen to and understand information and ideas presented through spoken words and sentences. |
| 81 | **Written Comprehension** — The ability to read and understand information and ideas presented in writing. |
| 78 | **Near Vision** — The ability to see details at close range (within a few feet of the observer). |
| 78 | **Oral Expression** — The ability to communicate information and ideas in speaking so others will understand. |
| 78 | **Problem Sensitivity** — The ability to tell when something is wrong or is likely to go wrong. It does not involve solving the problem, only recognizing there is a problem. |
| 72 | **Deductive Reasoning** — The ability to apply general rules to specific problems to produce answers that make sense. |
| 72 | **Inductive Reasoning** — The ability to combine pieces of information to form general rules or conclusions (includes finding a relationship among seemingly unrelated events). |
| 72 | **Speech Clarity** — The ability to speak clearly so others can understand you. |
| 72 | **Written Expression** — The ability to communicate information and ideas in writing so others will understand. |
| 69 | **Category Flexibility** — The ability to generate or use different sets of rules for combining or grouping things in different ways. |

back to top

## Work Activities Save Table (XLS/CSV)

10 of 41 displayed (28 important)

| Importance | Work Activity |
|---|---|
| 93 | **Updating and Using Relevant Knowledge** — Keeping up-to-date technically and applying new knowledge to your job. |
| 90 | **Getting Information** — Observing, receiving, and otherwise obtaining information from all relevant sources. |
| 90 | **Interacting With Computers** — Using computers and computer systems (including hardware and software) to program, write software, set up functions, enter data, or process information. |
| 89 | **Processing Information** — Compiling, coding, categorizing, calculating, tabulating, auditing, or verifying information or data. |
| 85 | **Documenting/Recording Information** — Entering, transcribing, recording, storing, or maintaining information in written or electronic/magnetic form. |
| 80 | **Evaluating Information to Determine Compliance with Standards** — Using relevant information and individual judgment to determine whether events or processes comply with laws, regulations, or standards. |
| 80 | |

- **Making Decisions and Solving Problems** — Analyzing information and evaluating results to choose the best solution and solve problems.
- 80 **Performing for or Working Directly with the Public** — Performing for people or dealing directly with the public. This includes serving customers in restaurants and stores, and receiving clients or guests.
- 79 **Assisting and Caring for Others** — Providing personal assistance, medical attention, emotional support, or other personal care to others such as coworkers, customers, or patients.
- 76 **Identifying Objects, Actions, and Events** — Identifying information by categorizing, estimating, recognizing differences or similarities, and detecting changes in circumstances or events.

back to top

## Detailed Work Activities Save Table (XLS/CSV)

10 of 18 displayed

- Treat chronic diseases or disorders.
- Verify accuracy of patient information.
- Maintain inventory of medical supplies or equipment.
- Recommend types of assistive devices.
- Instruct patients in the use of assistive equipment.
- Prepare medications or medical solutions.
- Determine protocols for medical procedures.
- Communicate detailed medical information to patients or family members.
- Maintain medical facility records.
- Collaborate with healthcare professionals to plan or provide treatment.

back to top

## Work Context Save Table (XLS/CSV)

All 57 displayed

| Work Context | Percentage of Top Responses |
| --- | --- |
| **Indoors, Environmentally Controlled** — How often does this job require working indoors in environmentally controlled conditions? | 100 Every day |
| **Telephone** — How often do you have telephone conversations in this job? | 100 Every day |
| **Face-to-Face Discussions** — How often do you have to have face-to-face discussions with individuals or teams in this job? | 95 Every day |
| **Importance of Being Exact or Accurate** — How important is being very exact or highly accurate in performing this job? | 93 Extremely important |
| | 92 Constant contact with others |

| | |
|---|---|
| **Contact With Others** — How much does this job require the worker to be in contact with others (face-to-face, by telephone, or otherwise) in order to perform it? | |
| **Consequence of Error** — How serious would the result usually be if the worker made a mistake that was not readily correctable? | 90 Extremely serious |
| **Impact of Decisions on Co-workers or Company Results** — What results do your decisions usually have on other people or the image or reputation or financial resources of your employer? | 80 Very important results<br>19 Important results |
| **Electronic Mail** — How often do you use electronic mail in this job? | 82 Every day<br>13 Once a week or more but not every day |
| **Frequency of Decision Making** — How frequently is the worker required to make decisions that affect other people, the financial resources, and/or the image and reputation of the organization? | 86 Every day |
| **Responsibility for Outcomes and Results** — How responsible is the worker for work outcomes and results of other workers? | 77 Very high responsibility<br>18 High responsibility |
| **Freedom to Make Decisions** — How much decision making freedom, without supervision, does the job offer? | 60 A lot of freedom<br>37 Some freedom |
| **Importance of Repeating Same Tasks** — How important is repeating the same physical activities (e.g., key entry) or mental activities (e.g., checking entries in a ledger) over and over, without stopping, to performing this job? | 78 Extremely important |
| **Work With Work Group or Team** — How important is it to work with others in a group or team in this job? | 71 Extremely important<br>21 Very important |
| **Deal With External Customers** — How important is it to work with external customers or the public in this job? | 81 Extremely important<br>11 Fairly important |
| **Structured versus Unstructured Work** — To what extent is this job structured for the worker, rather than allowing the worker to determine tasks, priorities, and goals? | 69 A lot of freedom<br>25 Some freedom<br>11 Limited freedom |
| **Time Pressure** — How often does this job require the worker to meet strict deadlines? | 61 Every day<br>22 Once a week or more but not every day<br>12 Once a month or more but not every week |

- **Coordinate or Lead Others** — How important is it to coordinate or lead others in accomplishing work activities in this job?
  - 54 Extremely important
  - 26 Very important
  - 14 Important

- **Deal With Unpleasant or Angry People** — How frequently does the worker have to deal with unpleasant, angry, or discourteous individuals as part of the job requirements?
  - 50 Every day
  - 26 Once a week or more but not every day
  - 17 Once a month or more but not every week

- **Spend Time Standing** — How much does this job require standing?
  - 63 Continually or almost continually
  - 12 About half the time
  - 15 Less than half the time

- **Exposed to Disease or Infections** — How often does this job require exposure to disease/infections?
  - 62 Every day
  - 28 Once a week or more but not every day
  - 11 Once a year or more but not every month

- **Letters and Memos** — How often does the job require written letters and memos?
  - 46 Every day
  - 24 Once a week or more but not every day
  - 19 Once a year or more but not every month

- **Physical Proximity** — To what extent does this job require the worker to perform job tasks in close physical proximity to other people?
  - 26 Very close (near touching)
  - 62 Moderately close (at arm's length)
  - 12 Slightly close (e.g., shared office)

- **Frequency of Conflict Situations** — How often are there conflict situations the employee has to face in this job?
  - 35 Every day
  - 24 Once a week or more but not every day
  - 31 Once a month or more but not every week
  - 11 Once a year or more but not every month

- **Level of Competition** — To what extent does this job require the worker to compete or to be aware of competitive pressures?
  - 28 Extremely competitive
  - 42 Highly competitive
  - 14 Moderately competitive
  - 16 Slightly competitive

- **Spend Time Making Repetitive Motions** — How much does this job require making repetitive motions?
  - 41 Continually or almost continually
  - 19 More than half the time
  - 27 About half the time

- **Responsible for Others' Health and Safety** — How much responsibility is there for the health and safety of others in this job?
  - 46 Very high responsibility
  - 14 High responsibility
  - 11 Moderate responsibility
  - 27 Limited responsibility

- **Spend Time Using Your Hands to Handle, Control, or Feel Objects, Tools, or Controls** — How much does this job require using your hands to handle, control, or feel objects, tools or controls?
  - 49 Continually or almost continually
  - 13 Less than half the time
  - 26 Never

- **Duration of Typical Work Week** — Number of hours typically worked in one week.
  - 22 More than 40 hours
  - 66 40 hours
  - 12 Less than 40 hours

- **Sounds, Noise Levels Are Distracting or Uncomfortable** — How often does this job require working exposed to sounds and noise levels that are distracting or uncomfortable?
  - 26 Every day
  - 20 Once a week or more but not every day
  - 16 Once a month or more but not every week
  - 13 Once a year or more but not every month
  - 26 Never

**Spend Time Walking and Running** — How much does this job require walking and running?

| | |
|---|---|
| 17 | Continually or almost continually |
| 22 | More than half the time |
| 13 | About half the time |
| 32 | Less than half the time |
| 16 | Never |

**Degree of Automation** — How automated is the job?

| | |
|---|---|
| 52 | Moderately automated |
| 27 | Slightly automated |

**Spend Time Sitting** — How much does this job require sitting?

| | |
|---|---|
| 11 | More than half the time |
| 12 | About half the time |
| 34 | Less than half the time |
| 39 | Never |

**Deal With Physically Aggressive People** — How frequently does this job require the worker to deal with physical aggression of violent individuals?

| | |
|---|---|
| 16 | Once a week or more but not every day |
| 11 | Once a month or more but not every week |
| 35 | Once a year or more but not every month |
| 38 | Never |

**Spend Time Bending or Twisting the Body** — How much does this job require bending or twisting your body?

| | |
|---|---|
| 50 | Less than half the time |
| 32 | Never |

**Exposed to Contaminants** — How often does this job require working exposed to contaminants (such as pollutants, gases, dust or odors)?

| | |
|---|---|
| 12 | Once a week or more but not every day |
| 14 | Once a month or more but not every week |
| 28 | Once a year or more but not every month |
| 45 | Never |

**Public Speaking** — How often do you have to perform public speaking in this job?

| | |
|---|---|
| 27 | Once a year or more but not every month |
| 57 | Never |

**Wear Common Protective or Safety Equipment such as Safety Shoes, Glasses, Gloves, Hearing Protection, Hard Hats, or Life Jackets** — How much does this job require wearing common protective or safety equipment such as safety shoes, glasses, gloves, hard hats or life jackets?

| | |
|---|---|
| 23 | Once a week or more but not every day |
| 71 | Never |

**Spend Time Kneeling, Crouching, Stooping, or Crawling** — How much does this job require kneeling, crouching, stooping or crawling?

| | |
|---|---|
| 53 | Less than half the time |
| 43 | Never |

**Exposed to Minor Burns, Cuts, Bites, or Stings** — How often does this job require exposure to minor burns, cuts, bites, or stings?

| | |
|---|---|
| 15 | Once a month or more but not every week |
| 27 | Once a year or more but not every month |
| 58 | Never |

**Exposed to Hazardous Conditions** — How often does this job require exposure to hazardous conditions?

| | |
|---|---|
| 14 | Once a year or more but not every month |
| 70 | Never |

**Cramped Work Space, Awkward Positions** — How often does this job require working in cramped work spaces that requires getting into awkward positions?

| | |
|---|---|
| 23 | Once a year or more but not every month |
| 68 | Never |

| | |
|---|---|
| 80 | Not important at all |

**Pace Determined by Speed of Equipment** — How important is it to this job that the pace is determined by the speed of equipment or machinery? (This does not refer to keeping busy at all times on this job.)

| | |
|---|---|
| **Extremely Bright or Inadequate Lighting** — How often does this job require working in extremely bright or inadequate lighting conditions? | 14 Once a year or more but not every month<br>82 Never |
| **Spend Time Keeping or Regaining Balance** — How much does this job require keeping or regaining your balance? | 22 Less than half the time<br>78 Never |
| **In an Enclosed Vehicle or Equipment** — How often does this job require working in a closed vehicle or equipment (e.g., car)? | 93 Never |
| **Very Hot or Cold Temperatures** — How often does this job require working in very hot (above 90 F degrees) or very cold (below 32 F degrees) temperatures? | 89 Never |
| **Exposed to Hazardous Equipment** — How often does this job require exposure to hazardous equipment? | 94 Never |
| **Exposed to High Places** — How often does this job require exposure to high places? | 97 Never |
| **Exposed to Radiation** — How often does this job require exposure to radiation? | 96 Never |
| **Indoors, Not Environmentally Controlled** — How often does this job require working indoors in non-controlled environmental conditions (e.g., warehouse without heat)? | 93 Never |
| **Spend Time Climbing Ladders, Scaffolds, or Poles** — How much does this job require climbing ladders, scaffolds, or poles? | 93 Never |
| **Wear Specialized Protective or Safety Equipment such as Breathing Apparatus, Safety Harness, Full Protection Suits, or Radiation Protection** — How much does this job require wearing specialized protective or safety equipment such as breathing apparatus, safety harness, full protection suits, or radiation protection? | 95 Never |
| **Exposed to Whole Body Vibration** — How often does this job require exposure to whole body vibration (e.g., operate a jackhammer)? | 99 Never |

- **Outdoors, Exposed to Weather** — How often does this job require working outdoors, exposed to all weather conditions? — 96 Never
- **Outdoors, Under Cover** — How often does this job require working outdoors, under cover (e.g., structure with roof but no walls)? — 97 Never
- **Work Schedules** — How regular are the work schedules for this job? — 99 Regular (established routine, set schedule)
- **In an Open Vehicle or Equipment** — How often does this job require working in an open vehicle or equipment (e.g., tractor)? — 100 Never

back to top

## Job Zone

Save Table (XLS/CSV)

| | |
|---|---|
| **Title** | Job Zone Five: Extensive Preparation Needed |
| **Education** | Most of these occupations require graduate school. For example, they may require a master's degree, and some require a Ph.D., M.D., or J.D. (law degree). |
| **Related Experience** | Extensive skill, knowledge, and experience are needed for these occupations. Many require more than five years of experience. For example, surgeons must complete four years of college and an additional five to seven years of specialized medical training to be able to do their job. |
| **Job Training** | Employees may need some on-the-job training, but most of these occupations assume that the person will already have the required skills, knowledge, work-related experience, and/or training. |
| **Job Zone Examples** | These occupations often involve coordinating, training, supervising, or managing the activities of others to accomplish goals. Very advanced communication and organizational skills are required. Examples include librarians, lawyers, astronomers, biologists, clergy, surgeons, and veterinarians. |
| **SVP Range** | (8.0 and above) |

back to top

## Education

| Percentage of Respondents | Education Level Required |
|---|---|
| 38 | Professional degree |
| 37 | Doctoral degree |
| 11 | Post-baccalaureate certificate |

back to top

## Credentials

Find Training | Find Certifications | Find Licenses

back to top

## Interests Save Table (XLS/CSV)

All 6 displayed (3 important)

| Occupational Interest | Interest |
|---|---|
| 100 | **Investigative** — Investigative occupations frequently involve working with ideas, and require an extensive amount of thinking. These occupations can involve searching for facts and figuring out problems mentally. |
| 72 | **Conventional** — Conventional occupations frequently involve following set procedures and routines. These occupations can include working with data and details more than with ideas. Usually there is a clear line of authority to follow. |
| 56 | **Social** — Social occupations frequently involve working with, communicating with, and teaching people. These occupations often involve helping or providing service to others. |
| 39 | **Realistic** — Realistic occupations frequently involve work activities that include practical, hands-on problems and solutions. They often deal with plants, animals, and real-world materials like wood, tools, and machinery. Many of the occupations require working outside, and do not involve a lot of paperwork or working closely with others. |
| 28 | **Enterprising** — Enterprising occupations frequently involve starting up and carrying out projects. These occupations can involve leading people and making many decisions. Sometimes they require risk taking and often deal with business. |
| 6 | **Artistic** — Artistic occupations frequently involve working with forms, designs and patterns. They often require self-expression and the work can be done without following a clear set of rules. |

back to top

## Work Styles Save Table (XLS/CSV)

10 of 16 displayed (15 important)

| Importance | Work Style |
|---|---|
| 96 | **Attention to Detail** — Job requires being careful about detail and thorough in completing work tasks. |
| 92 | **Dependability** — Job requires being reliable, responsible, and dependable, and fulfilling obligations. |
| 92 | **Integrity** — Job requires being honest and ethical. |
| 91 | **Stress Tolerance** — Job requires accepting criticism and dealing calmly and effectively with high stress situations. |
| 90 | **Concern for Others** — Job requires being sensitive to others' needs and feelings and being understanding and helpful on the job. |
| 88 | **Self Control** — Job requires maintaining composure, keeping emotions in check, controlling anger, and avoiding aggressive behavior, even in very difficult situations. |
| 85 | **Cooperation** — Job requires being pleasant with others on the job and displaying a good-natured, cooperative attitude. |

| | |
|---|---|
| 83 | **Adaptability/Flexibility** — Job requires being open to change (positive or negative) and to considerable variety in the workplace. |
| 79 | **Achievement/Effort** — Job requires establishing and maintaining personally challenging achievement goals and exerting effort toward mastering tasks. |
| 75 | **Initiative** — Job requires a willingness to take on responsibilities and challenges. |

back to top

## Work Values

Save Table (XLS/CSV)

All 6 displayed (6 important)

| Extent | Work Value |
|---|---|
| 78 | **Recognition** — Occupations that satisfy this work value offer advancement, potential for leadership, and are often considered prestigious. Corresponding needs are Advancement, Authority, Recognition and Social Status. |
| 72 | **Support** — Occupations that satisfy this work value offer supportive management that stands behind employees. Corresponding needs are Company Policies, Supervision: Human Relations and Supervision: Technical. |
| 67 | **Relationships** — Occupations that satisfy this work value allow employees to provide service to others and work with co-workers in a friendly non-competitive environment. Corresponding needs are Co-workers, Moral Values and Social Service. |
| 61 | **Achievement** — Occupations that satisfy this work value are results oriented and allow employees to use their strongest abilities, giving them a feeling of accomplishment. Corresponding needs are Ability Utilization and Achievement. |
| 61 | **Independence** — Occupations that satisfy this work value allow employees to work on their own and make decisions. Corresponding needs are Creativity, Responsibility and Autonomy. |
| 61 | **Working Conditions** — Occupations that satisfy this work value offer job security and good working conditions. Corresponding needs are Activity, Compensation, Independence, Security, Variety and Working Conditions. |

back to top

## Related Occupations

Save Table (XLS/CSV)

All 3 displayed

| | |
|---|---|
| 19-1042.00 | Medical Scientists, Except Epidemiologists |
| 25-1071.00 | Health Specialties Teachers, Postsecondary |
| 25-1072.00 | Nursing Instructors and Teachers, Postsecondary Bright Outlook |

back to top

## Wages & Employment Trends

**Median wages (2015)** $58.41 hourly, $121,500 annual

**State wages** Local Salary Info

**Employment (2014)** 297,000 employees

| | |
|---|---|
| **Projected growth (2014-2024)** | Slower than average (2% to 4%) |
| **Projected job openings (2014-2024)** | 78,400 |
| **State trends** | Employment Trends |
| **Top industries (2014)** | Retail Trade (61% employed in this sector)<br>Health Care and Social Assistance (28%)<br>(see all industries) |

Source: Bureau of Labor Statistics 2015 wage data and 2014-2024 employment projections. "Projected growth" represents the estimated change in total employment over the projections period (2014-2024). "Projected job openings" represent openings due to growth and replacement.

back to top

## Job Openings on the Web

Find Jobs

back to top

## Sources of Additional Information

All 5 displayed

**Disclaimer:** Sources are listed to provide additional information on related jobs, specialties, and/or industries. Links to non-DOL Internet sites are provided for your convenience and do not constitute an endorsement.

- Pharmacists. Bureau of Labor Statistics, U.S. Department of Labor. *Occupational Outlook Handbook, 2016-17 Edition.*
- American Association of Colleges of Pharmacy (AACP), 1426 Prince St., Alexandria, VA 22314. Phone: (703) 739-2330. Fax: (703) 836-8982.
- American Society of Health-System Pharmacists (ASHP), 7272 Wisconsin Ave., Bethesda, MD 20814. Phone: (301) 657-3000.
- National Association of Boards of Pharmacy (NABP), 1600 Feehanville Dr., Mount Prospect, IL 60056. Phone: (847) 391-4406. Fax: (847) 391-4502.
- National Association of Chain Drug Stores (NACDS), 413 N. Lee St., P.O. Box 1417-D49, Alexandria, VA 22313-1480. Phone: (703) 549-3001. Fax: (703) 836-4869.

back to top

7Q266160020

# EXHIBIT 4

EXHIBIT 4

7Q266160020

**ATI PHYSICAL THERAPY**
3233 W. Charleston Blvd., Suite 107 Las Vegas, Nevada 89102
Phone: (702) 258-9381 Fax (702) 258-8584

# FUNCTIONAL CAPACITY EVALUATION

| | |
|---|---|
| **PATIENT:** | ABOLFAZAL HOSSEINPOUR |
| **PHYSICIAN:** | NOT APPLICABLE |
| **SOCIAL SECURITY #:** | |
| **EMPLOYER:** | SAFEWAY |
| **INSURANCE CARRIER:** | SELF PAY |
| **DATE OF ONSET:** | 2014 |
| **DATE OF EXAM:** | AUGUST 26, 2016 |

Dear Ms. Mersch:

Mr. Abolfazal Hosseinpour did arrive at our clinic today requesting that he undergo a Functional Capacity Evaluation. He stated that he has experienced increased levels of pain involving his cervical and lumbar area. He reported that this has resulted in limited functional tolerances and abilities. He was requesting that a Functional Capacity Evaluation be performed at this time to document his physical abilities. This test is designed to help evaluate and document a person's capabilities in the performance of work-related activities, such as lifting, carrying, bending, walking, reaching, etc. I would welcome the opportunity to explain or discuss any of the components of this test with you.

## RECOMMENDATIONS

Based upon the observed performance and the objective findings obtained through this evaluation, and provided that there is no medical information to contradict this:

> **"This client demonstrated the ability to perform limited work activities. This would include occasional lifting and carrying of less than 10 pounds. He would be able to perform frequent lifting and carrying of less than 5 pounds. He was unable to perform any lifting from below the height of 21" above the floor. He was unable to perform any lifting above the height of 66" above the floor. He was able to perform occasional pushing and pulling producing average forces of up to 50 pounds. This client was unable to perform full squatting. He was able to perform less than occasional one-half squatting activities at best. This client should avoid any kneeling or crawling. Any kneeling or crawling should be performed only with the use of a support to enable him to obtain and return from these**

positions. This client was able to perform less than occasional rotational activities involving his thoracic/lumbar spine. He was unable to perform any constant cervical rotation. He was able to perform less than occasional bending to reach to work to the height of 27" above the floor. He was able to perform less than occasional reaching to work to the height of 69" above the floor. This client should avoid the climbing of stairs. Any stairs to be ascended or descended should be done only with the use of a hand railing for safety. This client should be restricted from performing any climbing of ladders, structures or stools. He should be allowed to change his position on an as needed basis. Continuous standing or walking should not exceed 15 to 20 minutes. Continuous sitting should not exceed 20 minutes. This client should be restricted from performing constant sitting, standing or walking. It is questionable as to whether or not this client would be able to maintain a competitive work pace over an 8 hour work shift. It is questionable as to whether or not this client would be able to maintain a competitive work pace over a 40 hour work week. These questions should best be addressed by his present primary care physician. There are no other recommendations to limit his work activities at this time."

This client did report that he has experienced a gradual reduction of his level of function due to his continued symptoms. "The problem is the pain in my lower back goes into my hips. I have neck and lower back problems. I lose my memory. I have to have my son write things down to help me to know what I have to do. I cannot concentrate. I get frustrated and I get anxiety when I get the pain. The symptoms radiate into my left hand and my fingers go numb. Most of the time I lay down or sit down because of my back."

It should be noted that this client demonstrated limited tolerance for activity as assessed during this evaluation. He was noted to change his position on a frequent basis. He did demonstrate alterations in his sitting posture.

This client was consistent in his demonstrated inability to perform functional activities as noted during this evaluation. He reported pain as the limiting factor. The results of this evaluation have been determined to be reliable.

Mr. Abolfazal Hosseinpour stated that he last worked as a Pharmacist with Safeway. A job description was provided for review at the time of this evaluation. Through conversation with this client, from past experience, and review of the job description, we were able to determine the following critical demands.

To describe the position of a Pharmacy Manager with Safeway would involve static and dynamic postures. This position would require the ability to constantly lift between 1 and 10 pounds. Occasionally it was documented to be between 11 and 20 pounds. This position would require the ability to frequently carry 1 to 10 pounds. This position would require constant reaching from knee to shoulder level. It would require occasional reaching above shoulder height and overhead reaching. This position would require constant standing and walking. It would require the ability to perform constant rotation of the neck, bending of the head and twisting. It would require occasional bending and stooping. It would require crouching on a seldom basis. This position would require the ability to utilize the upper extremities to perform fine motor and manual dexterity activities. This position would therefore fall into a medium work range using the definition provided by the Dictionary of Occupational Titles, with lifting reported to be constantly of up to 10 pounds. This client was not in agreement with the work activities as documented in the job description. He stated that his work position would require him to occasionally lift 30 pounds from the floor level. He stated that this would be cases of copy paper.

This client stated that he has not worked since June 13, 2015. This was due to his inability to tolerate the functional activities of his job. "I cannot stand 10 hours. I cannot bend too much."

## TESTING ANALYSIS

ATTENDANCE: Mr. Abolfazal Hosseinpour arrived on time for his scheduled Functional Capacity Evaluation. This client was noted to change his position on an occasional to frequent basis. He exhibited limited tolerance for sitting. At times he did sit with an altered posture. He demonstrated limited tolerance for standing and walking, and he was noted to change his position on a frequent basis. He did ambulate without the use of assistive devices. He did ambulate using a decreased speed of motion. He did favor his left lower extremity. The intensity of the favoring did increase with increased levels of activity. He did walk from the clinic following the formal testing using a decreased speed of motion with increased favoring of his left lower extremity.

This client was independent with transfers. He did use a decreased speed of motion. He did use his upper extremities to go from a seated to a standing position. This client was able to handle and finger small objects, but he did have limited tolerance for working above shoulder height. He did not perform the lifting and carrying requirements of his present job classification, which he felt would be up to 30 pounds, which is the estimated weight of a box of copy paper. He was unable to perform his job requirement of lifting up to 20 pounds.

STATIC OBSERVATION: This evaluation showed a pleasant male. He reported no changes in his body weight since his injury. He did stand with his weight equally distributed over his lower extremities on a grossly level pelvic base. He was wearing a lower back support, as well as supports to both knees. He did exhibit increased anterior/posterior thoracic/lumbar curves without lateral shifting. He did exhibit a forward head type of

posture with a flattened cervical lordosis. There was no lateral shifting noted of his spine. There was no atrophy with inspection of his upper and lower extremities. There was decreased muscle tone noted of his upper extremities which is evidence of deconditioning.

His standing height was reported at 69". Weight was 182 pounds. Blood Pressure was 120/90. Pulse was 78 bpm. This client was informed of his blood pressure reading on this date.

DOMINANCE: This client reported that he is right sided dominant.

GAIT: This client did ambulate independently without the use of assistive devices. He did walk using a decreased speed of motion. He did favor his left lower extremity. He did exhibit a decreased stance phase when comparing left to the right side. The intensity of the favoring of his left lower extremity did increase as the activities progressed. He did walk from the clinic using a decreased speed of motion and increased favoring of his left lower extremity. He did demonstrate functional balance with standing and walking on level surfaces. He was unable to perform single leg standing on either the left or the right lower extremity due to reports of increased pain.

MOBILITY: The active range of motion of his cervical spine was assessed using an angle inclinometer/Goniometer. Forward flexion was to 40°. Extension was to 20°. Lateral bending was 20° bilaterally. Rotation was 45° bilaterally. The motion observed was slow. He reported pain as the limiting factor at end ranges.

COMMENTS: This client was consistent in his presentation of limited active cervical range of motion as noted throughout the course of the evaluation.

The active range of motion of his thoracic/lumbar spine was assessed using an angle inclinometer. Forward flexion was to 35°. Extension was to 25°. Lateral bending was 20° bilaterally. Rotation was 25° bilaterally. This client performed all motions using a decreased speed of motion. He exhibited limited tolerance for bending. He was able to perform less than occasional bending to reach to work to the height of 27" above the floor as documented in the report.

The active range of motion of his upper extremities was assessed using a Goniometer. The range of motion was taken in a seated position. Active shoulder flexion was to 140° bilaterally. Abduction was to 120° bilaterally. Internal rotation was to 85° left and 80° right. External rotation was to 75° left and 65° right. This client did report tightness and pain as limiting factors at end range. He did demonstrate functional active range of motion of his elbows and wrists. He was able to make a full fist with both hands. He was able to perform functional opposition of both thumbs.

STRENGTH: Inspection of his upper extremities showed no atrophy. There was decreased muscle tone noted. This client's grip strength was assessed using a hand dynamometer. His upper extremity strength was determined by the computer to be in the

below normal ranges for both his left and the right hands. This client produced a deficit of 7.4% when comparing left grip strength to the right side. This client is right sided dominant.

This client's upper extremity strength was assessed using the manual muscle testing procedures. He did report increased shoulder symptoms with resisted motion. Bilateral upper extremity strength was 4 to a 4+/5 for all major muscle groups. This client did report pain with the limited lifting and carrying which he was able to perform during this evaluation.

Inspection of this client's lower extremities showed no atrophy. He was able to walk on his heels with difficulty. He was unable to walk on his toes, secondary to increased pain. This client's lower extremity strength was assessed using the manual muscle testing procedures. Lower extremity strength was 4+ to a 5-/5. There was no functional weakness noted of either lower extremity. He however was unable to perform full squatting due to reports of increased lower back pain with attempting this activity, as well as pain in both knees with attempting this procedure.

SITTING: Subjectively, this client reported that pain prevents him from sitting for more than 20 to 30 minutes. This client was noted to change his position on a frequent basis. He did demonstrate an altered sitting posture. It is therefore recommended that this client have the ability to change his position on an as needed basis. Continuous sitting should not exceed 20 minutes.

STANDING/WALKING: This client did ambulate with an altered gait pattern as previously described. Upon direct questioning, he did report that his present tolerance for standing and walking is 15 to 20 minutes. This client did not stand or walk at any one time during this evaluation for more than 10 to 12 minutes. He was noted to change his position frequently. There was a deterioration of his gait observed when performing higher level activities, as well as following the evaluation. It is therefore recommended that continuous standing or walking should not exceed 15 to 20 minutes. He should be restricted from performing constant sitting, standing or walking. He should be allowed to change his position on an as needed basis. This does not meet his present job requirements which requires constant standing and walking over a 10 hour work shift.

STATIC LIFTING: This client was unable to obtain or tolerate the position required for the static leg lift. This testing procedure was therefore not completed. This client demonstrated the ability to produce a maximum static lifting force of 33.7 pounds while performing an arm lift, in comparison to 86 pounds which is the norm for males. He demonstrated the ability to produce a maximum static lifting force of 48.8 pounds while performing a high near lift, in comparison to 121 pounds which is the norm for males. Coefficients of variation produced were 4% or less, which would indicate a consistent level of participation with these testing procedures.

DYNAMIC LIFTING: This client was unable to perform any lifting from below the height of 21" above the floor. He was unable to complete the lift of 10 pounds from 21" above the floor to shoulder height. He reported that this was due to increased pain. He did exhibit a

breakdown of his body mechanics. Frequently he was able to lift less than 5 pounds. He was unable to perform any frequent lifting from below the height of 21" above the floor. He was unable to perform any lifting above the height of 66" above the floor. This does not meet his documented job requirement of lifting occasionally up to 20 pounds. This client however was not in agreement and stated that he felt that lifting would be up to 30 pounds, which is the estimated weight of a box of copy paper.

CARRYING: This client did begin the carrying activity at 10 pounds. He could not complete the full testing and exhibited an altered gait pattem. He went on to state "that's hurting my back. That's heavy. I can't." It is therefore recommended that this client be restricted to occasional carrying of less than 10 pounds. Frequent carrying should be less than 5 pounds. This does not meet his documented job requirements.

PUSHING/PULLING: This client demonstrated the ability to produce occasional average static pushing forces of up to 57.4 pounds. He demonstrated the ability to produce occasional average static pulling forces of up to 52.4 pounds. It is therefore recommended that this client be limited to occasional pushing and pulling producing average forces of up to 50 pounds.

BENDING: This client was able to perform less than occasional bending to reach to work to the height of 27" above the floor. He demonstrated no difficulty with the handling or fingering of small objects other than using a decreased speed of motion. He did demonstrate protective postures of his lower back when attempting to reach below waist level. It is therefore recommended that this client be restricted to less than occasional bending to reach to work to the height of 27" above the floor.

KNEELING/CRAWLING: This client was unable to obtain and retum from kneeling or crawling positions without the use of a support. He was able to perform this activity with difficulty. He exhibited limited tolerance for being in a kneeling or crawling position due to reports of bilateral knee pain. It is therefore recommended that this client avoid kneeling and crawling. Any kneeling or crawling should be performed only with the use of a support to enable him to obtain and retum from these positions.

SQUATTING: This client was unable to perform a full squat. This client reported that this was due to increased pain in his lower back and both knees. He did perform the activity using a decreased speed of motion. It is therefore recommended that this client perform less than occasional one-half squatting activities at best.

REACHING: This client did begin the upper level reaching activity to work to the height of 69" above the floor. He did perform the activity using a decreased speed of motion. He did demonstrate protective posture of his cervical spine. It is therefore recommended that this client be restricted to less than occasional reaching to work to the height of 69" above the floor. He should perform no lifting above the height of 66" above the floor using either upper extremity.

CLIMBING: This client did attempt to perform a step up activity to simulate stair climbing. He did perform the activity using a decreased speed of motion. He did use a hand railing. He did report increased lower extremity and lower back pain as the activity progressed. He went on to state "I can't. That's too much." It is therefore recommended that this client be restricted to less than occasional climbing of stairs, and only with the use of a hand railing. It is recommended that he be restricted from the climbing of any ladders, structures or stools.

This client was able to handle and finger small objects without observed difficulty other than using a decreased speed of motion. He had difficulty with tolerating reaching. He demonstrated functional balance with standing and walking on level surfaces. He was able to follow both simple and complex directives.

This client reported that pain was the limiting factor for continuing the functional testing during this evaluation. He was consistent in the fact that he was unable to tolerate various activities due to his reported level of pain and performed them using a decreased speed of motion. This client reported that he has not worked since June of 2015. He reported no vocationally related goals at this time. "The problem is the pain in my lower back which goes into my hips. I cannot stand for more than 15 to 20 minutes because of the pain. Most of the time I lay down or sit down because of the pain. I cannot concentrate. I make mistakes. I have the neck and lower back problems. I lose my memory. I have to have my son write it down to help me know what I have to do. I cannot concentrate. I get frustrated and I get anxiety. When I get the pain, the symptoms radiate into my left hand and my fingers go numb. I cannot stand for 10 hours. I cannot bend too much."

## SUMMARY

In conclusion, Mr. Abolfazal Hosseinpour demonstrated the ability to perform limited work activities as documented. This client reported that he recently underwent an evaluation for social security disability. He stated that he was told by the physician that he would recommend social security disability. This client reported limited tolerance for activity due to his symptoms. "When I bend my neck, I have the pain and I get a migraine headache." This client did report a history of pain, anxiety and depression which affects his ability to concentrate. He reported no vocationally related goals at this time. It is questionable as to whether or not this client would be able to maintain a competitive work pace over a 10 hour work shift. It is questionable as to whether or not this client would be able to maintain a competitive work pace over a 40 hour work week. These questions should best be addressed by his present primary care physician. It is recommended that he perform occasional lifting and carrying of less than 10 pounds. It is recommended that he perform frequent lifting of less than 5 pounds. He should not perform lifting from below the height of 21" above the floor. He should perform no lifting above the height of 66" above the floor. This does not meet his documented job requirements as obtained through review of the job description provided for review at the time of this evaluation. He was unable to perform full squatting. He was able to perform less than occasional half squatting activities at best. He should avoid kneeling and crawling. Any kneeling or crawling should be performed using a

support. He was able to perform less than occasional rotational activities involving his thoracic/lumbar spine. He should be restricted from performing constant cervical rotation. He was able to perform less than occasional bending to reach to work to the height of 27" above the floor. He was able to perform less than occasional reaching to work to the height of 69" above the floor. He should be allowed to change his position on an as needed basis. Continuous standing or walking should not exceed 15 to 20 minutes. Continuous sitting should not exceed 20 minutes. This client should be restricted from performing constant sitting, standing or walking. His present job does require constant standing and walking.

This client has completed a Functional Capacity Evaluation at the offices of ATI Physical Therapy utilizing the Hanoun Evaluation and Rehabilitation System.

I would like to take this opportunity to thank you for allowing me to assist you in the treatment of this client.

If you should require any clarification of these tests or the procedures performed, I would be happy to discuss them with you in further detail.

Sincerely,

Doug Ellis, PT
Nevada State License 0149

de:dmp
dt:083016

Enclosures

7Q266160020

# FUNCTIONAL ABILITIES EVALUATION

BTE TECHNOLOGIES™

## Client Information

**Client Name:** Mr. Abolfazal Hosseinpour
**Address:**

**Dominant Hand:** Right Hand
**SSN:**

**Date of Birth:**
**Gender:** Male
**Height:** 69 inches
**Weight:** 182 lbs
**Marital Status:** Single

## Employment Information

**Occupation:** Pharmacy Manager
**Employer:** Safeway
**Address:**

## Insurance Information

**Company:** Self Pay
**Address:**

**Work Status:** Not currently working

**Start & Finish Date:** Aug 26, 2016
**Evaluator:** Doug Ellis PT

Doug Ellis PT
Physiotherapist

ATI PHYSICAL THERAPY
3233 W. CHARLESTON BLVD. LAS VEGAS NV 89102 (702) 258-9381

All testing was completed using the FOCUS System, Data Management was compiled through ODES products of BTE Technologies

7Q266160020

## Work Simulation ► Stair Climbing

Aug 26, 2016 2:19:07 PM

Client was asked to ascend/descend a series of 4 stairs for a total of 10 cycles. Gait patterns and performance behaviours will be recorded to determine tolerance for activity.

| Time (min,secs) | Initial Heart Rate (bpm) | Final Heart Rate (bpm) | Stairs Ascended | Stairs Descended |
|---|---|---|---|---|
| :49 | 78 | 89 | 8 | 8 |

**Evaluator Comments**

the client performed the testing using a hand railing and a slow speed of movement, He did favor his right lower extremity. The testing was stopped due to increased lower back and lower extremity pain. "I can't. That's too much".

## Hand Grip Strength

The JAMAR hand dynamometer was used in order to quantify grip strength and determine whether Mr. Abolfazal Hosseinpour exerted consistent effort during grip strength testing. Mr. Abolfazal Hosseinpour was tested using the standard hand grip protocol. Mr. Abolfazal Hosseinpour is right hand dominant. Normative data is based on the assumption that right and left hand dominant subjects, analyzed separately show little functional difference between their mean scores.[1, 2]



The client squeezes the hand grip dynamometer for a three second trial duration. A rest period of 5 seconds is given before testing the other hand. This process is repeated three times. The average of the three trials is compared to published normative data[1, 2]

### Standard Hand Grip

Aug 26, 2016 2:03:01 PM




| | Left | Right |
|---|---|---|
| Trial #1 | 50.6 lbs. | 53.6 lbs. |
| Trial #2 | 51.8 lbs. | 59.2 lbs. |
| Trial #3 | 51.2 lbs. | 53.0 lbs. |
| Average | 51.2 lbs. | 55.3 lbs. |
| Maximum | 51.8 lbs. | 59.2 lbs. |
| COV | 1.0% | 5.0% |
| Diff L Vs. R | 7.4% | |

Mr. Abolfazal Hosseinpour's grip strength was compared to age and gender matched normative data. The published normal grip strength range for the left hand is from 59.8 lbs to 106.6 lbs.[1, 2] Mr. Abolfazal Hosseinpour displayed an average force of 51.2 lbs. which is considered in the below normal range when compared to the normal population of the referenced study. The published normal grip strength range for the right hand is from 74.4 lbs to 127.8 lbs.[1, 2] Mr. Abolfazal Hosseinpour displayed an average force of 55.3 lbs. which is considered in the below normal range when compared to the normal population of the referenced study. The coefficient of variation was 1% for the left hand and 5% for the right hand. Values greater than 15% may be an indicator of inconsistent effort.

[1] Mathiowetz V, Kashman N, Volland G, Weber K, Dowe M, Rogers S. 1985. Grip and pinch strength: normative data for adults. Arch Phys Med Rehabil 66:69-74.
[2] Mathiowetz V, Wiemer D, Federman S. 1986. Grip and pinch strength: norms for 6- to 19- year olds. Am J Occup Ther 40(10):705-11.

## Pinch Strength

The FOCUS pinch strength test is performed to quantify pinch strength as compared to population norms.† Mr. Abolfazal Hosseinpour was asked to perform the Key pinch. The data demonstrated that Mr. Abolfazal Hosseinpour's Key pinch strength was normal for both the left and right hand. His left hand was 3.4% stronger than the right hand.



The client squeezes the pinch gauge using a key pinch for a three second trial duration. A rest period of 5 seconds is given before testing the other hand. This process is repeated three times. The average of the three trials is compared to puplished population normal values.†

### Key Pinch Strength

Aug 26, 2016 2:06:20 PM




| | Left | Right |
|---|---|---|
| Trial #1 | 24.7 lbs. | 24.6 lbs. |
| Trial #2 | 25.4 lbs. | 23.4 lbs. |
| Trial #3 | 25.1 lbs. | 24.8 lbs. |
| Average | 25.1 lbs. | 24.3 lbs. |
| Maximum | 25.4 lbs. | 24.8 lbs. |
| COV | 1.1% | 2.5% |
| Diff L Vs. R | 3.4% | |

Pinch Strength Average Force Comparison




† Mathiowetz V, Kashman N, Volland G, Weber K, Dowe M, Rogers S. 1985. Grip and pinch strength: normative data for adults. Arch Phys Med

7Q266160020

## Static Pull Strength

Test Date: Aug. 26, 2016 2:11:34 PM

Acc. Rot. Angle: Handle Type

Accessory Angle Foot Placement




| | |
|---|---|
| Trial 1: 52.4 lbs | Average: 52.4 lbs |
| Trial 2: 57.6 lbs | COV: 8.1% |
| Trial 3: 47.2 lbs | |

Mr. Abolfazal Hosseinpour reached an average peak force of 52.4 lbs. for the Static Pull Strength test. The coefficient of variation was 8.1% during the Static Pull Strength. Values greater than 15% may be an indicator of submaximal effort.

## Static Push Strength

Test Date: Aug. 26, 2016 2:10:28 PM

Acc. Rot. Angle: Handle Type

Accessory Angle Foot Placement




| | |
|---|---|
| Trial 1: 55.7 lbs | Average: 57.4 lbs |
| Trial 2: 60.4 lbs | COV: 3.7% |
| Trial 3: 56.1 lbs | |

Mr. Abolfazal Hosseinpour reached an average peak force of 57.4 lbs. for the Static Push Strength test. The coefficient of variation was 3.7% during the Static Push Strength. Values greater than 15% may be an indicator of submaximal effort.

**Standard NIOSH**

Mr. Abolfazal Hosseinpour's ability to lift, push or pull was assessed using the FOCUS Standard NIOSH strength test. It is predictable that leg strength will be greater than either torso or arm strength.†

Aug 26, 2016 2:14:45 PM



The client pulls up for a five second trial duration. A rest period of 15 seconds is given in between the three trials.




| | Force |
|---|---|
| Trial #1 | |
| Trial #2 | |
| Trial #3 | |
| Average | |
| Maximum | |
| COV | |



The client pulls up for a five second trial duration. A rest period of 15 seconds is given in between the three trials.




| | Force |
|---|---|
| Trial #1 | |
| Trial #2 | |
| Trial #3 | |
| Average | |
| Maximum | |
| COV | |



The client pulls up for a five second trial duration. A rest period of 15 seconds is given in between the three trials.




| | Force |
|---|---|
| Trial #1 | 31.2 lbs. |
| Trial #2 | 33.7 lbs. |
| Trial #3 | 32.3 lbs. |
| Average | 32.4 lbs. |
| Maximum | 33.7 lbs. |
| COV | 03.0% |

An average force of 32.4 lbs. was exerted by Mr. Abolfazal Hosseinpour during the arm lift. The coefficient of variation for this test was 3%. Values greater than 15% may be an indicator of inconsistent effort.



The client pushes up for a five second trial duration. A rest period of 15 seconds is given in between the three trials.




| | Force |
|---|---|
| Trial #1 | 47.1 lbs. |
| Trial #2 | 48.8 lbs. |
| Trial #3 | 43.8 lbs. |
| Average | 46.6 lbs. |
| Maximum | 48.8 lbs. |
| COV | 04.0% |

An average force of 46.6 lbs. was exerted by Mr. Abolfazal Hosseinpour during the high near lift. The coefficient of variation for this test was 4%. Values greater than 15% may be an indicator of inconsistent effort.

**Evaluator Comments**

The client was unable to obtain/tolerate the required testing position for thr leg lift."That's too low".

† Atuahene, F and A. Freivalds (1987) Comparison of Dynamic Static and Psychophysical Evaluations of Human Strength Capablities. Journal of Human Ergology, Vol. 16, No. 2: 17-191

7Q266160020

**Dynamic Lifting - Floor to Shoulder Occasional**

Aug 26, 2016 2:46:52 PM

The Dynamic Lifting - Floor to Shoulder Occasional was conducted in Mr. Hosseinpour's case in order to determine his ability to complete the task. A progressive loading method was used to determine Mr. Hosseinpour's capacity for the performance of dynamic lifting activities on a safe and dependable basis. Lifting was conducted between floor height and shoulder height for a total of 1 repetition at each weight increment. The increase in the amount of weight lifted was in 10-pound increments.

In order to ensure safety in the administration of the testing protocol, Mr. Hosseinpour's heart rate was monitored on a real-time basis. A cut-off of 138 beats per minute, based upon 85 percent of the age-predictive maximum heart rate was used in order to ensure the safe administration of the dynamic lifting protocol. A rating of perceived exertion was also used in order to make certain Mr. Hosseinpour was capable of continuing in the protocol without risk of injury.

During the course of testing Mr. Hosseinpour's heart rate remained constant at 78 beats per minute with a final weight of 0 lbs. Mr. Hosseinpour's heart rate did not recover. Instead it remained constant at 78 beats per minute during the 1 minute recovery period.

Mr. Hosseinpour demonstrated a safe weight lifting ability of 0 lbs. The reason for the conclusion of the dynamic lifting protocol was the fact Mr. Hosseinpour voluntarily stopped the test.




Initial Heart Rate: 78 BPM
Peak Heart Rate: 78 BPM
Final Testing Heart Rate: 78 BPM
% Heart Rate Increase: 0 %
Final RecoveryHeart Rate: 78 BPM
Avg. Recovery Heart Rate 78 BPM

Elapsed Time: 00:04
Recovery Time: 01:00

| | | | |
|---|---|---|---|
| Starting Height | Floor Height | Exertion Rating Stop Point | Very Heavy |
| Ending Height | Shoulder Height | Heart Rate Cut Off | 85% of age adj. |
| Initial Weight | 10.0 lbs. | Maximum Test Duration | Unlimited |
| Weight Increments | 10.0 lbs. | Maximum Allowed Weight | None |
| Repetitions Per Weight | 1 Repetition | Maximum Safe Weight Lifted | Less then 10 lbs. |
| Rest Period Per Weight Cycle | No Rest Period | | |

**Evaluator Comments**

The client was unable to lift from floor level. "That's too low. That hurts my back".

7Q266160020

**Dynamic Lifting - Waist to Shoulder Occasional**

Aug 26, 2016 2:43:05 PM

The Dynamic Lifting - Waist to Shoulder Occasional was conducted in Mr. Hosseinpour's case in order to determine his ability to complete the task. A progressive loading method was used to determine Mr. Hosseinpour's capacity for the performance of dynamic lifting activities on a safe and dependable basis. Lifting was conducted between waist height and shoulder height for a total of 1 repetition at each weight increment. The increase in the amount of weight lifted was in 10-pound increments.

In order to ensure safety in the administration of the testing protocol, Mr. Hosseinpour's heart rate was monitored on a real-time basis. A cut-off of 138 beats per minute, based upon 85 percent of the age-predictive maximum heart rate was used in order to ensure the safe administration of the dynamic lifting protocol. A rating of perceived exertion was also used in order to make certain Mr. Hosseinpour was capable of continuing in the protocol without risk of injury.

During the course of testing Mr. Hosseinpour's heart rate remained constant at 78 beats per minute with a final weight of 0 lbs. Mr. Hosseinpour's heart rate did not recover. Instead it remained constant at 78 beats per minute during the 1 minute recovery period.

Mr. Hosseinpour demonstrated a safe weight lifting ability of 0 lbs. The reason for the conclusion of the dynamic lifting protocol was the fact Mr. Hosseinpour voluntarily stopped the test.




Initial Heart Rate: 78 BPM
Peak Heart Rate: 78 BPM
Final Testing Heart Rate: 78 BPM
% Heart Rate Increase: 0 %
Final RecoveryHeart Rate: 78 BPM
Avg. Recovery Heart Rate 78 BPM
Elapsed Time: 00:30
Recovery Time: 01:00

| | | | |
|---|---|---|---|
| Starting Height | Waist Height | Exertion Rating Stop Point | Very Heavy |
| Ending Height | Shoulder Height | Heart Rate Cut Off | 85% of age adj. |
| Initial Weight | 10.0 lbs. | Maximum Test Duration | Unlimited |
| Weight Increments | 10.0 lbs. | Maximum Allowed Weight | None |
| Repetitions Per Weight | 1 Repetition | Maximum Safe Weight Lifted | Less then 10 lbs. |
| Rest Period Per Weight Cycle | No Rest Period | | |

**Evaluator Comments**

The client was unable to complete the lift. "I don't have the strength. It's the pain". The client did use an improper lifting technique".

7Q266160020

## Dynamic Carrying

Aug 26, 2016 2:49:28 PM

The Dynamic Carrying was conducted in Mr. Hosseinpour's case in order to determine his ability to complete the task. A progressive loading method was used to determine Mr. Hosseinpour's capacity for the performance of carrying activities on a safe and dependable basis. Carrying was conducted for a distance of 30 feet during each activity repetition. The lift performed in conjunction with the initiation of the carrying activity was at his waist height level. The programmed increase of the weight in this activity was 10 pounds for each carrying cycle.

In order to ensure safety in the administration of the testing protocol, Mr. Hosseinpour's heart rate was monitored on a real-time basis. A cut-off of 138 beats per minute, based upon 85 percent of the age-predictive maximum heart rate was used in order to ensure the safe administration of the dynamic carrying protocol. A rating of perceived exertion was also used in order to make certain Mr. Hosseinpour was capable of continuing in the protocol without risk of injury.

During the course of testing Mr. Hosseinpour's heart rate remained constant at 78 beats per minute with the initial attempted weight of 10 lbs. Mr. Hosseinpour's heart rate did not recover. Instead it remained constant at 78 beats per minute during the 1 minute recovery period.

Mr. Hosseinpour was unable to demonstrate the ability to safely carry the initial weight of 10 pounds. The reason for the conclusion of the dynamic carrying protocol was the fact Mr. Hosseinpour voluntarily stopped the test.




During Testing ■ Before & After Testing — Maximum Allowable HR

Initial Heart Rate: 78 BPM
Peak Heart Rate: 78 BPM
Final Testing Heart Rate: 78 BPM
% Heart Rate Increase: 0 %
Final RecoveryHeart Rate: 78 BPM
Avg. Recovery Heart Rate 78 BPM
Elapsed Time: 00:17
Recovery Time: 01:00

| | | | |
|---|---|---|---|
| **Starting Height** | Waist Height | **Exertion Rating Stop Point** | Heavy |
| **Carry Distance** | 30 Feet | **Heart Rate Cut Off** | 85% of age adj. |
| **Initial Weight** | 10.0 lbs. | **Maximum Test Duration** | Unlimited |
| **Weight Increments** | 10.0 lbs. | **Maximum Allowed Weight** | None |
| **Repetitions Per Weight** | 1 Repetition | **Maximum Safe Weight Carried** | Less then 10 lbs. |
| **Rest Period Per Weight Cycle** | No Rest Period | | |

**Evaluator Comments**

The client was unable to complete the lift. "That's heavy. I can't. That's hurting my back".

**Occasional - F.R.O.M. Axial Rotation Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of five cycles are completed.

The Sustained Standing Reach with Axial Rotation Evaluation protocol was used to determine Mr. Abolfazal Hosseinpour's ability to perform axial rotation activities in a standing position and performing functional reaching on a sustained basis. Mr. Abolfazal Hosseinpour was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Aug 26, 2016 2:28:15 PM | 02:27 | 0% | Below Competitive |

The test scoring is based upon the total time necessary to complete five cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Abolfazal Hosseinpour had a MTM score of 0% which correlates to a rating of below competitive.

**Evaluator Comments**

The client performed the testing using a decreased speed of movement. He did report increased lower back pain as the testing progressed. He was noted to shift his weight from side to side as the activity progressed. The testing was stopped by the client. "My back pain is getting worse because I'm turning".

**Occasional - F.R.O.M. Crouching/Squatting Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of five cycles are completed.

The Sustained Crouching Reach protocol was used to determine Mr. Abolfazal Hosseinpour's ability to perform crouching activities with functional reaching on a sustained basis. Mr. Abolfazal Hosseinpour was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Aug 26, 2016 2:35:12 PM | 00:01 | 0% | Below Competitive |

The test scoring is based upon the total time necessary to complete five cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Abolfazal Hosseinpour had a MTM score of 0% which correlates to a rating of below competitive.

**Evaluator Comments**

The client was unable to perform a full squat. "I can't because of my knee and my back pain". The testing was therefore not completed.

**Occasional - F.R.O.M Kneeling to Standing and Back Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of seven cycles are completed.

The Sustained Kneeling Reach to Standing Reach and Return to Kneeling Reach Evaluation protocol was used to determine Mr. Abolfazal Hosseinpour's ability to perform activities requiring going into and out of the kneeling position and performing functional reaching on a sustained basis. Mr. Abolfazal Hosseinpour was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Aug 26, 2016 2:32:42 PM | 00:02 | 0% | Below Competitive |

The test scoring is based upon the total time necessary to complete seven cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Abolfazal Hosseinpour had a MTM score of 0% which correlates to a rating of below competitive.

**Evaluator Comments**

The client was unable to obtain/return from a kneeling position without the use of a support. "I don't have the strength". The testing was therefore not completed.

**Occasional - F.R.O.M. Stooping Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of five cycles are completed.

The Sustained Stooping Reach protocol was used to determine Mr. Abolfazal Hosseinpour's ability to perform stooping activities with functional reaching on a sustained basis. Mr. Abolfazal Hosseinpour was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Aug 26, 2016 2:36:26 PM | 01:55 | 0% | Below Competitive |

The test scoring is based upon the total time necessary to complete five cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Abolfazal Hosseinpour had a MTM score of 0% which correlates to a rating of below competitive.

**Evaluator Comments**

The lower level bending was performed to reach to the height of 27 inches above the floor. The client performed the activity using a decreased speed of movement. He did report increased lower back pain with the lower level reaching. The testing was stopped due to his increased pain. "Now I'm pushing myself. It's getting worse".

**Occasional - F.R.O.M. Upper Level Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of five cycles are completed.

The Sustained Upper Level Reach protocol was used to determine Mr. Abolfazal Hosseinpour's ability to perform shoulder level and above reaching activities on a sustained basis. Mr. Abolfazal Hosseinpour was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Aug 26, 2016 2:22:49 PM | 01:37 | 0% | Below Competitive |

The test scoring is based upon the total time necessary to complete five cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Abolfazal Hosseinpour had a MTM score of 0% which correlates to a rating of below competitive.

**Evaluator Comments**

The upper level reaching was performed to the height of 69 inches. The client reported increased cervical pain with attempted higher level reaching. The client performed the testing using a decreased speed of movement. He did report increased pain. "That bothers my back when I'm standing. My hands get tired". The testing was stopped by the client due to his increased symptoms.

## Cardiovascular Intake

| Aug 26, 2016 | Resting Rate (Min) | Systolic (mm Hg) | Diastolic (mm Hg) |
|---|---|---|---|
| | 78 | 120 | 90 |
| **Result** | Normal Heart Rate | Normal Blood Pressure | Mild Hypertension |

7Q266160020

# EXHIBIT 5

EXHIBIT 5

7Q266160020

# Social Security Administration
# **Retirement, Survivors and Disability Insurance**
Notice of Award

Western Program Service Center
P.O. Box 2000
Richmond, California 94802-1791
Date: July 1, 2016
Claim Number: IA

961 2 MB 0.419 T10 MAAD296 PL1 S296 M3 PC5 160627
961 ABOLFAZL D HOSSEIN POUR
11

You are entitled to monthly disability benefits beginning January 2016.

## The Date You Became Disabled

We found that you became disabled under our rules on July 14, 2015.

To qualify for disability benefits, you must be disabled for five full calendar months in a row. The first month you are entitled to benefits is January 2016.

## What We Will Pay And When

- You will receive $13,026.00 around July 7, 2016.
- This is the money you are due for January 2016 through June 2016.
- Your next payment of $2,171.00, which is for July 2016, will be received on or about the second Wednesday of August 2016.
- After that you will receive $2,171.00 on or about the second Wednesday of each month.
- These and any future payments will go to the financial institution you selected. Please let us know if you change your mailing address, so we can send you letters directly.
- The day of the month you receive your payments depends on your date of birth.

## Others Who May Be Eligible For Benefits

Your child may now be eligible for benefits on your record. You named the following child when you applied for benefits:

Enclosure(s):
Pub 05-10153

C

See Next Page

7Q266160020

HA



- B H(

If you have not filed an application for benefits for the child, please contact us.

**Other Social Security Benefits**

This benefit is the only benefit you can receive from us at this time. In the future, if you think you might qualify for another benefit from us, you will need to apply again.

**Your Responsibilities**

We based our decision on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.

We have enclosed a pamphlet, "What You Need To Know When You Get Social Security Disability Benefits." It tells you what you must report and how to report. Please be sure to read the parts of the pamphlet that tell you what to do if you go to work or your health improves.

A vocational rehabilitation or employment services provider may contact you to help you in going to work. The provider may be from a State agency or work under contract with Social Security.

If you go to work, we have special rules that let us continue your cash payments and health care coverage. To learn more about how work and earnings affect disability benefits, visit our website at www.socialsecurity.gov/work/. You may also call or visit any Social Security office to ask for the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).
- Social Security - If You Are Blind–How We Can Help (SSA Publication No. 05-10052).

**Your Benefits May Be Taxed**

You may have to pay taxes on the benefits you get from us. Part of your Social Security benefits may be taxed if:

- you are single and your total income is more than $25,000 or
- you are married and you and your spouse have total income of more than $32,000.

You can decide if you want to have federal taxes withheld from your benefits. If you want taxes withheld, you need to complete and return a Form W-4V, Voluntary Withholding Request. You can get Form W-4V from the Internal Revenue Service by calling 1-800-829-3676. You can also get this form at www.socialsecurity.gov/planners/taxes.htm on our website. After you complete and sign the form, return it to your local Social Security office by mail or in person.

You can find more information on paying taxes in the enclosed pamphlet, "What You Need To Know When You Get Social Security Disability Benefits".

**Do You Disagree With The Decision?**

If you do not agree with this decision, you have the right to appeal. We will review your case and look at any new facts you have. A person who did not make the first decision will decide your case. We will review the parts of the decision that you think are wrong and correct any mistakes. We may also review the parts of our decision that you think are right. We will make a decision that may or may not be in your favor.

- You have 60 days to ask for an appeal.
- The 60 days start the day after you receive this letter. We assume you received this letter 5 days after the date on it unless you show us that you did not receive it within the 5-day period.
- You must have a good reason if you wait more than 60 days to ask for an appeal.
- You can file an appeal with any Social Security office. You must ask for an appeal in writing. Please use our "Request for Reconsideration" form, SSA-561-U2. You may go to our website at www.socialsecurity.gov/online/ to find the form. You can also call, write, or visit us to request the form. If you need help to fill out the form, we can help you by phone or in person.

**Things To Remember For The Future**

Doctors and other trained staff decided that you are disabled under our rules. However, we must review all disability cases. Therefore, we will review your case in 5 to 7 years. We will send you a letter before we start the review. Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.

**If You Want Help With Your Appeal**

You can have a friend, representative, or someone else help you. There are groups that can help you find a representative or give you free legal services if you qualify. There are also representatives who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a representative who is eligible for direct pay, we will withhold up to 25 percent of any past due benefits to pay toward the fee.

**Suspect Social Security Fraud?**

Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline at 1-800-269-0271 (TTY 1-866-501-2101).

7Q266160020



**If You Have Questions**

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-866-614-9667. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
4340 SIMMONS STREET
NORTH LAS VEGAS NV 89032

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Carolyn W. Colvin
Acting Commissioner of
Social Security

7Q266160020

# EXHIBIT 6

EXHIBIT 6

7Q266160020

**SOCIAL SECURITY ADMINISTRATION**

Form Approved
OMB No. 0960-0681

## FUNCTION REPORT – ADULT

*How your illnesses, injuries, or conditions limit your activities*

**For SSA Use Only**
**Do not write in this box.**

Related SSN ______________

Number Holder ______________

## SECTION A- GENERAL INFORMATION

| 1. NAME OF DISABLED PERSON (*First, Middle, Last*) | 2. SOCIAL SECURITY NUMBER |
|---|---|
| ABOLFAZL DJAFAR ABADI HOSSEIN POUR | |

**3. YOUR DAYTIME TELEPHONE NUMBER** *(If there is no telephone number where you can be reached, please give us a daytime number where we can leave a message for you.)*

______ ______________ ☒ Your Number ☐ Message Number ☐ None
*Area Code* *Phone Number*

4. a. Where do you live? *(Check One.)*

☒ House ☐ Apartment ☐ Boarding Home ☐ Nursing Home
☐ Shelter ☐ Group Home ☐ Other (What?) ______________

b. With whom do you live? *(Check One.)*

☐ Alone ☒ With Family ☐ With Friends
☐ Other *(Describe Relationship)* ______________

## SECTION B – INFORMATION ABOUT YOUR ILLNESSES, INJURIES, OR CONDITIONS

5. How do your illnesses, injuries, or conditions limit your ability to work?

Since I have lower back pain which Transfer to my hips and legs & knee it makes impossible to stand whole day at pharmacy. The pain is so severe I loose my belance and control my walking in pharmacy. The pain from my neck shoot to my head which gives me migraine headache and make impossible to focus on pt's prescription and most of time I can't concentrate to my job as pharmacist to fill pt's prescription with accuracy and not making mistake. God forbid if I make mistake because of my pain and not able to concentrate it will harm or kill some p

"Continue in page 8 Section E"

7Q266160020

## SECTION C – INFORMATION ABOUT DAILY ACTIVITIES

6. Describe what you do from the time you wake up until going to bed.
First take some meds before breakfast, make 2-3 Cup of tea and eat some bread with cheese around 9:30-10 Am. Take other meds around 11 Am. take shower, I might call my boys or text them in overseas. Watch some TV for news. Do my praying around 1 Pm. eat something for lunch 1:30-2 pm I might take nap 3 pm for 20 mints. Drink a cup tea at 4-5 pm. pray at 6 pm go outside for 10-15 mits for fresh air. eat dinner around 8-9 pm Take meds and go to bed 10:30-11 pm

7. Do you take care of anyone else such as a wife/husband, children, grandchildren, parents, friend, other? ☐ Yes ☒ No

If "YES," for whom do you care, and what do you do for them? ______

8. Do you take care of pets or other animals? ☐ Yes ☒ No

If "YES," what do you do for them? ______

9. Does anyone help you care for other people or animals? ☐ Yes ☒ No

If "YES," who helps and what do they do to help? ______

10. What were you able to do before your illnesses, injuries, or conditions that you can't do now? my pains from neck & back and anxiety limited my ability to concentrate and stand up for l[...]

11. Do the illnesses, injuries, or conditions affect your sleep? ☒ Yes ☐ No
If "YES," how? The pain from my back goes to my leg and get tingling sensation and also headache from my neck and also I have bladder problem.

12. **PERSONAL CARE** (Check here ☐ if **No PROBLEM** with personal care.)
a. Explain how your illnesses, injuries, or conditions affect your ability to:

Dress: Sometimes I can't stand or fall while puting my pants
Bathe: standing cause severe pain on my legs also I have obsession with bathing to feel washed prefect
Care for hair: No Problem
Shave: standing while shaving cause severe pain on my legs
Feed self: Sometimes my anxity cause to drop my food or bite my lips or tongue & checks
Use the toilet: No
Other? ______

7Q266160020

b. Do you need any special reminders to take care of personal needs and grooming? Not for grooming ☐ Yes ☒ No

If "YES," what type of help or reminders are needed?

Yes, sometimes I Tell my son to reminds me about my medication which I don't want to double The dose.

c. Do you need help or reminders taking medicine? ☒ Yes ☐ No

If "YES," what kind of help do you need?

Sometimes I forget to take my meds and can't remember I Took them or not

## 13. MEALS

a. Do you prepare your own meals? ☒ Yes ☐ No

If "Yes", what kind of food do you prepare? (For example, sandwiches, frozen dinners, or complete meals with several courses.)

frozen food, sandwiches, Pizza from outside, Can food

How often do you prepare food or meals? (For example, daily weekly, monthly.)

Daily

How long does it take you? 5 minuts

Any changes in cooking habits since the illness, injuries, or conditions began?

Yes, I used To cook but now I Can't do it

b. If "No," explain why you cannot or do not prepare meals. Sometimes I drop dishes or cut my fingers if I get anxiety attack.

## 14. HOUSE AND YARD WORK

my health would not let me to do any thing outdoor at all.

a. List household chores, both indoors and outdoors, that you are able to do. (For example, cleaning, laundry, household repairs, ironing, mowing, etc.)

I do only laundry with wash machine

b. How much time does it take you, and how often do you do each of these things?

5 minuts

c. Do you need help or encouragement doing these things? ☐ Yes ☒ No

If "YES", what help is needed?

7Q266160020

d. If you don't do house or yard work, explain why not. my back pain, hip pain, anxitey would not let me to do any thing and no delice at all.

15. **GETTING AROUND**

a. How often do you go outside? once or twice a day to get fresh air on
If you don't go out at all, explain why not. clear my mind or some bizare thing which I feel useless

b. When going out, how do you travel? *(Check all that apply.)*

☒ Walk ☒ Drive a car ☒ Ride in a car ☐ Ride a bicycle
☐ Use public transportation ☒ Other *(Explain)* my Son drive too

c. When going out, can you go out alone? ☒ Yes ☐ No

If "NO," explain why you can't go out alone. I prefer go out with my son because of anxiety attack and depression which made me to feel down and sad. Also my pain from neck + back

d. Do you drive? ☒ Yes ☐ No
If you don't drive, explain why not

16. **SHOPPING**

a. If you do any shopping, do you shop: *(Check all that apply.)*

☒ In stores ☐ By phone ☐ By mail ☐ By computer

b. Describe what you shop for. go to pharmacy, buy bread, frozen food, Can food, Cooked food. any thing simple and easy like soups + Hotdog

c. How often do you shop and how long does it take? 10-15 minits once or twice a week with my son

17. **MONEY**

a. Are you able to

| | | | | | |
|---|---|---|---|---|---|
| Pay bills | ☒ Yes | ☐ No | Handle a savings account | ☐ Yes | ☒ No |
| Count change | ☒ Yes | ☐ No | Use checkbook/money orders | ☒ Yes | ☐ No |

Explain all "NO" answers. No Saving account

7Q266160020

b. Has your ability to handle money changed since the illnesses, injuries, or conditions began? ☐ Yes ☒ No
If "YES," explain how the ability to handle money has changed.

18. **HOBBIES AND INTERESTS**

a. What are your hobbies and interests? (For example, reading, watching TV, sewing, playing sports, etc.)

reading, watching TV, Looking medical procedure on T.V listen to dua or Some lectures from quran on internet or Youtube

b. How often and how well do you do these things? every day, I Can read and Some news at T.V but not scary movies which cause my anxitey to go worst

c. Describe any changes in these activities since the illnesses, injuries, or conditions began.

I can't go to mountain for picnic because of anxiety or drive on bridge which cause severe anxity and fear of falling from bridg

19. **SOCIAL ACTIVITIES**

Do you spend time with others? *(In person, on the phone, on the computer, etc.)* ☒ Yes ☐ No

a. If "YES," describe the kinds of things you do with others

phone, Texting To my sisters & family in Iran

How often do you do these things? every day or other day

b. List the places you go on a regular basis. (For example, church, community center, sports events, social groups, etc.)

Sometimes to mosque to pray or for ramadan yearly

Do you need to be reminded to go places? ☐ Yes ☒ No

How often do you go and how much do you take part?

Not That often, That would be yearly for Ramadan

Do you need someone to accompany you? ☐ Yes ☒ No

7Q266160020

c. Do you have any problems getting along with family, friends, neighbors, or others ☐ Yes ☒ No
If "YES," explain. I really don't contect with my neighboss, I just Say hi. My family live in over Sea.

d. Describe any changes in social activities since the illnesses, injuries, or conditions began.
I used to go out but now I Stay at home mostly and I feel guilty to go to Casino or I Can't Stay out long time because on my neck + back pain

## SECTION D - INFORMATION ABOUT ABILITIES

20. a. Check any of the following items your illness, injuries, or conditions affect

| | | | |
|---|---|---|---|
| ☒ Lifting | ☒ Walking | ☒ Stair-Climbing | ☐ Understanding |
| ☐ Squatting | ☒ Sitting | ☐ Seeing | ☐ Following Instructions |
| ☒ Bending | ☒ Kneeling | ☒ Memory | ☐ Using Hands |
| ☒ Standing | ☐ Talking | ☒ Completing Tasks | ☐ Getting Along with Others |
| ☐ Reaching | ☐ Hearing | ☒ Concentration | |

Sever pain for my neck + head ← (Bending)

Please explain how your illness, injuries or conditions affect each of the items you checked. (For example, you can only lift [how many pounds], or you can only walk [how far]) my pain from beck + Neck + anxitey ede pression all of These make my health worsen and Took away my ability to function as before

b. Are you: ☒ Right Handed? ☐ Left handed?

c. How far can you walk before needing to stop and rest? 5 mints

If you have to rest, how long before you can resume walking? 3-5 mints

d. For how long can you pay attention? 5 mints

e. Do you finish what you start? *(For example: a conversation, chores, reading, watching a movie)* ☐ Yes ☒ No
Sometimes I forgot what I was doing and I Can't rec

f. How well do you follow written instructions? (For example a recipe) ok Not bad

g. How well do you follow spoken instructions? ok not bad

7Q266160020

h. How well do you get along with authority figures? (For example, police, bosses, landlords or teachers) No Problem, but I Prefer to Stay away because I don't want my anxiety triggers any Problems or Conflict for me.

i. Have you ever been fired or laid off from a job because of problems getting along with other people? ☐ Yes ☒ No

If "YES," please explain. ______

If "YES," please give name of employer ______

j. How well do you handle stress? I Can't handle Stress at all. I Stay aw[ay] even a little stress Cause big anxiety for me.

k. How well do you handle changes in routine? It is hard to change anything

l. Have you noticed any unusual behavior or fears? ☒ Yes ☐ No

If "YES," please explain. I lose my Concentrations forget most of time what I was doing and I keep washing myself in bath even I have Severe back & hip pain I became obssesed with most of things for now, specially when I am bathing

21. Do you use of any of the following? *(Check all that apply)*

☐ Crutches ☐ Cane ☐ Hearing Aid
☐ Walker ☐ Brace/Splint ☒ Glasses/Contact Lenses
☐ Wheelchair ☐ Artificial Limb ☐ Artificial Voice Box
☐ Other (Explain) Sometimes I Can't walk and I have to hold my son hand or lean on somethi[ng]

Which of these were prescribed by a doctor? Glasses

When was it prescribed? Since 2000

When do you need to use these aids? All the time

7Q266160020

22. Do you currently take any medicines for your illnesses, injuries, or conditions? ☒ Yes ☐ No

If "YES," do any of your medicines cause side effects? ☒ Yes ☐ No

If "YES," please explain (Do not list all of the medicines that you take. List only the medicines that cause side effects.) addication or dependecy to painkiller

| NAME OF MEDICINE | SIDE EFFECTS YOU HAVE |
|---|---|
| Alprazolam | |
| Paxil | itching |
| gabapentin | rash (at the begin) |
| lovaza | |
| ~~Fioricet c codein~~ | ~~I got scare to get Addicted~~ to codein |
| ~~Tramadol~~ | but I need it for my pain |

Protonix + Ambien

## SECTION E - REMARKS

**Use this section for any added information you did not show in earlier parts of this form. When you are done with this section (or if you don't have anything to add), be sure to complete the fields at the bottom of this page.** Continue from Section "B" page 1

The anxiety attach which I get 3-4 times during day while I am working as a pharmacist it really makes me to have nervess break down. and my whole body get hot and my heart beats so fast it seems I have heart attac and the anxiety would make me to loose my focus and concentration on pt's prescriptions. Sometimes it comes to me I will die from anxiety attack. The depression cause my mind to fly constantly to lots of bad things happened in past such as death my parents, my best friend and cousin in auto accident or myself in paine attack while driving on bridges or high hill area. All of these thoght in my mind limited my ability to concentrate on pt's prescription for accuracy. Sometimes I forget to check the prescription and go back to same pt to redo it gain. It is really not safe for me and pt.

| Name of person completing this form. (Please print) | Date (month, day, year) |
|---|---|
| Abolfazl Hosseinpour | 11-11-15 |

| Address (Number and Street) | Email address (optional) |
|---|---|
| | |

| City | State | ZIP Code |
|---|---|---|
| | | |

7Q266160020

# EXHIBIT 7

EXHIBIT 7

AUG-25-2016 00:29 SSAD49 7026462636 P.002

7O266160020

SOCIAL SECURITY ADMINISTRATION

# DISABILITY DETERMINATION AND TRANSMITTAL

1. DESTINATION: DDS [X] ODO [ ] DQS [ ] DQB [ ] OTHER [ ]
2. DDS CODE: V64
3. FILING DATE: 8/18/15
4. SSN:
5. NAME AND ADDRESS OF CLAIMANT (Include ZIP Code): ABOLFAZL D HOSSEIN POUR
6. WAGE EARNER NAME (If CDB or DWB CLAIM)
7. TYPE CLAIM (Title II): DIB [X] FZ [ ] DWH [ ] CDB-R [ ] CDB-D [ ] RD-R [ ] RD-D [ ] RD [ ] FR [ ] F-D [ ] MQFE [ ]
8. TYPE CLAIM (Title XVI): DI [ ] DS [ ] DC [ ] BI [ ] BS [ ] BC [ ] AI [ ] AS [ ]
9. DATE OF BIRTH
10. PRIOR ACTION: PD [ ] PT [ ]
11. REMARKS: 9/15/15 Ref Agy
12. DISTRICT-BRANCH OFFICE ADDRESS (Include Zip Code): SOCIAL SECURITY, 4340 SIMMONS STREET, NORTH LAS VEGAS, NV 89032
DO-BO CODE: D49
13. DO-BO REPRESENTATIVE: S CACHO 866-614-9667
14. DATE
11A. [ ] Presumptive Disability
11B. [ ] Impairment

DETERMINATION PURSUANT TO THE SOCIAL SECURITY ACT, AS AMENDED

15. CLAIMANT DISABLED
A. [X] Disability Began: 7/14/15
B. [ ] Disability Ceased:
16A. PRIMARY DIAGNOSIS: BODY SYS. 01 CODE NO. 7240 — Disorders of Back (Discogenic & Degenerative)
16B. SECONDARY DIAGNOSIS: CODE NO. 2960 — Affective (Mood) Disorders
17. DIARY TYPE: MRP MO./YR. 5/01/23 REASON 7
18. CASE OF BLINDNESS AS DEFINED IN SEC. 1614(a)(2)/216(i): A. [ ] Not Disab. for Cash Bene. Purp. B. [ ] Disab. for Cash Benefit Purp. Hsg
19. CLAIMANT NOT DISABLED: A. [ ] Through Date of Current Determination B. [ ] Through C. [ ] Before Age 22 (CDB Only)
20. VOCATIONAL BACKGROUND: OCC YRS. 0 ED YRS. 16
21. VR ACTION: SCRN [ ] SC OUT [X] Prior Ref [ ]
22. REG-BASIS CODE: C1
23. MED LIST NO.
24. MOB CODE
25. REVISED DET [ ]
25A. Initial A. [X] Recon B. [ ] Recon DHU C. [ ] ALJ Hearing D. [ ] Appeals Council E. [ ] U.S. District Court F. [ ]
26. LIST NO.: A. 721 B. C. D. E. F.
27. RATIONALE: [ ] See Attached SSA-4268-U4/C4 [ ] Check If Vocational Rule Met. Cite Rule
28. A. [X] Period of Disability B. [ ] Disability Period C. [X] Estab Beg. AND D. [ ] Continues E. [ ] Term
29. LTR/PAR NO.
30. DISABILITY EXAMINER-DDS: J. Troy Miles
31. DATE: 6/23/16
32. PHYSICIAN OR MEDICAL SPEC. SIGNATURE: See Form DDE Dated: 06/22/16
33. DATE
32A. PHYSICIAN OR MEDICAL SPEC. NAME (Stamp, Print, or Type): Maria M. Rehrig, MD (20)
32B. SPEC. CODE: 20
34. REMARKS:
CER:N EOR:Y DAA: SNO:NO
Claimant capable per Lisa Foerster report of 01/21/2016.

MULTIPLE IMPAIRMENTS CONSIDERED
34A. COMBINED MULTIPLE NONSEVERE-SEVERE
34B. COMBINED MULTIPLE NONSEVERE-NONSEVERE
35. BASIS CODE
36. REV. DST. CODE
37. SSA REPRESENTATIVE
SSA CODE
38. DATE

Form SSA-831-C3 (5/89)
Previous editions may be used
Electronic Input [ ] DECISION [ ] CASE CONTROL
Case Number 173797

TOTAL P.002

7Q266160020

# EXHIBIT 8

EXHIBIT 8

PATIENT
**Abolfazl Hosseinpour**
DOB
AGE 57 yrs
SEX Male
PRN AH376941

FACILITY
**Meadows Medical Group Practice**
T (702) 258-8100
F (702) 258-4244
4500 Meadows Lane
Las Vegas, NV 89107

ENCOUNTER
**Office Visit**
NOTE TYPE SOAP Note
SEEN BY Mehrdad Tafreshi
DATE 03/29/2016
AGE AT DOS 57 yrs
Electronically signed by Mehrdad Tafreshi at 03/29/2016 03:24 pm

**Chief complaint**
Follow up

| Vitals for this encounter | |
|---|---|
| | 03/29/16 3:03 PM |
| Temperature | 97.50 °F |
| Weight | 188 lb |
| Pulse | 75 bpm |
| Height | 69 in |
| Respiratory rate | 16 bpm |
| O2 Saturation | 96 % |
| BMI | 27.76 |
| Blood pressure | 126/82 mmHg |

**SUBJECTIVE**

fu. no changes
pain neck and lower back persists. left arm hand weakness.
using a lumbar brace
pain radiates to both legs
Severe Anxiety depression persists panic attacks. Insomnia. losing concentrations.

**OBJECTIVE**

General: mood depressed. . Neck: Supple tender paracervicals, no masses, no thyromegaly, no bruits. Chest: Lungs clear, no rales, no rhonchi, no wheezes. Heart: RR, no murmurs, no rubs, no gallops. Abdomen: Soft, no tenderness, no masses, BS normal.Back decreased ROM. . EXT: , motor L hand grip decreased.

**ASSESSMENT**

Diagnoses attached to this encounter:

Severe recurrent MDD without psychotic features [ICD-10: F33.2], [ICD-9: 296.33], [SNOMED: 36474008]

Cervical disc degeneration [ICD-10: M50.30], [ICD-9: 722.4], [SNOMED: 69195002]

Spinal stenosis of lumbar region [ICD-10: M48.06], [ICD-9: 724.02], [SNOMED: 18347007]

Pure hyperglyceridemia [ICD-10: E78.1]

**PLAN**

continue same
pain mngmnt referral
fu Psychiatrist.
refill RX

practice fusion
Free cloud based EHR

| PATIENT | | FACILITY | ENCOUNTER | |
|---|---|---|---|---|
| **Abolfazl Hosseinpour** | | **Meadows Medical Group Practice** | **Office Visit** | |
| DOB | | T (702) 258-8100 | NOTE TYPE | SOAP Note |
| AGE | 57 yrs | F (702) 258-4244 | SEEN BY | Mehrdad Tafreshi |
| SEX | Male | 4500 Meadows Lane | DATE | 02/25/2016 |
| PRN | AH376941 | Las Vegas, NV 89107 | AGE AT DOS | 57 yrs |
| | | | Not signed | |

## Chief complaint

No chief complaint recorded

## Vitals for this encounter

No vitals recorded

SUBJECTIVE

OBJECTIVE

ASSESSMENT

PLAN

practice fusion
Free cloud based EHR

| PATIENT | | FACILITY | ENCOUNTER | |
|---|---|---|---|---|
| **Abolfazl Hosseinpour** | | **Meadows Medical Group Practice** | **Office Visit** | |
| DOB | | T (702) 258-8100 | NOTE TYPE | SOAP Note |
| AGE | 57 yrs | F (702) 258-4244 | SEEN BY | Mehrdad Tafreshi |
| SEX | Male | 4500 Meadows Lane | DATE | 04/28/2016 |
| PRN | AH376941 | Las Vegas, NV 89107 | AGE AT DOS | 57 yrs |
| | | | Electronically signed by Mehrdad Tafreshi at 04/28/2016 04:27 pm | |

## Chief complaint

1 month fu/bcbs/mc (Appt time: 3:00 PM) (Arrival time: 3:36 PM) pt is here for f/u on meds

| Vitals for this encounter | |
|---|---|
| | 04/28/16 3:59 PM |
| Height | 69 in |
| Weight | 189 lb |
| Temperature | 97.80 °F |
| Pulse | 81 bpm |
| Respiratory rate | 16 bpm |
| O2 Saturation | 98 % |
| BMI | 27.91 |
| Blood pressure | 122/76 mmHg |

### SUBJECTIVE

fu refills
unable to see pain specialist due to insurance
no changes. pain neck uses neck brace at home. and lower back persists. left arm hand weakness.. using a lumbar brace . pain radiates to both legs.

Save psychiatrist in March but not in April.
severe Anxiety depression persists panic attacks. Insomnia. losing concentrations.
Needs refills on Effexor. requesting 3 mo supply

ROS: NO Shortness of Breath. No Nausea, no heart burn. No Chest pain. No palpitation. No dysurea. No frequency. No discharge. No fever. No chills. No abdominal pain

### OBJECTIVE

Head: Normocephalic, no lesions. Eyes: PERRLA, EOM's full, conjunctivae clear,. Neck: Supple, no masses, no thyromegaly, no bruits. Chest: Lungs clear. no rales, no rhonchi, no wheezes. Heart: RR, no murmurs, no rubs, no gallops. Abdomen: Soft, non tender. no masses. Back: Normal curvature, no tenderness. Extremities: FROM. no deformities, no edema. no erythema,warm, good pulses. Neuro: Physiological, no localizing findings. Skin: Normal, no rashes, no lesions noted.

### ASSESSMENT

Diagnoses attached to this encounter:

- Cervical disc degeneration [ICD-10: M50.30], [ICD-9: 722.4], [SNOMED: 69195002]
- Severe recurrent MDD without psychotic features [ICD-10: F33.2], [ICD-9: 296.33], [SNOMED: 36474008]
- Spinal stenosis of lumbar region [ICD-10: M48.06], [ICD-9: 724.02], [SNOMED: 18347007]

PLAN

continue same. no changes
refill RX.

practice fusion
Free cloud based EHR

PATIENT
**Abolfazl Hosseinpour**
DOB
AGE 57 yrs
SEX Male
PRN AH376941

FACILITY
**Meadows Medical Group Practice**
T (702) 258-8100
F (702) 258-4244
4500 Meadows Lane
Las Vegas, NV 89107

ENCOUNTER
**Office Visit**
NOTE TYPE SOAP Note
SEEN BY Mehrdad Tafreshi
DATE 05/30/2016
AGE AT DOS 57 yrs
Electronically signed by Mehrdad Tafreshi at 05/30/2016 04:28 pm

**Chief complaint**
Follow up

| Vitals for this encounter | |
|---|---|
| | 05/30/16 4:06 PM |
| Height | 69 in |
| Weight | 191.80 lb |
| Pulse | 93 bpm |
| Respiratory rate | 16 bpm |
| Temperature | 97.30 °F |
| O2 Saturation | 96 % |
| BMI | 28.32 |
| Blood pressure | 116/85 mmHg |

SUBJECTIVE

fu no changes
pain neck uses neck brace at home. and lower back persists. left arm hand weakness.. pain radiates to both legs. Insomnia.
severe Anxiety depression persists panic attacks persists

No dysurea. No frequency. No discharge. No fever. No chills. No abdominal pain. No Nausea, no heart burn. No Chest pain. No palpitation.

OBJECTIVE

In NAD
Neck: Supple tender paracervicals, no masses, no thyromegaly, no bruits. Chest: Lungs clear. no rales, no rhonchi. no wheezes.
Heart: RR, no murmurs. no rubs, no gallops. Abdomen: Soft, no tenderness, no masses. BS normal.Back decreased ROM. .
Back decreased ROM
EXT: , motor L hand grip decreased..

ASSESSMENT

Diagnoses attached to this encounter:

Cervical disc degeneration [ICD-10: M50.30], [ICD-9: 722.4], [SNOMED: 69195002]

Severe recurrent MDD without psychotic features [ICD-10: F33.2], [ICD-9: 296.33], [SNOMED: 36474008]

Anxiety disorder [ICD-10: F41.9], [ICD-9: 300.00], [SNOMED: 197480006]

Spinal stenosis of lumbar region [ICD-10: M48.06], [ICD-9: 724.02], [SNOMED: 18347007]

Pure hyperglyceridemia [ICD-10: E78.1]

PLAN

continue same.

refill RX.

practice fusion
Free cloud based EHR

| PATIENT | FACILITY | ENCOUNTER |
|---|---|---|
| **Abolfazl Hosseinpour** | **Meadows Medical Group Practice** | **Office Visit** |
| DOB | T (702) 258-8100 | NOTE TYPE SOAP Note |
| AGE 57 yrs | F (702) 258-4244 | SEEN BY Mehrdad Tafreshi |
| SEX Male | 4500 Meadows Lane | DATE 07/11/2016 |
| PRN AH376941 | Las Vegas, NV 89107 | AGE AT DOS 57 yrs |
| | | Electronically signed by Mehrdad Tafreshi at 07/11/2016 03:51 pm |

**Chief complaint**

Follow up

| Vitals for this encounter | 07/11/16 3:08 PM |
|---|---|
| Height | 69 in |
| Weight | 191.60 lb |
| Temperature | 97.30 °F |
| Pulse | 101 bpm |
| Respiratory rate | 16 bpm |
| O2 Saturation | 97 % |
| BMI | 28.29 |
| Blood pressure | 146/90 mmHg |

**SUBJECTIVE**

fu
needs refills
persistant neck pain lower back pains
left arm hand weakness.. pain radiates to both legs. Insomnia.
severe Anxiety depression persists panic attacks persists. No dysurea. No frequency. No discharge. No fever. No chills. No abdominal pain. No Nausea. no heart burn. No Chest pain, No palpitation.

**OBJECTIVE**

In NAD
Neck: Supple tender paracervicals, no masses, no thyromegaly, no bruits. Chest: Lungs clear. no rales, no rhonchi, no wheezes. Heart: RR, no murmurs. no rubs, no gallops. Abdomen: Soft, no tenderness. no masses, BS normal.Back decreased ROM. .
Back decreased ROM
EXT: . motor L hand grip decreased..

**ASSESSMENT**

Diagnoses attached to this encounter:

- Pure hyperglyceridemia [ICD-10: E78.1]
- Spinal stenosis of lumbar region [ICD-10: M48.06], [ICD-9: 724.02], [SNOMED: 18347007]
- Degeneration of cervical intervertebral disc [ICD-10: M50.30], [ICD-9: 722.4], [SNOMED: 69195002]
- Anxiety disorder [ICD-10: F41.9], [ICD-9: 300.00], [SNOMED: 197480006]
- Severe recurrent MDD without psychotic features [ICD-10: F33.2], [ICD-9: 296.33], [SNOMED: 36474008]
- Cervical disc degeneration [ICD-10: M50.30], [ICD-9: 722.4], [SNOMED: 69195002]

**PLAN**

Try Cymbalta DC Effexor
continue same

practicefusion
Free cloud based EHR

PATIENT
**Abolfazl Hosseinpour**
DOB
AGE 57 yrs
SEX Male
PRN AH376941

FACILITY
**Meadows Medical Group Practice**
T (702) 258-8100
F (702) 258-4244
4500 Meadows Lane
Las Vegas, NV 89107

## Patient identifying details and demographics

| | | | | | |
|---|---|---|---|---|---|
| FIRST NAME | Abolfazl | SEX | Male | ETHNICITY | Not Hispanic or Latino |
| MIDDLE NAME | - | DATE OF BIRTH | 12/01/1958 | | |
| LAST NAME | Hosseinpour | DATE OF DEATH | - | PREF. LANGUAGE | English |
| SSN | 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 | PRN | AH376941 | RACE | Other |
| | | | | STATUS | Active patient |

### CONTACT INFORMATION

| | | | |
|---|---|---|---|
| ADDRESS LINE 1 | 5502 Cinnamon Ave | CONTACT BY | - |
| | | EMAIL | rxah37@yahoo.com |
| ADDRESS LINE 2 | - | | |
| CITY | las vegas | HOME PHONE | - |
| STATE | NV | MOBILE PHONE | 702-606-0136 |
| ZIP CODE | 89122 | OFFICE PHONE | - |
| | | OFFICE EXTENSION | - |

### FAMILY INFORMATION

| | | | |
|---|---|---|---|
| NEXT OF KIN | - | PATIENT'S MOTHER'S MAIDEN NAME | - |
| RELATION TO PATIENT | - | | |
| PHONE | - | | |
| ADDRESS | - | | |

## Chronic Diagnoses

| ACTIVE DIAGNOSES | START | STOP |
|---|---|---|
| (722.52) Degeneration of lumbar or lumbosacral intervertebral disc | | |
| (272.1) Pure hyperglyceridemia | | |
| (724.02) Spinal stenosis of lumbar region | | |
| (722.4) Degeneration of cervical intervertebral disc | | |
| (300.00) Anxiety disorder | | |
| (296.20) Major depressive disorder | | |
| (296.33) Severe recurrent MDD without psychotic features | | |
| (722.4) Cervical disc degeneration | | |

| HISTORICAL DIAGNOSES | START | STOP |
|---|---|---|
| (296.32) Moderate recurrent MDD | | 12/21/2015 |

## Acute Diagnoses

| ACTIVE DIAGNOSES | START | STOP |
|---|---|---|
| No active diagnoses | | |

| HISTORICAL DIAGNOSES | START | STOP |
|---|---|---|
| No historical diagnoses | | |

## Active Medications

| MEDICATION | SIG | START/STOP | ASSOCIATED DX |
|---|---|---|---|
| Alprazolam (Xanax) 1 MG Oral Tablet | Take 1 tablet q8h prn | - | - |
| - Script: 07/07/15 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60<br>- Script: 09/09/15 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60<br>- Script: 10/27/15 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60<br>- Script: 12/21/15 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60<br>- Script: 01/28/16 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60<br>- Script: 03/29/16 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60<br>- Script: 04/28/16 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60<br>- Script: 05/30/16 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60<br>- Script: 07/11/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 60 | | | |
| betamethasone topical (Diprosone) dipropionate 0.05% topical ointment | | 08/21/12 - | - |
| - Script: 08/21/12 Prescriber: Mehrdad Tafreshi MD Refills: 0 | | | |
| Butalbital-Acetaminophen-Caffeine w/ Codeine (Fioricet/Codeine) 50-300-40-30 MG Oral Capsule | 1 capsule orally every 4 hours as needed | - | - |
| - Script: 06/24/15 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 60<br>- Script: 09/23/15 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 60<br>- Script: 12/21/15 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 60<br>- Script: 01/28/16 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60<br>- Script: 03/29/16 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60<br>- Script: 04/28/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 60<br>- Script: 07/11/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 90 | | | |
| Duloxetine HCl (Cymbalta) 30 MG Oral Capsule Delayed Release Particles | Take 1 capsule (30 mg) by mouth 2 times per day | - | - |
| - EScript: 07/11/16 Prescriber: Mehrdad Tafreshi MD Refills: 2 Quantity: 60 | | | |
| Esomeprazole Magnesium (NexIUM) 40 MG Oral Capsule Delayed Release | Take 1 capsule (40 mg) by mouth daily | - | - |
| - EScript: 05/30/16 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 90 | | | |
| esomeprazole-naproxen (Vimovo) 20 mg-500 mg oral delayed release tablet | | 11/29/12 - | - |
| - Script: 11/29/12 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60 | | | |
| finasteride (Proscar) 5 mg oral tablet | 1qd | 10/20/14 - | |
| - EScript: 10/20/14 Prescriber: Mehrdad Tafreshi MD Refills: 2 Quantity: 90 | | | |
| Finasteride 5 MG Oral Tablet | TAKE ONE TABLET BY MOUTH ONE TIME DAILY | - | prostate |
| - ERefill: 07/11/15 Prescriber: Mehrdad Tafreshi MD Refills: 2 Quantity: 90<br>- ERefill: 03/18/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 90<br>- ERefill: 06/27/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 90 | | | |
| fluticasone nasal (Fluticasone Propionate) 50 mcg/inh nasal spray | 1 spray bid each nostril | 10/21/14 - | - |
| - EScript: 10/20/14 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 3 | | | |

| | | | |
|---|---|---|---|
| Gabapentin 600 MG Oral Tablet | Take half of a tablet (300 mg) by mouth 3 times per day | - | - |

- EScript: 04/28/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 270

| | | | |
|---|---|---|---|
| metaxalone (Skelaxin) 800 mg oral tablet | 1q8h | 08/23/13 - | - |

- EScript: 08/23/13 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 180
- EScript: 10/20/14 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 180

| | | | |
|---|---|---|---|
| Olopatadine HCl (Patanol) 0.1 % Ophthalmic Solution | 1 drop into affected eye 2 times per day | - | - |

- EScript: 05/20/15 Prescriber: Mehrdad Tafreshi MD Refills: 5 Quantity: 1

| | | | |
|---|---|---|---|
| omega-3 polyunsaturated fatty acids (Lovaza) ethyl esters 1000 mg oral capsule | 4 cas daily | 03/26/12 - | - |

- ERefill: 03/26/12 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 360
- Script: 06/04/13 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 360
- Script: 06/04/13 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 360
- EScript: 10/20/14 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 360
- ERefill: 10/13/15 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 360
- ERefill: 05/12/16 Prescriber: Mehrdad Tafreshi MD Refills: 4 Quantity: 360
- EScript: 05/13/16 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 360

| | | | |
|---|---|---|---|
| Phenobarbital-Hyoscyamine-Atropine-Scopolamine (Donnatal) 16.2 MG Oral Tablet | 1q12 h prn | - | - |

- EScript: 05/30/16 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 60

| | | | |
|---|---|---|---|
| Sildenafil Citrate (Viagra) 100 MG Oral Tablet | 1qd prn | - | - |

- EScript: 05/30/16 Prescriber: Mehrdad Tafreshi MD Refills: 5 Quantity: 10

| | | | |
|---|---|---|---|
| Sildenafil Citrate (Viagra) 100 MG Oral Tablet | 1qd prn | 12/23/14 - | - |

- EScript: 12/23/14 Prescriber: Mehrdad Tafreshi MD Refills: 6 Quantity: 15

| | | | |
|---|---|---|---|
| Tadalafil (Cialis) 20 MG Oral Tablet | Take 1 tablet (20 mg) by mouth every 36 hours | - | - |

- EScript: 04/04/16 Prescriber: Mehrdad Tafreshi MD Refills: 4 Quantity: 6

| | | | |
|---|---|---|---|
| Tamsulosin HCl 0.4 MG Oral Capsule | Take 1 capsule (0.4 mg) by mouth daily 30 minutes after the same meal each day | - | ← prostate |

- EScript: 12/21/15 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 30
- EScript: 03/29/16 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 90
- EScript: 03/29/16 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 90

| | | | |
|---|---|---|---|
| traMADol (TraMADol Hydrochloride) 50 mg oral tablet | 1-2q4h prn | 08/23/13 - | - |

- EScript: 08/23/13 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 180
- Script: 05/20/15 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 120
- Script: 12/21/15 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 120
- Script: 03/29/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 120
- Script: 04/28/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 120

- Script: 07/11/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 120

| | | | |
|---|---|---|---|
| traMADol (Ultram) 50 mg oral tablet | Take 1 tablet (50 mg) by mouth every 4 hours as needed | 08/21/12 - | - |

- Script: 08/21/12 Prescriber: Mehrdad Tafreshi MD Refills: 0
- ERefill: 10/10/12 Prescriber: Mehrdad Tafreshi MD Refills: PRN Quantity: 100
- Script: 11/29/12 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 90
- Script: 09/09/15 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 90

| | | | |
|---|---|---|---|
| Zolpidem Tartrate (Ambien) 10 MG Oral Tablet | 10 mg orally daily at bedtime | - | - |

- Script: 10/27/15 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 30
- Script: 12/21/15 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 30
- Script: 03/29/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 30
- Script: 05/30/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 30
- Script: 07/11/16 Prescriber: Mehrdad Tafreshi MD Refills: 2 Quantity: 30

## Historical Medications

| MEDICATION | SIG | START/STOP | ASSOCIATED DX |
|---|---|---|---|
| Azithromycin (Zithromax Z-Pak) 250 MG Oral Tablet | as directed | - 03/29/16 | - |
| azithromycin (Zithromax) 500 mg oral tablet | 1qd | 06/04/13 - 07/07/15 | - |

- Script: 06/04/13 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 15
- EScript: 12/23/14 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 15
- EScript: 12/23/14 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 15

| | | | |
|---|---|---|---|
| Azithromycin 500 MG Oral Tablet | Take 1 tablet (500 mg) by mouth daily for 10 days | - 05/30/16 | - |

- EScript: 03/29/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 10

| | | | |
|---|---|---|---|
| benzonatate (Tessalon) 200 mg oral capsule | 1 tid | 10/20/14 - 05/30/16 | - |

- EScript: 10/20/14 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 60

| | | | |
|---|---|---|---|
| Diazepam (Valium) 5 MG Oral Tablet | 1-2 q8h prn anxiety | - 05/30/16 | - |

- Script: 07/14/15 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 30

| | | | |
|---|---|---|---|
| Gabapentin 300 MG Oral Capsule | Take 1 capsule (300 mg) by mouth 3 times per day | - 04/28/16 | - |

- Script: 07/14/15 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 90

| | | | |
|---|---|---|---|
| levofloxacin (Levaquin) 750 mg oral tablet | 1qd | 10/20/14 - 05/20/15 | - |

- EScript: 10/20/14 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 10

| | | | |
|---|---|---|---|
| Levofloxacin 500 mg oral tablet | | 03/08/12 - 01/28/16 | - |

antibiotic

- ERefill: 03/08/12 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 20
- Script: 08/21/12 Prescriber: Mehrdad Tafreshi MD Refills: 0 Quantity: 20

| | | | |
|---|---|---|---|
| omeprazole (PriLOSEC) 20 mg oral | 1 bid | 10/31/13 - | |

| | | | |
|---|---|---|---|
| delayed release capsule | | 05/30/16 | |
| ➖ EScript: 10/31/13 Prescriber: Mehrdad Tafreshi MD Refills: 4 Quantity: 180 | | | |
| Pantoprazole 40 mg oral delayed release tablet | 1qam | 10/20/14<br>05/30/16 | for GERD |
| ➖ EScript: 10/20/14 Prescriber: Mehrdad Tafreshi MD Refills: 2 Quantity: 90<br>➖ EScript: 10/27/15 Prescriber: Mehrdad Tafreshi MD Refills: 2 Quantity: 90<br>➖ EScript: 03/29/16 Prescriber: Mehrdad Tafreshi MD Refills: 2 Quantity: 90 | | | |
| Paroxetine HCl (Paxil) 20 MG Oral Tablet | 1 bid | - 09/23/1 | |
| ➖ Script: 09/09/15 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 60 | | | |
| Paroxetine HCl (Paxil) 40 MG Oral Tablet | Take 1 tablet (40 mg) by mouth daily in the morning | - 12/21/15 | - |
| ➖ EScript: 09/23/15 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 30<br>➖ ERefill: 01/16/16 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 30 | | | |
| PARoxetine HCl 40 MG Oral Tablet | TAKE ONE TABLET BY MOUTH DAILY EVERY MORNING | - 05/30/16 | ← paxil |
| ➖ ERefill: 04/05/16 Prescriber: Mehrdad Tafreshi MD Refills: 2 Quantity: 30<br>➖ ERefill: 07/02/16 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 30 | | | |
| Pregabalin (Lyrica) 75 MG Oral Capsule | Take 1 capsule (75 mg) by mouth 3 times per day | - 08/13/15 | |
| ➖ Script: 05/20/15 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 90 | | | |
| Sertraline HCl (Zoloft) 50 MG Oral Tablet | Take 1 tablet (50 mg) by mouth daily | - 09/09/15 | - |
| ➖ Script: 07/07/15 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 90 | | | |
| Venlafaxine HCl (Effexor XR) 75 MG Oral Capsule Extended Release 24 Hour | | - 04/28/16 | - |
| Venlafaxine HCl (Venlafaxine HCl ER) 75 MG Oral Tablet Extended Release 24 Hour | Take 3 tablets (225 mg) by mouth daily with food | - 07/11/16 | ← effexor |
| ➖ EScript: 04/28/16 Prescriber: Mehrdad Tafreshi MD Refills: 1 Quantity: 270<br>➖ EScript: 05/30/16 Prescriber: Mehrdad Tafreshi MD Refills: 3 Quantity: 270 | | | |

# EXHIBIT 9

EXHIBIT 9

Dynamic Future LLC

INITIAL EVALUATION

**PATIENT NAME:** Abolfazl Hosseinpour

**DATE:** 12/11/15 **DATE OF BIRTH:**

**IDENTIFYING DATA:** The patient is a 57-year-old, Iranian male.

**CHIEF COMPLAINT:** The patient states "I have problems."

**HISTORY OF PRESENT ILLNESS:** The patient presents today for a psychiatric evaluation. The patient has significant difficulties with multiple medical problems; primarily in his back with lower back pain and cervical spine, with medical issues. The patient is not sleeping. He has had a loss of appetite and loss of interest in things. The patient reports significant panic attacks and anxiety. There are subtle post traumatic stress disorder symptoms. He does hear buzzing noises and he feels his memory has been poor. The patient denies any suicidal ideation.

**PAST PSYCHIATRIC HISTORY:** None.

**DRUG AND ALCOHOL HISTORY:** None.

**FAMILY PSYCHIATRIC HISTORY:** The patient's sister is positive for obsessive-compulsive disorder and psychosis. The patient's mother is positive for obsessive-compulsive disorder.

**PAST MEDICAL HISTORY:** Cervical neck pain, low back pain, migraine headaches, cholecystitis and prostatic hypertrophy.

**CURRENT MEDICATIONS:**
1. Gabapentin 300 mg three times a day.
2. Xanax 1 mg three times a day.
3. Tramadol as needed.
4. Paxil 40 mg daily.
5. Finasteride 5 mg daily.

**PREVIOUS MEDICATION TRIALS:** Zoloft and Percocet.

**ALLERGIES:** THE PATIENT HAS NO KNOWN DRUG ALLERGIES.

**SOCIAL HISTORY:** The patient was born and raised in Iran. He came to the United States in 1989. The patient has been married twice. The patient has worked as a pharmacist, but is not currently working. The patient has no hobbies. He has no legal issues.

**MENTAL STATUS EXAM:** The patient is a 57-year-old, Iranian male with glasses who is wearing a golf shirt. He is acceptably groomed. There is significant psychomotor irritability/agitation. His thought form is coherent. His thought content shows no active suicidal, homicidal or psychotic thinking. There are questionable flashbacks. His mood is depressed. His affect is anxious. His cognitive functions show his short-term memory

A PLACE OF GRACE

INITIAL EVALUATION

PATIENT NAME: Abolfazl Hosseinpour

PAGE 2 (Mental Status Exam continued)
to be three of three immediate and zero of three recent. Fund of knowledge shows that he knows the president is Obama, but does not know the vice president. He relates three large cities of New York, Los Angeles and San Francisco. His abstract thinking is intact for apple-orange, plane-train and desk-chair. His calculations show he is able to subtract 35 from 100 and get 65; but when he takes that number times two, he gets 75. His judgement and insight are fair.

ASSESSMENT:

| | |
|---|---|
| AXIS I: | MAJOR DEPRESSION. |
| | *F33.1 Major Depression, Recurrent, Moderate* |
| | RULE OUT PSYCHOSIS. |
| | PANIC DISORDER. |
| | *F41.0 Panic disorder without agoraphobia* |
| | GENERALIZED ANXIETY DISORDER. |
| | *F41.1 Generalized anxiety disorder* |
| | RULE OUT POST TRAUMATIC STRESS DISORDER. |
| | RULE OUT COGNITIVE DISORDER, NOT OTHERWISE SPECIFIED. |
| AXIS II: | NONE. |
| AXIS III: | CHRONIC PAIN. |
| | PROSTATIC HYPERTROPHY. |
| AXIS IV: | MEDICAL, STAGE OF LIFE AND FINANCIAL. |
| AXIS V: | CURRENT: 50. PAST: 60. |

PLAN:
1. We will add Remeron 15 mg at bedtime times one week, titrating to 30 mg at bedtime. This physician discussed the risks and benefits with the patient, who is accepting.
2. We will increase the patient's gabapentin to 600 mg in the a.m., 300 mg at noon and 600 mg 17:00 times one week, and then 600 mg three times a day to address anxiety and pain.
3. We will check laboratories.
4. We will further titrate gabapentin for pain and Remeron as needed.
5. We will consider Cymbalta.
6. We will consider switching Xanax to Klonopin.
7. We will consider the addition of Namenda for cognition, pain and mood.
8. We will consider Tegretol for pain and mood.
9. We will consider Lamictal for pain and mood.
10. The patient will return to the clinic in one month.

____________________________

MARK J. COLLINS, D.O.

MJC/cg10; #1211-104; DT: 12/12/15

Dynamic Future LLC

PHYSICIAN'S PROGRESS NOTE

**PATIENT NAME:** Abolfazl Hosseinpour

**DATE OF EVALUATION:** 02/19/16

**SUBJECTIVE/OBJECTIVE:** The patient is seen today for follow up of depression and chronic pain. The patient continues with pain issues. He is still hearing buzzing noises in his ears, but denies being psychotic. The patient denies any overt suicidal ideation. The patient continues with neurovegetative depressive symptoms. There is subtle improvement of sleep.

**PAST PSYCHIATRIC HISTORY:** None.

**DRUG AND ALCOHOL HISTORY:** None.

**FAMILY PSYCHIATRIC HISTORY:** The patient's sister is positive for obsessive-compulsive disorder. The patient's mother is positive for obsessive-compulsive disorder.

**PAST MEDICAL HISTORY:** Cervical pain, low back pain, migraine headaches, cholecystitis and prostatic hypertrophy. It should be noted that the patient is not currently receiving any pain management.

**CURRENT MEDICATIONS:**

1. Gabapentin 600 mg three times a day.
2. Xanax 1 mg three times a day.
3. Tramadol as needed.
4. Paxil 40 mg daily.
5. Finasteride 5 mg daily.
6. Remeron 30 mg daily.

**EXAMINATION OF THE PATIENT:** The patient's mental status exam shows him to be alert, anxious and somewhat irritable. His thought form is coherent. His thought content is with no current suicidal, homicidal or psychotic thinking. His mood is depressed. There are questionable flash- backs. His cognitive functions are stable.

**LABORATORY DATA:** The patient's laboratories are reviewed. There are mild CBC abnormalities; refer to his primary care physician.

**ASSESSMENT:**

**AXIS I:** MAJOR DEPRESSION.

*F33.1 Major Depression, Recurrent Moderate*

PANIC DISORDER.

*F41.0 PANIC DISORDER WITHOUT AGORAPHOBIA.*

GENERALIZED ANXIETY DISORDER.

*F41.1 Generalized anxiety disorder*

A PLACE OF GRACE

PHYSICIAN'S PROGRESS NOTE

PATIENT NAME: Abolfazl Hosseinpour

PAGE 2

ASSESSMENT: (Continued)

RULE OUT POST TRAUMATIC STRESS DISORDER.
COGNITIVE DISORDER, NOT OTHERWISE SPECIFIED SECONDARY TO MEDICAL ISSUES.

| | |
|---|---|
| AXIS II: | NONE. |
| AXIS III: | CHRONIC PAIN.<br>PROSTATIC HYPERTROPHY. |
| AXIS IV: | MEDICAL, STAGE OF LIFE AND FINANCIAL ISSUES. |
| AXIS V: | CURRENT: 52. PAST: 60. |

PLAN:

1. We will discontinue Paxil. We discussed discontinuation syndrome.
2. We will add Effexor XR 150 mg daily.
3. We will consider further titration of Remeron.
4. We will consider Namenda for cognition, pain and mood.
5. We will consider switching Xanax to Klonopin.
6. We will consider Cymbalta.
7. We will consider further titration of Effexor/Remeron.
8. We will consider Tegretol/Lamictal for pain and mood.
9. The patient will return to the clinic in one month.

____________________
Mark J. Collins, D.O.

MJC/cg10
#0219-088
DT: 02/19/16

# EXHIBIT 10

EXHIBIT 10

7Q266160020

**PHYSICAL IMPAIRMENT RESIDUAL FUNCTIONAL CAPACITY QUESTIONNAIRE**[1]

PROVIDER'S NAME: Mehrdad Tafreshi TELEPHONE: 702-258-8100

PATIENT'S NAME: Abolfazl Hosseinpour

PATIENT'S DATE OF BIRTH: ____________ PATIENT'S SSN: ____________

Please answer the following questions concerning Abolfazl Hosseinpour's impairments, based on your physical examination; your observations of Mr. Hosseinpour; objective testing; and review of the attached Functional Capacity Evaluation dated August 26, 2016 by Doug Ellis, PT.

1. Nature, frequency, and length of your contact with Mr. Hosseinpour: He has been my patient since 2012

2. Diagnoses: Degeneration of lumbar & cervical disc, spinal stenosis, Anxiety and major depressive disorder.

3. Prognosis: Poor

4. Identify Mr. Hosseinpour's symptoms, including pain, dizziness, fatigue, etc.: Pain from neck and back that radiates to left hand causing numbness and tingling, Inability to concentrate

5. If Mr. Hosseinpour exhibits pain, characterize the nature, location, frequency, precipitating factors, and severity of your patient's pain: Neck pain radiates to left hand causing numbness and tingling. Lower back pain radiating to hips and legs. The pains are constant and severe.

6. What objective testing have you performed on (or ordered for) Mr. Hosseinpour to assess the degree of any physical impairment?

X-Rays, MRI's

[1] Please refer to the attached Job Description for Mr. Hosseinpour in conjunction with your completion of this form.

7Q266160020

7. Please describe how the above test results inform your opinions:

The MRI's confirmed diagnosis

8. Please identify any positive objective findings supporting Mr. Hosseinpour's symptoms:

- [x] Reduced range of motion
  Joints affected: neck, back,
- [ ] Sensory changes
- [x] Reflex changes
- [ ] Impaired sleep
- [ ] Weight loss
- [ ] Impaired appetite
- [ ] Abnormal posture
- [ ] Neuropathy
- [ ] Positive straight leg raising
- [ ] Tenderness
- [ ] Crepitus
- [ ] Trigger points
- [ ] Redness
- [ ] Swelling
- [x] Muscle spasm
- [x] Muscle weakness
- [ ] Muscle atrophy
- [x] Abnormal gait

Other clinical findings: ______

9. In your professional opinion, does Mr. Hosseinpour have a physical impairment(s) that affects his ability to perform the material duties of a Pharmacy Manager on a regular basis? (yes) / no If you answered "yes," what is the medical basis of your opinion? Please be specific.

Severe pain in lower back & neck radiates to hips and legs.

10. Do you believe that Mr. Hosseinpour can perform the duties listed in the attached job description on a regular and sustained basis in light of his impairments, over an 8-hour work day, 40 hours per week? yes / (no) Please explain:

He is unable to sit stand bend or concentrate. He also has issues focusing and making decisions.

7Q266160020

____________________________________________________________

____________________________________________________________

11. Do emotional factors contribute to the severity of Mr. Hosseinpour's symptoms and functional limitations? ☒ Yes ☐ No

12. Are Mr. Hosseinpour's physical impairments plus any emotional impairments reasonably consistent with the symptoms (including pain) and functional limitations described in this evaluation? ☒ Yes ☐ No

If no, please explain: ____________________________________________

____________________________________________________________

13. How often is Mr. Hosseinpour's experience of pain sufficiently severe to interfere with attention and concentration?

☐ Never ☐ Seldom ☐ Often ☐ Frequently ☒ Constantly

14. To what degree is Mr. Hosseinpour limited in the ability to deal with the normal stresses of competitive employment such as working at a consistent pace, working appropriately with coworkers and supervisors, not taking an excessive number of breaks, etc.?
☐ No limitation ☐ Slight limitation ☐ Moderate limitation
☐ Marked limitation ☒ Extreme limitation

15. Identify the side effects of any medication which may have implications for working, e.g. dizziness, drowsiness, stomach upset, etc.: ____________________

Unable to drive & drowsiness

16. Have Mr. Hosseinpour's impairments lasted or can they be expected to last at least twelve months? ☒ Yes ☐ No

17. As a result of Mr. Hosseinpour's impairments, estimate his physical functional limitations assuming he were placed in a ***competitive work situation on an ongoing basis:***

A. **Circle** the one number that best estimates how long Mr. Hosseinpour can **continuously** sit and stand **at one time?**

| | | |
|---|---|---|
| **Sit:** | 0 5 10 15 (20 30) 45<br>Minutes | 1 2 3 4 5 6 7 8<br>Hours |
| **Stand:** | (0 5 10) 15 20 30 45<br>Minutes | 1 2 3 4 5 6 7 8<br>Hours |

7Q266160020

B. How long can Mr. Hosseinpour sit and stand/walk total in an eight-hour work day (with normal breaks)?

| Sit | Stand/Walk | |
|---|---|---|
| ☒ | ☒ | Less than 2 hours |
| ☐ | ☐ | About 2 hours |
| ☐ | ☐ | About 4 hours |
| ☐ | ☐ | At least 6 hours |

C. Does Mr. Hosseinpour need to include frequent periods of walking during an 8-hour work day to relieve pain? ☐ Yes ☒ No

D. Does Mr. Hosseinpour need to include periods of lying down during an 8-hour work day due to pain or fatigue? ☒ Yes ☐ No

If yes, how much total time during an average 8-hour work day would the patient normally need to lie down? 2-4 hours

E. Does Mr. Hosseinpour need a job which permits shifting positions at will from sitting, standing, or walking? ☐ Yes ☐ No

F. While sitting, should Mr. Hosseinpour's legs be elevated? ☒ Yes ☐ No

G. While standing and walking, should Mr. Hosseinpour use a cane or other assistive device? ☒ Yes ☐ No

H. How many pounds can Mr. Hosseinpour lift and carry *in a competitive work situation?*

| | Never | Occasionally | Frequently |
|---|---|---|---|
| Less than 10 lbs. | ☐ | ☐ | ☒ |
| 10 lbs. | ☐ | ☒ | ☐ |
| 20 lbs. | ☒ | ☐ | ☐ |
| 50 lbs. | ☒ | ☐ | ☐ |

**In an average 8-hour workday, "occasionally" means less than 1/3 of the work day; "frequently" means between 1/3 to 2/3 of the work day.**

I. Does Mr. Hosseinpour have significant limitations in the ability to use hands and fingers *for actions in a competitive job* such as:

| | Grasp Twist | Turn Objects | Fine Manipulation | Reaching (Including Overhead) |
|---|---|---|---|---|
| Right | ☐Yes ☒No | ☐Yes ☒No | ☐Yes ☒No | ☐Yes ☒No |
| Left | ☒Yes ☐No | ☒Yes ☐No | ☒Yes ☐No | ☐Yes ☒No |

7Q266160020

If the answer to any question is "yes", please explain: numbness, tingling and weakness

J. Does Mr. Hosseinpour have the ability to bend and twist at the waist?
- ☐ Not at all
- ☑ Occasionally
- ☐ Frequently

K. On the average, how often do you anticipate that Mr. Hosseinpour's impairments or treatment would cause the patient to be absent from work?
- ☐ Never or less than one a month
- ☐ About once a month
- ☐ About twice a month
- ☐ More than twice a month
- ☑ More than three times a month

18. Please describe any other limitations that would affect Mr. Hosseinpour's ability to work at a regular job on a sustained basis:

__________________________________________________________

__________________________________________________________

19. Please complete the attached "NON-EXERTIONAL FUNCTION ASSESSMENT." It attempts to isolate any non-exertional restrictions and limitations that may affect Mr. Hosseinpour's ability to work on a sustained basis.

9-15-16
DATE

[signature]
SIGNATURE

Mehrdad Tafreshi
PRINT NAME

Meadows Medical Group
YOUR CLINIC / FACILITY / OFFICE

7Q266160020

## NON-EXERTIONAL FUNCTION ASSESSMENT

Based on your personal assessment of Abolfazl Hosseinpour, please circle the word that best describes his non-exertional functioning in the associated category, using the definitions provided below. Assume that these activities must be performed on a regular and sustained basis (40 hours per week).

| | |
|---|---|
| None: | There are no limitations on the ability to function in this area. |
| Mild: | There are limitations on ability to function but they are mild or transient. |
| Moderate: | The ability to function in this area is less than marked but more than mild. |
| Marked: | The ability to function in this area is seriously limited. |
| Extreme: | The ability to function in this area is precluded. |
| Not Ratable: | There is no evidence available to rate the ability to function in this area. |

### I. UNDERSTANDING AND MEMORY

a. The ability to remember locations and work-like procedures.

*None Mild Moderate Marked Extreme Not Ratable*

b. The ability to understand and remember very short and simply instructions.

*None Mild Moderate Marked Extreme Not Ratable*

c. The ability to understand and remember detailed instructions.

*None Mild Moderate Marked Extreme Not Ratable*

### II. SUSTAINED CONCENTRATION AND PERSISTENCE

a. The ability to carry out very short and simple instructions.

*None Mild Moderate Marked Extreme Not Ratable*

b. The ability to carry out detailed instructions.

*None Mild Moderate Marked Extreme Not Ratable*

c. The ability to maintain attention and concentration for extended periods.

*None Mild Moderate Marked Extreme Not Ratable*

d. The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

*None Mild Moderate Marked Extreme Not Ratable*

e. The ability to sustain an ordinary routine without special supervision.

*None Mild Moderate Marked Extreme Not Ratable*

7Q266160020

f. The ability to work in coordination with or proximity to others without being distracted by them.

*None Mild Moderate Marked Extreme Not Ratable*

g. The ability to make simple work-related decisions.

*None Mild Moderate Marked Extreme Not Ratable*

h. The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods.

*None Mild Moderate Marked Extreme Not Ratable*

III. **SOCIAL INTERACTION**

a. The ability to interact appropriately with the general public.

*None Mild Moderate Marked Extreme Not Ratable*

b. The ability to ask simple questions or request assistance.

*None Mild Moderate Marked Extreme Not Ratable*

c. The ability to accept instructions and respond appropriately to criticism from supervisors.

*None Mild Moderate Marked Extreme Not Ratable*

d. The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

*None Mild Moderate Marked Extreme Not Ratable*

f. The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

*None Mild Moderate Marked Extreme Not Ratable*

IV. **ADAPTATION**

a. The ability to respond appropriately to changes in the work setting.

*None Mild Moderate Marked Extreme Not Ratable*

b. The ability to be aware of normal hazards and take appropriate precautions.

*None Mild Moderate Marked Extreme Not Ratable*

c. The ability to travel in unfamiliar places or use public transportation.

*None Mild Moderate Marked Extreme Not Ratable*

7Q266160020

d. The ability to set realistic goals or make plans independently of others.

*None* *Mild* (circled) *Moderate* *Marked* *Extreme* *Not Ratable*

e. The ability to tolerate normal levels of stress

*None* *Mild* *Moderate* *Marked* *Extreme* (circled) *Not Ratable*

9.15.16
DATE

[signature]
SIGNATURE

Mehrdad Tafreshi
PRINT NAME

W:\HOSSEINPOUR\MEMOS\PhysicalResidFuncCapacityQuestr.wpd

**JULIE A. MERSCH, ESQ.**
701 S. 7th Street
Las Vegas, Nevada 89101
(702) 387-5868
FAX: (702) 387-0109

# FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO/FAX NO.: Attn: Jessica Austin<br>Liberty Life<br>(603) 334-5717 | FROM: Julie A. Mersch, Esq. |
| FILE NO.: Hosseinpour v. Liberty Mutual<br>2016-00006 | DATE: September 19, 2016 |

YOUR IMMEDIATE ATTENTION IS REQUIRED.

**Transmission includes: LTD appeal letter for Abolfazl Hosseinpour, claim no. 5482725, without exhibits. Exhibits sent via US Mail.**

| | | | |
|---|---|---|---|
| | RESPONSE REQUIRED BY ____ | xx | PLEASE TAKE APPROPRIATE ACTION |
| | PLEASE FAX RESPONSE TO ____ | xx | FOR YOUR REVIEW |
| | PLEASE CALL ME AT 702-387-5868 | | PURSUANT TO YOUR REQUEST |
| xx | ORIGINAL WILL FOLLOW BY MAIL | | ORIGINAL WILL NOT FOLLOW BY MAIL |

This facsimile transmission is intended only for the addressee shown below. It may contain information that is privileged, confidential or otherwise protected from disclosure. Any review, dissemination or use of this transmission to its contents by persons other than the addressee is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and mail the original to us at the above address.

If there are any problems with this transmission, please contact the undersigned at (702) 387-5868:

Sender: Robin No. of Pages: 19

701 S. 7th Street
Las Vegas, NV 89101

www.merschlaw.com

LAW OFFICE OF
JULIE A. MERSCH

(702) 387-5868
fax (702) 387-0109

email: jam@merschlaw.com

September 19, 2016

The Liberty Life Assurance Co. of Boston
Attn: Jessica Austin
Group Benefits Disability Claims
PO Box 7213
London, KY 40742-7213

**Re: My Client/Claimant : Abolfazl Hosseinpour**
**Claim No. : 5482725**
**Plan/Policy Holder : Safeway, Inc.**

Dear Ms. Austin:

As you know, I represent your insured Abolfazl Hosseinpour and am appealing Liberty's March 22, 2016 denial of his claim for Long Term Disability benefits. As set forth below, it is clear that Liberty ignored the duties to investigate and deal fairly with its insured – consistent with its fiduciary duty – and I request that Liberty reconsider its denial of benefits.

Liberty concludes in its denial letter that Mr. Hosseinpour has "at least full-time sedentary work capacity from a physical standpoint." The letter states that Liberty was unable to assess his level of impairment from a psychiatric standpoint because it did not receive any updated psychiatric records.

**A. History of Claim through Denial of LTD Benefits**

For employees such as Mr. Hosseinpour, Liberty Life's policy definition of "Disability" or "Disabled" means that "during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." See Group Disability Income Policy, at Form ADOP-DEF-2/3.

At the time of his disability, Mr. Hosseinpour was employed as a Pharmacy Manager for Safeway. Primary duties of his occupation include: pharmacy customer service; compounding and dispensing of prescribed medications, drugs, and other pharmaceuticals according to professional standards and state and federal legal requirements; training, supervision, scheduling, and assignment of duties to pharmacy employees; maintaining quality assurance, security, and disposal of drugs; maintaining pharmacy files, chart systems, and drug and supply inventory; and oversight of all applicable legal requirements and quality control procedures. See Job Description for Pharmacy Manager at 1. "Physical Demands" of the position include: constant lifting of 1-10 pounds and occasional lifting of 11-20 pounds; frequent carrying of 1-10 pounds; frequent pushing/pulling of 1-10 pounds; constant knee- to shoulder-level reaching; occasional at- or above-shoulder level and overhead reaching; constant standing with sitting allowed on breaks; frequent walking; use of a step stool; constant neck rotation, bending of the head, and twisting; occasional bending/stooping; seldom crouching, squatting, and kneeling; and constant handling/grasping, fine finger manipulation, and repetitive motion. Id. at 2.

In late 2013, early 2014, Mr. Hosseinpour began experiencing neck and back pain which he attributed to long hours of driving multiple times back and forth from Las Vegas to Hawthorne, Nevada. His primary care physician, Mehrdad Tafreshi, MD, referred him for cervical and lumbar MRI's in June, 2015. MRI findings dated June 15, 2015 revealed the following:

**Cervical MRI:**

Multilevel advanced degenerative disc disease, disc dehydration and disc space narrowing from C4-C5 through C6-C7, more advanced at C6-C7 where there are degenerative endplate changes.
C2-3: AP dimension of the spinal canal 11mm; no foraminal stenosis.
C3-4: AP dimension of the spinal canal 8.9 mm; no significant foraminal stenosis.
C4-5: AP dimension of the spinal canal 9.5 mm; moderate to marked narrowing of both neural foramen with possible encroachment on the exiting C5 nerve roots particularly on the right side.
C5-6: AP dimension of the spinal canal 8.8 mm; moderate narrowing of both neural foramen, slightly worse on the right side with possible mild impingement on the exiting right C6 nerve root (advise clinical correlation).
C6-7: AP dimension of the spinal canal 10 mm; moderate narrowing of the right neural foramen.
C7-T1: AP dimension of the spinal canal 11 mm; no significant foraminal stenosis.

IMPRESSION:
1. Multilevel moderate foraminal stenosis, looks most impressive on the right side at C4-C5 through C6-C7 and on the left side at C4-C5.
2. Lower cervical advanced degenerative disc disease.

**Lumbar MRI:**

2.5 mm central-right paramedian protrusion at T11-T12 resulting in mild ventral cord effacement (identified on sagittal imaging).
The L2-3 disk is normal in height and hydration; less than 2 mm central disc bulge with a component of subligamentous extrusion above the L2 endplate, right paramedian location. Extruded disc measures approximately 11 x 4 mm, both resulting in mild thecal sac effacement. No facet or ligamentum flavum pathology. No significant central canal or foraminal stenosis.
The L3-4 disk is mildly desiccated. 2 mm annular bulge and facet arthropathy efface the ventral thecal sac, AP sac measurement 8 mm. No foraminal narrowing.
The L4-5 disk is normal in height and hydration. Less than 2 mm annular bulge barely effaces the ventral thecal sac. Mild facet arthropathy without central canal, lateral recess, or foraminal stenosis.
The L5-S1 disk is normal. Mild facet arthropathy without central canal, lateral recess or foraminal stenosis.

IMPRESSION:
1. L3-L4 spondylosis and facet arthropathy resulting in moderate central canal stenosis, AP sac measurement 8 mm.
2. L2-L3 central disc bulge with a component of subligamentous extrusion above the L2

endplate. Only mild resulting thecal sac effacement without neural impingement.
3. 2.5 mm central-right paramedian protrusion at T11-T12 resulting in mild cord effacement on sagittal imaging. Consider formal thoracic MRI if clinical symptoms warrant.

Mr. Hosseinpour saw Dr. Tafreshi on July 7 and July 14, 2015, reporting complaints of neck and low back pain; occasional left arm numbness; anxiety and panic attacks; inability to stand or sit for long periods due to neck and back pain; and difficulty concentrating at work. Dr. Tafreshi's objective exam findings included tender paracervical and paralumbar musculature; decreased lumbar range of motion; and depressed mood. He provided diagnoses of degeneration of the cervical and lumbar intervertebral discs; lumbar spinal stenosis; anxiety disorder; and pure hyperglyceridemia. He referred Mr. Hosseinpour for pain management consult and prescribed trials of Zoloft, Xanax, Gabapentin, and Valium. Mr. Hosseinpour was unable to continue working as a Pharmacy Manager beyond July 11, 2015 due to his symptoms. He contacted Liberty by phone on July 13, 2015 to report his short-term disability claim. See STD Claim Note 1 dated 07/13/2015 2:50 pm.

Mr. Hosseinpour was seen in orthopedic consult with Jason Garber, MD of the Western Regional Center for Brain and Spine Surgery on July 16, 2015 with reports of neck pain and stiffness, reduced neck range of motion, and shoulder pain radiating to both arms, worse with movement and associated with upper extremity paresthesias and weakness. He also reported gradually worsening severe, sharp, and stabbing low back pain radiating to both legs and aggravated by walking with associated back stiffness, leg weakness, and leg paresthesias. A review of symptoms included neck and back pain; arm and leg pain and weakness; joint pain and decreased range of motion; memory problems; inability to concentrate; blurred vision; headaches; anxiety; and insomnia. Dr. Garber noted no significant neurologic findings on exam. The musculoskeletal portion of the exam appears incomplete, in that the "global assessment" only lists findings for gait and station (normal). Nonetheless, Dr. Garber diagnosed cervical and lumbar disc bulges without myelopathy and referred Mr. Hosseinpour for cervical and lumbar x-rays; nerve conduction studies and electromyography; and physical therapy.

On August 3, 2015, Liberty's nurse case manager Donna Paine reviewed the treatment notes from Drs. Tafreshi and Garber and the MRI findings, noting objective findings limited to "cervical tenderness." She recommended contacting Dr. Tafreshi to clarify Mr. Hosseinpour's restrictions and limitations and duration of any disability. STD MDS Note dated 08/03/2015 7:02 pm by Donna Paine. After unsuccessfully attempting to speak to Dr .Tafreshi by phone, nurse Paine wrote to him asking him to answer a series of targeted questions regarding Mr. Hosseinpour's impairments. Dr. Tafreshi responded in writing on or about August 13, 2015, noting objective findings of "cervical spinal muscle tenderness on exam; depressed mood; changed position from sitting to standing [during exam]; moderate to severe [anxiety] interfering with his ability to concentrate; depressed mood [on mental status exam]; able to perform ADL's; [impairing diagnoses of] anxiety and spinal stenosis; [R&L's of] sit and stand no more than 30 mins at a time and lift/carry no more than 15 lbs; and [duration of R&L's though] 10/1/15 [based on] his improvement on medications." See Handwritten responses to Liberty's 8/3/15 letter by Mehrdad Tafreshi, MD dated 8/5/15. Nurse Paine reviewed the responses and recommended that due to "inability to sustain focus and concentration until 10/1/15" and "cervical disc disease, spinal stenosis", R&L's of sit/stand no more than 30 minutes at a time and lift/carry no more than 15 pounds were reasonable and supported until 10/1/15 to allow Mr. Hosseinpour time to have nerve studies and physical therapy and follow up with his providers, with review of updated

medical documentation thereafter if his disability continued. STD MDS Note dated 08/20/2015 11:26 am by Donna Paine. Based on nurse Paine's recommendation, Liberty approved the STD claim through October 1, 2015.

In the meantime, Mr. Hosseinpour attended physical therapy at Kelly Hawkins Physical Therapy throughout August, 2015. Initial exam findings on August 10, 2015 included +4/5 bilateral lower extremity muscle strength testing; 4/5 left upper extremity muscle testing; +4/5 right upper extremity muscle testing; cervical and lumbar area tenderness on palpation; and cervical ranges of motion limited to 30 degrees in extension; 50 in flexion; 40 left rotation; and 30 right rotation. He reported symptoms of left hand pain and numbness and tingling in all fingers. Lumbar ranges of motion were documented on August 26, 2015 as 14 degrees in extension; 45 flexion; and 20 degrees bilateral side bending.

Mr. Hosseinpour followed up with Dr. Tafreshi on September 9, 2015 with ongoing complaints of neck and back pain; left arm pain, numbness, and weakness; left knee pain with difficulty walking or standing for long periods; anxiety and panic attacks; difficulty concentrating; and overall lack of improvement in his condition. Objective findings included depressed mood; paracervical tenderness; decreased lumbar range of motion; decreased left hand grip strength; and left knee tenderness on flexion. Dr. Tafreshi recommended left knee x-ray; follow up with Dr. Garber; and psych referral. He discontinued Zoloft and started Mr. Hosseinpour on Paxil.

On September 17, 2015, Dr. Garber reviewed the cervical and lumbar x-rays with Mr. Hosseinpour, noting straightening of the cervical spine consistent with spasm; cervical disc degeneration present most notably at C4-5, C5-6, and C6-7; idiopathic rotatory lumbar scoliosis; and some lower lumbar disc degeneration. He asked Mr. Hosseinpour to return for further recommendations after completing the nerve conduction studies.

Mr. Hosseinpour returned to see Dr. Tafreshi on September 23, 2015, reporting no improvement in his neck and back pain or left hand symptoms with physical therapy and in fact, he told Dr. Tafreshi that at times, his neck and back pain was severe enough to "bring tears to his eyes." He was also having bitemporal headaches and continued anxiety and difficulty concentrating. Objective findings remained unchanged from his last visit. Dr. Tafreshi increased the Paxil to 40mg and started him on Fiorcet with codeine for the headaches. He further noted that Mr. Hosseinpour was "still not fit to return to work."

Mr. Hosseinpour contacted Liberty that day, September 23, 2015, to report that Dr. Tafreshi was continuing to support his off-work status and to ask what type of documentation would be necessary to continue his claim into the long-term phase. He was advised by Liberty representative Ethan Kernek to submit updated medical records from his attending physician. STD Phone Note 9 dated 09/23/2015 2:55 pm by Ethan Kernek.

On October 7, 2015, Liberty's Disability Case Manager Nicole Schulke reviewed updated records from Dr. Tafreshi for treatment dates through September 23, 2015 documenting no improvement in Mr. Hosseinpour's condition and noting upcoming consults with Dr. Garber and with psychiatry. STD Claim Note 18 dated 10/07/2015 11:31 am by Nicole Schulke. On October 8, 2015, Ms. Schulke referred the file for neuropsychological and medical peer reviews. In the meantime, Liberty escalated the claim to "severe" based on "TCTM RECC" (see STD Claim Note 23 dated 10/09/2015 10:17 am by Ryan Tucker), and forwarded the file to its long-

term disability case manager Jessica Austin. STD Claim Note 25 dated 10/19/2015 10:18 am by Jessica Austin (noting "ext[end] ben[efits] while awaiting results of peer reviews")

Timothy Belliveau, PhD performed a psychiatry Clinical Case Review at Liberty's request on October 19, 2015. As part of the review, Liberty asked Dr. Belliveau to contact Dr. Tafreshi. Dr. Belliveau spoke to Dr. Tafreshi on October 12, 2015, and provided a summary of the call:

> In response to my inquiry, Dr. Tafreshi reported that Mr. Hosseinpour's panic attack symptoms include palpitations, light-headedness, and shortness of breath, and that when these happen at work he can't concentrate. In response to my question, Dr. Tafreshi clarified that this is based on Mr. Hosseinpour report of having difficulty with concentration. Dr. Tafreshi reported that Mr. Hosseinpour's antidepressant medication was changed on 09/09/15, confirmed that psychiatric treatment was recommended, and explained that it had not yet occurred. We briefly reviewed the medical record note of 09/23/15, at which time Mr. Hosseinpour's score on the PHQ-9 (19) was in the moderately severe range of depressive symptoms, and that Dr. Garber was following him for pain management. In response to my question about Dr. Tafreshi's 08/05/15 documentation to Liberty Mutual (i.e., fax rom Donna Paine, BSN, RN, CRRN, CCM) which indicates **both anxiety and spinal stenosis as impairing diagnoses, Dr. Tafreshi reported that both conditions cause impairment, that he can't sit down or stand for long periods due to spinal stenosis, and that his depression and anxiety effect his work as a pharmacist.** Dr. Tafreshi reported that Mr. Hosseinpour's next visit would be in a couple of weeks.

Clinical Case Review date October 19, 2015 by Timothy Belliveau, PhD at 4 ("Belliveau review")(emphasis added). Based on his conversation with Dr. Tafreshi and review of medical records from Drs. Tafreshi and Garber (including Dr. Tafreshi's August 3rd handwritten responses to nurse Paine's questions), Kelly Hawkins, and the MRI reports, Dr. Belliveau concluded that Mr. Hosseinpour was unable to work from a psychiatric standpoint due to *depression* at least through November 15, 2015. Rationale for his opinion included:

> The available records and supplementary AP report on 10/12/15 provide reasonable support for the presence of psychiatrically-based impairment that would probably interfere with the claimant's ability to consistently maintain pace and persistence on work-related tasks. The medical records and information from the claimant's primary care physician provide reasonable support for the need for complete occupational restriction through approximately 11/15/15, due to psychiatrically-based impairment. The medical record documentation provides stronger support for case formulation as functional impairment due to depression, rather than panic attacks.
>
> .
> .
> .
>
> The July 2015 medical records indicate that the claimant reported anxious and depressed moods, sleep disturbance, panic attacks, and difficulty concentrating. The 09/09/15 note reflects no change in his psychiatric symptoms in response to medication. The claimant's 09/23/15 score on a depression screening questionnaire (PHQ-9 = 19) reflects a scope and severity of mood symptoms which are generally consistent with the clinical diagnosis of

> Major Depression.
>
> During AP contact on 10/12/15 the claimant's primary care physician described the claimant's report of anxiety symptoms that are generally consistent with the diagnostic criteria for panic attacks, but seem to be primarily occurring, or limited to the work setting. Although the medical records indicate that the claimant has reported having difficulty concentrating, no objective mental status assessment has been completed that would support the presence of cognitive impairment.

Belliveau report at 1-2. Based on Dr. Belliveau's review, Liberty approved STD benefits through November 15, 2015. STD Claim Note 28 dated 10/20/2015 8:49 am by Jessica Austin.

Howard Grattan, MD (Board certified in Physical Medicine and Rehabilitation and Pain Management), on behalf of Liberty's vendor MLS Peer Review Services, completed a physical medicine and rehabilitation ("PM&R") peer review also on October 19, 2015. Despite multiple documented attempts to reach Drs. Tafreshi and Garber, he was unable to speak to either doctor. Dr. Grattan prepared a summary of medical documentation, citing to the "impression" portion of the cervical and lumbar MRI reports noting "moderate central canal stenosis" at L3-4 and "multilevel moderate foraminal stenosis" on the cervical MRI. He listed Dr. Tafreshi's multiple objective exam findings, including paracervical and paralumbar tenderness; decreased lumbar range of motion; and decreased left hand grip strength. He cited to Dr. Garber's review of cervical and lumbar x-rays showing "straightening of the cervical spine consistent with spasm; cervical disc degeneration at C4-7; idiopathic rotatory lumbar scoliosis; and lumbar disc degeneration." He cited the abnormal (4/5 and +4/5) muscle testing findings and decreased cervical and lumbar range of motions findings documented in the Kelly Hawkins physical therapy records. Finally, Dr. Grattan accurately recounted the subjective complaints Mr. Hosseinpour reported to his providers. In his conclusions, Dr. Grattan acknowledged that the medical evidence supported diagnoses of cervical and lumbar intervertebral disc degeneration and lumbar spinal stenosis. However, he opined that these findings were "mild in severity" and lacked any "quantifiable objective measurements, instability, or findings on MRI that would place the claimant at increased risk of injury." He opined that, incredibly, Mr. Hosseinpour was "not functionally impaired" and recommended no restrictions and limitations *at all*. He further opined that Mr. Hosseinpour's medications (Tramadol, Xanax, Lyrica, and Skelaxin) "would not be expected to impact his functional capacity." Independent Peer Review dated October 19, 2015 by Howard Grattan, MD ("Grattan review").

Liberty file notes indicate that Jessica Austin sent a copy of the "PM&R peer review" to Dr. Tafreshi for response. STD Claim Note 30 dated 10/21/2015 10:38 am by Jessica Austin. However, the October 21, 2015 letter to Dr. Tafreshi enclosed a copy of *Dr. Belliveau's* 4-page Clinical Case Review, not Dr. Grattan's report. See Letter dated October 21, 2015 to Dr. Tafreshi from Jessica Austin.[1] On October 27, 2015, Dr. Tafreshi faxed a letter To Whom It May Concern to Liberty, advising that Mr. Hosseinpour's condition "has not improved and in my

---

[1] The 2-page 10/21/15 letter to Dr. Tafreshi contained in Liberty's file is preceded by a fax cover page indicating that a total of seven (7) pages are being sent, and is followed by Dr. Belliveau's 4-page review (1 fax cover page + 2-page letter + 4-page review = 7 pages). Dr. Grattan's report is six (6) pages long, and does not appear to have been attached to the letter to Dr. Tafreshi.

opinion he is still unable to work." The letter further advised that Mr. Hosseinpour had an appointment to see a therapist on November 3, 2015, and would thereafter be referred to psychiatry. Ms. Austin reviewed the letter and extended STD benefits through December 5, 2015 "as the [claimant] is still out of work and has just begun treatment with therapist." STD Claim Note 31 dated 11/24/2015 2:49 pm by Jessica Austin. Ms. Austin then extended STD benefits through the January 19, 2016 STD maximum benefit period and closed out the STD claim. STD Claim Notes 32 and 33.

In the meantime, Liberty's LTD adjuster Stephen Levitt initiated investigation into Mr. Hosseinpour's eligibility for LTD benefits. On October 9, 2015, Mr. Levittt sent claim forms and an activity questionnaire to Mr. Hosseinpour, and a request for medical records to Dr. Garber. On October 12, 2015, Liberty reassigned the LTD file back to Jessica Austin. LTD Claim Note 7 dated 10/12/2015 at 12:36 pm. On October 21, 2015, Ms. Austin referred the file to its vendor, Claims Verification, Inc. (CVI), with instructions to conduct three days of surveillance of Mr. Hosseinpour to "determine whether he is working and level of physical function he maintains." Confidential Investigative Report dated October 30, 2015 by CVI at 1. Surveillance conducted over October 28, 29, and 30, 2015 produced a total of 46 seconds of images of Mr. Hosseinpour, 32 seconds of which he is seen standing outside the front of his house and is only in view from the height of his chest upwards. From these 32 seconds of grainy, distant video of Mr. Hosseinpour's chest and head, the investigator determined that he "seemed to move smoothly and with no indications of discomfort" and was not using an assistive device. The other 14 seconds of video show Mr. Hosseinpour walking slowly from his house towards the street to enter the passenger side of a vehicle parked in front of his house. The investigator reported from these 14 seconds of video that Mr. Hosseinpour "ha[d] no difficulty in this maneuver." He is seen at one point during the 14 seconds placing his right hand on the small of his back. Liberty's claim file does not contain documentation of any assessment of the video.

On October 25, 2015, Dr. Belliveau wrote to Dr. Tafreshi, asking Dr. Tafreshi to ensure that Dr. Belliveau had accurately summarized their conversation regarding Mr. Hosseinpour's symptoms, diagnoses, and impairments. Dr. Tafreshi responded on October 27, 2015, stating that he had.

Mr. Hossseinpour completed the claim forms and activities questionnaire and returned them to Liberty on November 22, 2015, indicating that he was only able to sit for 30 minutes to 2 hours; stand 5-10 minutes, and walk 10-15 minutes although at times he needed to lean or grab onto something when walking to avoid losing control and falling. He stated he was unable to work due to anxiety attacks 3-4 times per day limiting his ability to focus and concentrate which he feared would affect his ability to properly fill patients' prescriptions; depression causing tiredness, loss of energy, and difficulty concentrating with racing thoughts; neck pain radiating into his head and causing severe migraines and interfering with concentration and focus; pain into his left arm and hand causing numbness and tingling in his fingers; and severe low back pain radiating into his hips and thighs preventing him from standing or walking more than 5 minutes.

On November 30, 2015, Ms. Austin wrote to Kelly Hawkins Physical Therapy requesting medical records; to Drs. Tafreshi and Garber requesting updated records and completion of a Restrictions Form; and to Dynamic Futures, LLC (Mr. Hosseinpour's mental health providers)

requesting medical records and completion of a Functional Mental Status Evaluation Form.[2] On January 26, 2016, Ms. Austin confirmed receipt of records from Kelly Hawkins.

On February 3, 2016, Ms. Austin spoke to Mr. Hosseinpour regarding his medical status and the status of Liberty's medical records request. He advised that he had not seen Dr. Garber since 9/15, and was in any case looking for a second opinion regarding possible surgery. He explained to Ms. Austin that the combination of neck pain and anxiety was keeping him out of work; that he was having panic attacks 1-5 times a day and taking Xanax three times a day for anxiety; was also taking Remeron for depression and gabapentin for pain; that his neck pain was so bad that it radiated through his body and caused migraine headaches; and that he was not able to stand for more than 10 minutes or bend his head forward due to neck and back pain. He stated he did not know if he would return to work, given his current state. Ms. Austin's Phone Note 9 documenting the call indicates that she "confirmed Extension thru 2/10," but advised Mr. Hosseinpour that Liberty would need to make a decision at that point. LTD Phone Note 9 dated 2/3/2016 at 3:30 pm.

On February 4, 2016, Ms. Austin confirmed receipt of updated records from Dr. Tafreshi for dates of service October 27, 2015, December 21, 2015, and January 28, 2016. Subjective reports in the October 27th OVN included continued panic attacks with associated heart racing 3-4 times a day; unhappiness; lack of desire; persistent neck and back pain at 9/10 pain level; and difficulty sleeping due to pain. Objective exam findings were unchanged from his last visit. Dr. Tafreshi noted on December 21, 2015 that Mr. Hosseinpour had seen his psychiatrist, Mark Collins, who prescribed Remeron for depression. Subjective and objective findings remained unchanged. In his January 28, 2016 office visit note, Dr. Tafreshi again noted "no changes" in Mr. Hosseinpour's subjective reports, with persistent severe anxiety and depression; panic attacks; insomnia; difficulty concentrating; neck and back pain; left arm and hand weakness and dropping things; and headaches. He noted that Mr. Hosseinpour's prognosis was "poor," and recommended follow-up care with psychiatry. Dr. Tafreshi did not complete the Restrictions Form.

A February 17, 2016 file note by Ms. Austin indicates that Liberty consultant physician "Monti" performed a PM&R review of the file and opined that the medical records did not support impairment from working. LTD Claim Note 29 dated 2/17/2016 at 10:15 am by Jessica Austin. Although Liberty's claim file includes a curriculum vitae of David A. Monti, Jr., MD, **there is no documentation in the file of any review by Dr. Monti himself.** In an Action Plan of the same date (LTD Claim Note 30), Ms. Austin referred the file back to Dr. Grattan for PM&R peer review addendum for "comment on additional records and current level of impairment." She also referred the file for psychiatry addendum, despite having only received updated records from Dr. Tafreshi *but not* from Mr. Hosseinpour's mental health providers at Dynamic Futures. Liberty did attempt to obtain records from Dynamic Futures several times (faxed requests on November 30, 2015, December 18, 2015, and January 25, 2016, and phone call on February 3, 2016), but did not wait to receive those records prior to referring the file for psychiatry peer review addendum. Furthermore, Liberty failed to notify Mr. Hosseinpour that it was sending the file for psych review *without* those records. See Letter to Abolfazl Hosseinpour dated February 17, 2016 from Jessica

---

[2] However, it does not appear (from the page count on the fax cover pages) that Ms. Austin included a signed HIPAA authorization from Mr. Hosseinpour in any of her November 30th letters to his providers. All of the requests were re-faxed on December 18, 2015, each with an additional page, presumably the signed HIPAA authorization.

Austin (advising that the file had been referred "for a medical review and assessment by a Board Certified physician," but not otherwise discussing the fact that the file was also being sent for psychiatry review despite not having received his mental health records).

Ms. Austin also referred the file for occupational analysis. Amanda Voce, Liberty's Vocational Case Manager (VCM), prepared an Occupational Analysis on February 17, 2016 for Mr. Hosseinpour's job as a Pharmacy Manager, identifying the Dictionary of Occupational Titles's (DOT's) job description for "Pharmacist" as the occupation most closely related to a Pharmacy Manager. She cited the full "job description" portion of the Job Description for Pharmacy Manager from Mr. Hosseinpour's employer (but did not list "physical demands" listed on the same job description which include, *inter alia*, constant standing and frequent walking). Ms. Voce stated that she reviewed the O*Net 2013 survey of incumbents regarding the physical demands of the occupation (i.e., the "work context" list in the Details Reports for "Pharmacists"). She did not, however, discuss those physical demands. She stated that an internet labor market search identified a "variety of Pharmacists" including Order/Remote Pharmacist; Managed Care and Pharmacy Benefit Management Pharmacist; Medication Management Center Pharmacist; and Informatics Pharmacist (all considered "Consultant Pharmacists"), as well as Pharmaceutical Industry Pharmacist; Clinical Pharmacist; and Community Pharmacist. She stated that these jobs "span from the sedentary and light physical demand levels." She listed the cognitive demands of a Pharmacist. She then concluded that the typical physical demands of a Pharmacist "are most often sedentary and light in physical demand." She further stated that part-time opportunity exists for the occupation.

On February 22, 2016, Mr. Hosseinpour called Liberty and left a message inquiring whether Liberty had received the missing records. Ms. Austin returned his call the same day and left him a message advising that the Dynamic Futures records had not been received, but "since the deadline has expired, we are having [the] file reviewed based on the info currently on file." LTD Phone Note 11 dated 2/22/2016 at 1:37 pm by Jessica Austin. On February 26, 2016, Mr. Hosseinpour left another message for Ms. Austin regarding the missing records, and she again returned his call and left him a message, this time stating that "if information was received [from Dynamic Futures], it would be forwarded to CP for review." LTD Phone Note 12 dated 2/26/2016 at 10:45 am by Jessica Austin.

Liberty referred the file back to Dr. Grattan for PM&R addendum, asking him to review updated records and opine whether Mr. Hosseinpour currently had "full-time **sedentary** work capacity." 02/17/16 Peer Review Referral (emphasis added). Dr. Grattan prepared an Addendum to his October 19, 2015 Peer Review on February 25, 2016 ("Grattan Addendum"). His list of records reviewed includes a progress note from Dr. Tafreshi dated August 5, 2015; notes from Dr. Garber dated July 16, 2015 and September 17, 2015; updated records from Kelly Hawkins; the claim forms completed by Mr. Hosseinpour; the Job Description; Dr. Tafreshi's October 27, 2015 letter; and the CVI surveillance report. He attempted a peer-to-peer call to Dr. Garber, but was told by "Lisandra" at Dr. Garber's office that Mr. Hosseinpour was last seen "back in 06/15", and that Dr. Garber had "nothing to add...". Dr. Grattan's Addendum contains no discussion of Dr. Tafreshi's updated treatment notes from October, December, and January. He did not contact Dr. Tafreshi. Based on his review, Dr. Grattan opined that Mr. Hosseinpour had "full time sedentary work capacity" with no restrictions or limitations. He provided no rationale for his opinion. He further opined that the surveillance information conflicted with Mr. Hosseinpour's self-reported limitations (in standing and walking), as it showed him "moving smoothly and with no indications of discomfort." He did not discuss the cervical and lumbar MRI findings.

On March 14, 2016, Dr. Belliveau prepared an Addendum to his October 19, 2015 review ("Belliveau Addendum"). Dr. Belliveau reviewed Dr. Tafreshi's office visit notes from October, December, and January and acknowledged Dr. Tafreshi's reports that Mr. Hosseinpour's condition remained "unchanged." He wrote that the "interim history is notable for the claimant's report of continued anxious and depressed moods, panic attacks, pain, sleep problems, and concentration problems." Nonetheless, Dr. Belliveau opined that the records provided "insufficient support for the presence of continued psychiatrically-based functional impairment or associated need for occupational restrictions / limitations beyond approximately 11/15/15" due to the lack of "any documented behavioral changes" or "mental status or cognitive assessment data that would support the presence of cognitive impairment." Belliveau Addendum at 2-3. He recommended further review if subsequent mental health records were received.

Liberty denied Mr. Hosseinpour's LTD claim in a letter dated March 22, 2016 based on Ms. Voce's occupational analysis classifying his own occupation as "sedentary to light"; Dr. Grattan's opinion that Mr. Hosseinpour has full-time sedentary work capacity; and Dr. Belliveau's addendum addressing the lack of mental health records to support a psychiatric impairment. Liberty's denial letter cites the policy's provision with regard to the time frame for providing Proof of loss ("90 days after the end of the Elimination Period"); cites its multiple unsuccessful attempts to obtain psychiatric records; then cites Dr. Belliveau's Addendum pointing to the absence of such records as lack of support for any psychiatric impairment. Liberty readily admits in its denial letter that it is "unable to assess [Mr. Hosseinpour's] level of impairment from a psychiatric standpoint." Denial letter at 4.

**B. Liberty's Investigation was Inadequate**

*i.* ***Liberty relied on Dr. Grattan's flawed review to determine that Mr. Hosseinpour had no physical restrictions and limitations* at all**

Sadly, Dr. Grattan's review is flawed in several ways. He incorrectly states that "motor strength is 5/5" (based only on Dr. Garber's findings but ignoring the Kelly Hawkins findings). Despite including in his summary of records the abnormal cervical and lumbar ranges of motion listed in the Kelly Hawkins physical exam findings, he claims there to be no "quantifiable objective measurements" to place Mr. Hosseinpour "at increased risk of injury." Dr. Grattan provides no rationale for his conclusion that Mr. Hosseinpour's physical exam and MRI findings are so "mild in severity" as to render him "not functionally impaired" or not "at increased risk for injury" such that restrictions and limitations were not warranted. No reasonable reading of the MRI reports – even from a layman's point of view – would suggest that the findings were in any way "mild," and, when coupled with Mr. Hosseinpour's reported pain levels, the MRI findings support his impairments in prolonged standing and walking, repetitive neck movements, and lifting/ carrying.

The lumbar MRI showed *moderate central canal stenosis* at the L3-L4 level. This is not an insignificant finding and explains what is likely affecting Mr. Hosseinpour's ability to be on his feet for long periods: in essence, the passageway through which his spinal column passes at the L3-L4 level is narrowed by degenerative changes, compressing the neural elements of the spinal cord and reducing the blood flow to the nerves that provide sensation and motor control to the legs. See www.mdguidelines.com/spinal-stenosis (**Exhibit 1**)(MD Guidelines' overview of spinal stenosis). Cardinal symptoms of lumbar stenosis (per the MD Guidelines) include low

back pain, pain radiating into the legs, and intolerance for walking – the very complaints Mr. Hosseinpour consistently reports to his providers. Furthermore, as discussed in the Guidelines, physical examination for patients with lumbar stenosis will generally be unremarkable for neurologic findings, except in cases of severe stenosis. Id. And whether Mr. Hosseinpour is at "increased risk for injury" as Dr. Grattan remarks is irrelevant; Mr. Hosseinpour has pain symptoms emanating from a spinal condition evidenced on imaging studies that prevent him from performing an essential duty of his job. No one asked Dr. Grattan to assess his injury risk.

Perhaps most disturbing of all is Dr. Grattan's contention that there is "no evidence of definitive neural compromise on MRI." Again, even a layman's reading of the MRI belies such statement. Cervical MRI findings at the cervical C4-5 level revealed "**moderate to marked** narrowing of both neural foramen with possible encroachment on the exiting C5 nerve roots...". Here, the passageway (foramen) through which the C5 nerves leaving the spinal cord at both sides of the C4-5 vertebral level are narrowed – *in this case to a moderately or marked degree* – causing localized neck pain and pain, weakness, and numbness into both arms and particularly into his left arm and hand – hallmarks of cervical foraminal nerve compression (i.e., "encroachment"). MRI findings at the C5-6 level similarly showed evidence of "moderate narrowing of both neural foramen, slightly worse on the right side with possible mild impingement on the exiting right C6 nerve root," and "moderate narrowing of the right neural foramen" at the C6-7 level. To read these findings as "no evidence" of neural compromise is quite simply to ignore plain facts, and Dr. Grattan's opinion that Mr. Hosseinpour is not functionally impaired based on these finding cannot be relied upon to support claim denial.

To treat the pain related to his spinal conditions, Mr. Hosseinpour is prescribed Tramadol, an opioid pain medication with common side effects of decreased alertness, dizziness, and rash/itching among others. He also takes Xanax, an anti-anxiety medication. Common effects of Xanax include drowsiness, fatigue, dizziness, and difficulty concentrating. Lyrica is prescribed for him to treat neuropathic pain. Commonly reported side effects of Lyrica include blurred vision, ataxia, dizziness, headache, diplopia, drowsiness, tremor, fatigue, and visual field loss. Skelaxin is a muscle relaxant producing common side effects of drowsiness, dizziness, headache, and nervousness. Dr. Grattan contends that these medications "would not be expected to impact [Mr. Hosseinpour's] functional capacity." Perhaps not, if Dr. Grattan had been asked to assess Mr. Hosseinpour's functional capacity for say, testing chair cushions. Dr. Grattan knows however that Mr. Hosseinpour is a Pharmacist, an occupation with considerable cognitive skill requirements where focus and concentration are crucial to the safety of patients. Any one of these medications has the potential to reduce his cognitive abilities; one can only imagine the cumulative effect of taking them in combination.

Any fair assessment of the surveillance video, as suggested on page 7 *supra*, would have to conclude at a minimum that Mr. Hosseinpour was only surveilled for 46 seconds over three (3) days and that surveillance did not undermine in any way his reported limitations. One could also readily conclude that the surveillance supports his limitations in that it shows a slow gait and weakness in his back. For Dr. Grattan to rely on this surveillance to assert that Mr. Hosseinpour was "moving smoothly and with no indications of discomfort" (see page 9, *supra*) means he either did not see this video or simply refused to acknowledge what it plainly showed.

*ii.* ***<u>Liberty failed to perform an adequate occupational analysis. Recent FCE findings demonstrate that Mr. Hosseinpour cannot perform his job duties over an 8-hour workday.</u>***

Liberty referred the file for Occupational Analysis on February 17, 2016 with instructions to filter for *sedentary* capacity *prior* to the completion of Dr. Grattan's addendum in which he was asked to determine Mr. Hosseinpour's physical capacity! As Liberty was aware from the job description already received from Mr. Hosseinpour's employer, his occupation as "Pharmacy Manager" was clearly not a sedentary job, listing physical requirements of, *inter alia,* constant standing; frequent walking; constant neck rotation, bending of the head, and twisting; occasional bending/stooping; constant lifting of 1-10 pounds and occasional lifting of 11-20 pounds; frequent carrying of 1-10 pounds; frequent pushing/pulling of 1-10 pounds; constant knee- to shoulder-level reaching; and occasional at- or above-shoulder level and overhead reaching – hardly a sedentary-level occupation.

Nonetheless, Liberty's VCM Amanda Voce was tasked with the job of trying to classify Mr. Hosseinpour's job as a sedentary position. She started by conspicuously failing to list the physical requirements in the employer's job description for "Pharmacy Manager." She then matched Mr. Hosseinpour's job as "Pharmacy Manager" to "Pharmacist" in the Dictionary of Occupational Titles (DOT), but conveniently failed to mention that the DOT description for "Pharmacist" lists the strength rating for the job as "light," not sedentary. See **Exhibit 2** (DOT Job Description for "Pharmacist"). She then states that she reviewed the O*Net 2013 survey regarding the physical demands for a Pharmacist, but again failed to discuss those demands in her analysis. Had she done so, she would have found that the O*Net Details Report for a "Pharmacist" indicate that 63% of respondents state the job requires "continually or almost continually" standing (in addition to numerous other physical work activities that clearly extend beyond a sedentary demand). See **Exhibit 3** (O*Net Details Report for Pharmacist listing "continual standing" in "work context" heading). A typical occupational analysis under the "own occupation" review would have ended there. However, Ms. Voce, having failed to fulfill her mission to somehow classify Mr. Hosseinpour's job as sedentary as per Liberty's mandate, took her review one step further with her own *undocumented* internet "labor market research" to identify a subset of "consultant" and "clinical" pharmacists whose strength ratings "span from the sedentary and light physical demand levels." Bingo. Mission accomplished.

Liberty clearly went out of its way to expand Mr. Hosseinpour's job title to include a sub-set of pharmacist occupations far removed from his actual job as a Pharmacy Manager in order to decrease the strength requirement to sedentary to achieve its goal of claim denial. It completely ignored the physical requirements of Mr. Hosseinpour's Own Occupation. Furthermore, Liberty made no consideration whatsoever for the high level of *cognitive* requirements of the job, especially important here where Mr. Hosseinpour has expressed concern for making mistakes in filling prescriptions due to difficulty with focus and concentration caused by his pain symptoms and panic attacks.

In an effort to assess and document his physical abilities, Mr. Hosseinpour underwent a formal Functional Capacity Evaluation with Doug Ellis, PT at ATI Physical Therapy on August 26, 2016. During testing, Mr. Ellis noted that Mr. Hosseinpour exhibited limited tolerance for sitting, frequently changing his position and sitting with an altered posture. He was noted to walk slowly and favor his left leg, which increased with increasing levels of activity. Cervical ranges of motion were measured using an angle inclinometer/Goniometer, and were recorded at 40 degrees in forward flexion (50-60 considered normal); 20 extension (55-60 normal); 20 bilateral lateral bending (40-45 normal); and 45 in bilateral rotation (80 considered normal), with pain reported as the limiting factor. Lumbar flexion was measured at 35 degrees (of 60 normal); extension 25 (near normal); bilateral lateral bending 20 (of 25-30 normal); and rotation 25 degrees

bilaterally (near 30 normal). Following extensive physical ability testing, Mr. Ellis made the following recommendations:

> This client demonstrated the ability to perform limited work activities. This would include occasional lifting and carrying of less than 10 pounds. He would be able to perform frequent lifting and carrying of less than 5 pounds. He was unable to perform any lifting from below the height of 21" above the floor. He was unable to perform any lifting above the height of 66" above the floor. He was able to perform occasional pushing and pulling producing average forces of up to 50 pounds. This client was unable to perform full squatting. He was able to perform less than occasional one-half squatting activities at best. This client should avoid any kneeling or crawling. Any kneeling or crawling should be performed only with the use of a support to enable him to obtain and return from these positions. This client was able to perform less than occasional rotational activities involving his thoracic/ lumbar spine. He was unable to perform any constant cervical rotation. He was able to perform less than occasional bending to reach to work to the height of 27" above the floor. He was able to perform less than occasional reaching to work to the height of 69" above the floor. This client should avoid the climbing of stairs. Any stairs to be ascended or descended should be done only with the use of a hand railing for safety. This client should be restricted from performing any climbing of ladders, structures or stools. He should be allowed to change his position on an as needed basis. Continuous standing or walking should not exceed 15 to 20 minutes. Continuous sitting should not exceed 20 minutes. This client should be restricted from performing constant sitting, standing or walking. It is questionable as to whether or not this client would be able to maintain a competitive work pace over an 8 hour work shift. It is questionable as to whether or not this client would be able to maintain a competitive work pace over a 40 hour work week. These questions should best be addressed by his present primary care physician. There are no other recommendations to limit his work activities at this time.

See Functional Capacity Evaluation by Doug Ellis, PT dated August 26, 2016 at 1-2 ("FCE") (**Exhibit 4**). A functional capacity evaluation constitutes objective proof of disability. See e.g., Calvert vs. Firstar Finance, Inc. 409 F.3d 286, 296 (6th Cir 2015). As to validity, Mr. Ellis noted that Mr. Hosseinpour "was consistent in his demonstrated inability to perform functional activities as noted during this evaluation," and that "[t]he results of this evaluation have been determined to be reliable." FCE at 2. In sum, Mr. Ellis recommended the following physical restrictions and limitations:

> Lifting and Carrying: occasional less than 10 pounds, frequent less than 5 pounds
> No lifting from below the height of 21" from the floor or over 66" from the floor
> Pushing and Pulling: occasional up to 50 pounds
> No squatting, kneeling, crawling, or climbing ladders, structures or stools
> Rotational activities involving thoracic/ lumbar spine: less than occasional
> No constant cervical rotation
> Bending: less than occasional
> Reaching above shoulders: less than occasional
> Change position on an as-needed basis
> Continuous standing or walking limited to 15 to 20 minutes
> Continuous sitting not to exceed 20 minutes
> NO constant sitting, standing or walking

These R&L's restrict Mr. Hosseinpour from performing nearly all of the physical duties of his job, including constant lifting of 1-10 pounds and occasional lifting of 11-20 pounds; frequent carrying of 1-10 pounds; constant neck rotation, bending of the head, and twisting; use of a step stool; occasional reaching at- or above-shoulder level and overhead reaching; and most importantly, constant standing and frequent walking.

As if the foregoing documentation was not enough to show that Mr. Hosseinpour is functionally disabled from his own occupation, Liberty's Amanda Voce only concluded he could perform *part-time* work, not *full-time* work. If Mr. Hosseinpour is only capable of part-time work, *as Liberty itself asserts*, then he is totally disabled from his own occupation under Liberty's policy definition.

*iii.* ***Liberty ignored Mr. Hosseinpour's own report of subjective complaints in support of disability.***

Although Liberty asked Mr. Hosseinpour to describe in the claimant questionnaire the impairments that prevented him from working, Liberty did not lend any credence to his reports of pain and impairment, which is another factor warranting reversal of its termination of benefits. See White vs. Coblentz, Patch and Bass LLP Long Term Disability Insurance Plan, 2011 WL 2531193, *5, citing Patrick vs. Hewitt-Packard Co. Emp. Benefits Org. Income Protection Plan, 638 F.Supp.2d 1195, 1215 (S.D.Cal.2009)(ERISA insurer's approach of "disregarding subjective evidence of pain is disapproved in Ninth Circuit precedent"). Liberty has been repeatedly criticized for ignoring subjective reports of pain. See, e.g., James vs. Liberty Life Assurance Co. of Boston, 582 F. Appx 581, 589 (6th Cir 2014); Sikkema vs. Liberty Life at *9-10 (W.D. Mich Sept. 6, 2016)(Hon. Paul Maloney)(citing *James* with approval). As discussed in Section A *supra*, Mr. Hosseinpour reported in the claimant questionnaire that due to his pain symptoms he was only able to sit for 30 minutes to 2 hours; stand 5-10 minutes, and walk 10-15 minutes (and sometimes needed to lean on or grab something to avoid falling); that he suffered anxiety attacks 3-4 times per day limiting his ability to focus and concentrate and interfering with his ability to properly filling patients' prescriptions; he suffered neck pain radiating into his head and causing severe migraines, also interfering with concentration and focus; he had pain into his left arm and hand causing numbness and tingling in his fingers; and he suffered severe low back pain radiating into his hips and thighs interfering with his ability to walk for more than 5 minutes.

As discussed in the following section, the Social Security Administration (SSA) also asked Mr. Hosseinpour to describe how his condition limits his ability to work but in its case, the SSA *did* consider his reports as evidence of disability. In the SSA Function Report, Mr. Hosseinpour explains that his low back pain transfers to his hip, legs, and knees making it impossible for him to stand all day at the pharmacy, with pain so severe at time he loses his balance or control when walking. He states that his neck pain "shoots to his head" causing migraine headaches and making it impossible to focus on the preparation of his patients' prescriptions. He worried that his difficulty concentrating would interfere with his accuracy in filling prescriptions and that he might make a mistake and possibly harm or kill a patient. He also described having anxiety attacks 3-4 times a day at work with symptoms of overheating and peart racing, causing him to lose focus and concentration. He sometimes thought he was about to die from the attacks. He reported depressive symptoms with racing thoughts and flashbacks of the death of his parents, his best friend, and a cousin in an auto accident. He had visions of himself having a panic attack while driving over bridges. He was concerned for the safety of his patients due to these multiple distractions. The SSA Function Report is enclosed for review as **Exhibit 6.**

C. **Social Security Administration's finding of total disability**

The Liberty LTD policy requires that Mr. Hosseinpour apply for Social Security Disability (SSD) insurance benefits. Mr. Hosseinpour applied for and was awarded SSD benefits *after only his initial application*. The Social Security Administration (SSA) notified him of the award in a letter dated July 1, 2016, with an established onset date of July 14, 2015. See Notice of Award (Exhibit 5). Mr. Hosseinpour's monthly SSD benefit was calculated at $2,171.00, which Liberty will apply as an offset to its monthly benefit should it reverse its decision.

In making its decision to award SSD benefits, the SSA considered the *same set of medical records* Liberty relied upon to *deny* Mr. Hosseinpour his LTD benefits. In addition, the SSA considered the subjective complaints detailed by Mr. Hosseinpour in a Function Report as evidence of his disability **(Exhibit 6)**. Following physical and psychological evaluations of Mr. Hosseinpour commissioned by the SSA after considering his subjective complaints and his doctors' reports, the SSA determined that he was disabled from a primary diagnosis of **Discogenic and Degenerative Disorder of the Back** and a secondary diagnosis of **Affective Mood Disorder**. See Disability Determination and Transmittal ("DDT")(**Exhibit** 7).[3]

While it is true that the criteria for an award of Social Security Disability differ from the requirements necessary to meet the definition of disability in the subject policy, Liberty cannot ignore the *evidence* upon which the SSA bases its decisions. As Liberty most assuredly knows, the Social Security Administration only considers a claimant disabled:

> if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. §1382c(a)(3)(A). Indeed, the SSA notified Mr. Hosseinpour in the Award letter that his claim would not even be reviewed again for another 5-7 years! Further, the interpretive guidelines clarify that payment of benefits will occur only after sufficient medical evidence has been presented showing that the claimant is totally disabled:

> The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this definition, you must have a severe impairment(s) that makes you unable to do your past relevant work (see § 404.1560(b)) or any other substantial gainful work that exists in the national economy. If your severe impairment(s) does not meet or medically equal a listing in appendix 1, we will assess your residual functional capacity as provided in §§404.1520(e) and 404.1545. (*See* §§404.1520(g)(2) and

[3] Please note: Box 34 of the DDT under "remarks" states: "Claimant capable per [psychologist] Lisa Foerster report..." My office was advised by "Ms. Long" of the Social Security Administration's local Las Vegas office that this remark refers to Mr. Hosseinpour's ability to "handle money." If necessary, feel free to confirm this information directly with the SSA or with your own SSA unit.

404.1562 for an exception to this rule.)

See 20 Code of Federal Regulations § 404.1505(a) (regulations interpreting 42 U.S.C. §1382c(a)(3)(A)). See also, e.g., *Glenn v. MetLife,* 461 F.3d 660, 668 (6th Cir.2006) (a plan administrator's decision to deny benefits where Social Security disability benefits have been awarded under a more stringent definition than the policy definition can be considered arbitrary and capricious); see also *Pierce v. American Waterworks Co.,* 683 F.Supp. 996, 1000 (W.D.Pa.1988), (rejecting the conclusions of a doctor who performed a paper review of the medical record over the credible conclusions of the primary treating physician and a Social Security Administrative Law Judge). Here, Mr. Hosseinpour's claim is in the own occupation stage, not even the "any occupation" stage. The fact that the SSA awarded him total disability benefits under its narrow standards, on his first time and without representation by a vendor or an attorney, is compelling evidence that Liberty cannot dismiss but must consider. Again, Mr. Hosseinpour only has to prove to Liberty by a preponderance of the evidence that he is disabled from his occupation as a Pharmacy Manager, not disabled from any occupation, as he successfully did *on his own* to the Social Security Administration.

**D. Additional medical documentation supporting disability**

Enclosed are updated medical records from Dr. Tafreshi (**Exhibit 8**) and the records from Mr. Hosseinpour's mental health provider at Dynamic Futures (**Exhibit 9**). Dr. Tafreshi also completed a functional assessment. A summary of these records follows:

Mr. Hosseinpour presented for psychiatric initial evaluation with Mark Collins, DO of Dynamic Futures on December 11, 2015 with reports of neck and low back pain; trouble sleeping; loss of appetite; loss of interest; significant panic attacks and anxiety; "subtle post-traumatic stress disorder symptoms"; hearing buzzing noises; and poor memory. He was currently taking Gabapentin 300mg 3x/day; Xanax 1 mg 3x/day; Tramadol (an opioid pain medication) as needed; Paxil 40mg/day; and Finasteride 5mg/day (for prostate issues). Dr. Collins' findings on a mental status exam included: significant psychomotor irritability/agitation; questionable flashbacks; depressed mood; anxious affect; short-term memory 3/3 immediate and 0/3 recent; knows president is Obama but does not know who the vice-president is; abstract thinking intact; and fair insight and judgment. Dr. Collins assessed Axis I diagnoses of: Major Depression, Recurrent, Moderate; rule out psychosis; Panic Disorder without Agoraphobia; Generalized Anxiety Disorder; rule out PTSD; rule out cognitive disorder, NOS. He assessed Mr. Hosseinpour's GAF (Global Assessment of Functioning) at 50 (indicative of serious impairment in social, occupational, or school functioning). He referred Mr. Hosseinpour for labwork; added Remeron 15mg at bedtime (anti-depressant); and increased Gabapentin to 600mg in the AM, 300mg at noon, and 600mg at 5:00 PM for a week and then 600mg 3x/day after a week for anxiety and pain. He suggested a possible trial of Cymbalta; switching Xanax to Klonopin; adding Namenda for cognition, pain, and mood; or a trial of Tegretol or Lamictal for pain and mood.

Mr. Hosseinpour began taking Remeron as directed and returned to see Dr. Collins on February 19, 2016 with reports of continued neck and back pain; hearing buzzing noises; and neurovegetative depressive symptoms (not further described by Dr. Collins). He reported a subtle improvement in his sleep. Exam showed him to be anxious and somewhat irritable, with depressed mood, questionable flashbacks, and stable cognitive functions. Labwork showed mild CBC abnormalities. Dr. Collins assessed a GAF of 52 (GAF scores of 51 - 60 indicate "moderate

symptoms", for example, flat affect and circumlocutory speech, and occasional panic attacks, or moderate difficulty in social, occupational, or school functioning). He noted a diagnosis of Cognitive Disorder "secondary to medical issues." He discontinued Paxil and started Effexor XR 150mg/day.

Mr. Hosseinpour has remained under the regular care of his primary care physician, Dr. Tafreshi, for medication management. In follow-up on March 29, 2016, he presented with subjective complaints of persistent neck and back pain; left arm and hand weakness; pain radiating into both legs; severe anxiety and depression; panic attacks; insomnia; and difficulty concentrating. He was using a lumbar brace. Exam findings included depressed mood; paracervical tenderness; decreased lumbar range of motion; and decreased left hand grip. Diagnoses included severe recurrent Major Depressive Disorder; cervical disc degeneration; lumbar spinal stenosis; and pure hyperglyceridemia. Dr. Tafreshi recommended he continue his meds; referred him for pain management; and recommended he follow up with psychiatry. One month later, on April 28, 2016, Mr. Hosseinpour returned to see Dr. Tafreshi advising that he had been unable to see a pain management specialist due to lack of insurance. Subjective reports remained the same. He was now using a neck brace at home. He requested a refill of Effexor. Findings were similar in follow-ups with Dr. Tafreshi on May 30, 2016 and again on July 11, 2016. Dr. Tafreshi continued to prescribe Xanax for anxiety; Fioricet/Codeine for headaches; Cymbalta for depression; Tramadol for pain; Ambien for sleep; and Paxil/Effexor for mood.

As suggested by Mr. Ellis in his Functional Capacity Evaluation, see *supra* at 12-13 for this discussion, his findings were forwarded to Dr. Tafreshi for review and comment regarding whether Mr. Hosseinpour could maintain a competitive work pace over an 8-hour work shift/40-hour work week. On September 15, 2016, Dr. Tafreshi completed a Physical Impairment Residual Functional Capacity Questionnaire and Non-Exertional Function Assessment based on his physical exam and observations of Mr. Hosseinpour, objective testing, and Mr. Ellis's findings (**Exhibit 10**). In the questionnaire, Dr. Tafreshi states Mr. Hosseinpour is physically impaired by severe pain in his neck and back (with pain radiating into his hips and legs), and is unable to perform the listed duties of his job over an 8-hour work day, 40 hours per week due to his inability to sit, stand, bend, or concentrate and because of his difficulty with focus and decision-making. Exhibit 10 (responses to Questions Nos. 9 and 10). He notes medication side effects of drowsiness and inability to drive. He recommends physical R&L's similar to Mr. Ellis's. In addition, Dr. Tafreshi states that Mr. Hosseinpour has marked impairment in his ability to maintain attention and concentration for extended periods; is unable to tolerate normal levels of stress; and would have moderate difficulty understanding, remembering, and carrying out detailed instructions, all of which would clearly have a negative impact on his ability to accurately fill prescriptions and manage a pharmacy.

## E. Conclusion

As you know, a fiduciary of an ERISA plan must adequately investigate a claim; ask the plaintiff for necessary evidence; and credit a claimant's reliable evidence. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 968 - 969 (9th Cir.2006)(emphasis added); *accord*, Boonton v. Lockheed Medical Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997). This duty mandates that the plan administrator engage in "meaningful dialogue" with the beneficiary. Id. "If the administrator believes more information is needed to make a reasoned decision, they must ask for it." Id.; see also Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 538 (9th Cir. 1990). The Tenth Circuit

has stated that ERISA fiduciaries "cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement." Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 773 (10th Cir. 2004) (citations omitted).

Based on the evidence submitted here – the FCE report; the SSA determination; Liberty's own conclusion that he can only perform part-time work; the opinion of his treating doctor based on his medical treatment and first-hand observations; and his own subjective complaints – as well as the points made here analyzing Liberty's initial decision, and the relevant case law, please review this claim anew and pay Mr. Hosseinpour his past due LTD benefits and ongoing monthly benefits, subject to ongoing proof.

If Liberty or any of its peer reviewing doctors, as part of Liberty's appeal review, wishes to speak with or otherwise contact Dr. Tafreshi or any other of Mr. Hosseinpour's treating physicians, please be sure to provide a proper authorization to the treating physician prior to making contact. Also, if Liberty or any of its peer reviewers encounter any difficulty *whatsoever* in speaking with his doctors, please contact my office to facilitate that contact. I and my paralegal Robin are readily available to assist you.

Very truly yours,

Julie A. Mersch, Esq.

JAM/rmj

| | | |
|---|---|---|
| enclosures: | Exhibit 1: | MD Guidelines article on spinal stenosis |
| | Exhibit 2: | DOT's description for Pharmacist |
| | Exhibit 3: | O*Net Details Report for Pharmacist |
| | Exhibit 4: | Functional Capacity Evaluation by Doug Ellis, PT |
| | Exhibit 5: | SSA Notice of Award |
| | Exhibit 6: | SSA Function Report |
| | Exhibit 7: | SSA Disability Determination and Transmittal |
| | Exhibit 8: | Updated medical records from Dr. Tafreshi |
| | Exhibit 9: | Medical records from Dynamic Futures |
| | Exhibit 10: | Physical Impairment Residual Functional Capacity Questionnaire and Non-Exertional Function Assessment by Dr. Tafreshi |

W:\HOSSEINPOUR\LTRS\Austin.Liberty.Appeal.091916.wpd

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213

JULIE MERSCH
LAW OFFICE OF JULIE A. MERSCH
701 S. 7TH ST.
LAS VEGAS NV 89101

Liberty Mutual INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 427-1844

April 27, 2016

Julie A. Mersch
Law Office of Julie A. Mersch
701 S. 7TH ST.
LAS VEGAS, NV 89101

RE: Long Term Disability (LTD) Benefits
Safeway, Inc.
Claim #: 5482725
Claimant: Abolfazl Hosseinpour

Dear Julie Mersch:

Liberty Life Assurance Company of Boston ("Liberty") is responsible for managing claims for Long Term Disability (LTD) benefits under Safeway, Inc.'s Group Disability Policy. We are writing in reference to Abolfazl Hosseinpour's claim for LTD benefits under the Policy.

Per Mr. Hosseinpour's April 11, 2016 request for relevant claim documentation, we have enclosed the following information:

- Safeway, Inc.'s Long Term Disability (LTD) Policy
- The medical information contained in our claim file
- The vocational information contained in our claim file
- The surveillance documentation contained in our claim file
- A complete copy of our claim file

Also included are copies of the *curriculum vitaes* of all health care professionals with whom Liberty consulted prior to the benefit determination. There are no other medical experts with whom we consulted. Not included is a list of all peer review articles authored by these professionals, as this is outside of Liberty's disclosure obligations under ERISA.

With regard to your request for internal guidelines, memorandums, and protocols, we do not agree with your interpretation of the scope of Liberty's disclosure obligations under ERISA and we decline your request for this type of documentation.

Regarding your request for a copy of the latest *summary plan description*, your client is covered under a Group Disability Income policy, therefore your request for certificates of insurance or summary plan descriptions would be directed to Safeway, INC.

If Mr. Hosseinpour has any questions regarding this information, please contact me.

Sincerely,

Jessica Austin
Technical Claims Consultant
Phone No.: (888) 437-7611 Ext. 16352
Secure Fax No.: (603) 427-1844

 claim – 5482725 

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, UPS Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.

UPS Access Point™
THE UPS STORE
1931 WOODBURY AVE
PORTSMOUTH ,NH 03801

FOLD HERE

---

JESSICA AUSTIN
LIBERTY MUTUAL-DOVER-0096
100 LIBERTY WAY
DOVER NH 03820

0.0 LBS LTR 1 OF 1

**SHIP TO:**
LAW OFFICE OF JULIE A. MERSCH
JULIE MERSCH
701 S. 7TH ST.
**LAS VEGAS NV 89101-6907**

**NV 891 9-04**

**UPS 2ND DAY AIR 2**
TRACKING #: 1Z 248 96X 02 9468 7526

BILLING: P/P

Office/Dept Number: 009600200

CS 18.1.15. WNTNV50 75.0A 04/2016

# DAVID A. MONTI, JR., MD

## Curriculum Vitae

### Education:

| | |
|---|---|
| 9/90-6/94 | *University of Connecticut School of Medicine*, Farmington, CT<br>M.D. Degree |
| 9/89-6/90 | *Central Connecticut State University*, New Britain, CT<br>Matriculated in M.S. in Physiology |
| 9/85-6/89 | *Fairfield University*, Fairfield, CT<br>B.S. Degree, Biology, with a minor in Mathematics and Chemistry |

### Post-Graduate Training:

| | |
|---|---|
| 7/95-6/98 | *JFK Johnson Rehabilitation Institute*, Edison, NJ<br>Resident in Physical Medicine and Rehabilitation<br>Chief Resident<br>Instructor, Introduction to Clinical Medicine, UMDNJ Robert Wood Johnson Medical School |
| 7/94-6/95 | *University of Connecticut School of Medicine*, Farmington, CT<br>Internship in Internal Medicine |

### Professional Experience:

| | |
|---|---|
| 6/08- present | *Hartford Hospital*, Hartford, CT<br>Attending Physiatrist, Associate Director of Stroke Rehabilitation |
| 3/05-present | *Liberty Mutual Life Assurance Company*<br>Consulting physician |
| 5/2010-9/2015 | *Medsolutions/Evicore*, Consulting physician |
| 1/07- 5/08 | *Gaylord Hospital*, Wallingford, CT<br>Attending Physiatrist |
| 2/03-12/06 | *Physical Medicine and Rehabilitation Associates*, Woodbridge, CT<br>Attending Physiatrist at Hospital of St. Raphael's |
| 7/98-2/03 | *Eastern Rehabilitation Network*, Newington, CT<br>Associate Physiatrist with the following appointments:<br><br>*Hartford Hospital*, Hartford, CT (2000 – 2003)<br>Attending Physician, Department of Physical Medicine and Rehabilitation |

3-9-16

*Middlesex Hospital*, Middletown, CT (1998-2002)
Medical Director, Department of Physical Medicine
and Rehabilitation

## Certification:

Fellow of the American Board of Physical Medicine & Rehabilitation , 1999,2009
Recertification 2009

## Licensure:

State of Connecticut Licensure: Active
United States Medical Licensing Examination

## Professional Affiliations:

American Academy of Physical Medicine and Rehabilitation
Connecticut Society of Physical Medicine and Rehabilitation, President 2005-2008
PMR representative to the Medicare Advisory Committee 2000-present

## Honors & Awards:

| | |
|---|---|
| 2010-2016 | Connecticut Magazine TOP DOC award |
| 2012 | Vitals.com Most Compassionate Physician acknowledgement |
| 2008,2009,2011 | Vitals.com Top Physician award |
| 1988 | Pi Mu Epsilon (Mathematics Honor Society) |
| 1987 | Alpha Epsilon Delta (Pre-Med Honor Society) |
| F-'85, F-'88, S-'88 | Dean's List |

## Research Experience and Lectures:

| | |
|---|---|
| 2016 | *Medicine and Mobility* Lecture to ICU staff at Hartford Hospital |
| 2015 | *Physiatric approach to the Medical Patient;* Department of Medicine Grand Rounds |
| 2014 | *New Interventions in Stroke Rehabilitation;* Jefferson House |
| 2013 | *Grand Rounds Neurology; A Case Based Presentation on Spasticity* |
| 2011 | *Keynote Speaker Stroke Survivor Conference; Neuroplasticity in Stroke* |
| 2009 | *Early Intervention in Stroke Rehabilitation;* American Heart Association Stroke Conference, |
| 2008 | *Treatment of Spasticity; New Innovations,* Neurology residents Hartford Hospital |
| 2005 | *A Physiatrist's Approach to Low Back Pain,* Connecticut VNA |
| 2004 | *Steroid Abuse in Sports,* University of New Haven |
| 2003 | *Management of the Traumatic Brain Injured Patient,* Hospital of St. Raphael's |

| | |
|---|---|
| 2001 | *Diagnosis and Treatment of Carpal Tunnel Syndrome,* Grand Rounds, Middlesex Hospital |
| 2000 | *Diagnosis and Treatment of Cumulative Trauma Disorders,* Occupational Medicine Seminar |
| 1998 | *Writing Prescriptions for Outpatient PT*, Lecture Series UMDNJ, Department of Orthopedic Surgery |
| 1997 | *The Treatment of Tremor after Traumatic Brain Injury With Botulinum Toxin and EMG Localization: A Case Report,* Presentation at Resident's Research Day of New Jersey sponsored by the New Jersey Society of PM & R |
| 1996 | *Head Injury in Football*, Grand Round Presentation, Dept of PM&R, JFK Johnson Rehabilitation Institute |
| 1996 | *Resident Education: A Didactic Teaching Program in Practice Management* Poster Presentation at American Academy of PM&R Conference |

**Timothy Belliveau, PhD, ABPP**
*Board Certified in Clinical Neuropsychology*
*Board Certified in Rehabilitation Psychology*

**HOSPITAL**
Hospital for Special Care
2150 Corbin Avenue New Britain, CT 06053

**CONSULTING**
Liberty Mutual Assurance Company of Boston
55 Capitol Boulevard Rocky Hill CT 06067
*Telephone*: 860.571.2306
*E-mail*: timothy.belliveau@libertymutual.com

**EDUCATION & CREDENTIALS**

04/21/07:
Board Certified in Rehabilitation Psychology
American Board of Professional Psychology

11/06/01:
Board Certified in Clinical Neuropsychology
American Board of Professional Psychology

9/86 - 2/94:
The Catholic University of America, Washington, DC
Ph.D., Clinical Psychology, February 1994
M.A., Clinical Psychology, February 1989

9/84 - 5/86:
Connecticut College, New London, CT

9/80 - 5/84:
The College of the Holy Cross, Worcester, MA
A.B., Psychology, May 1984

**PROFESSIONAL LICENSE**

Psychologist - State of Connecticut (May 1995 to present; License # 001962)

1-11-16

**AFFILIATIONS**

Hospital for Special Care

- Affiliate Medical Staff, Department of Psychology

Yale University School of Medicine

- Assistant Professor of Psychology, Clinical Faculty, Department of Psychiatry.

**HONORS, AWARDS, AND OFFICES HELD**

June 1994: *Alumni Association Award*
The New York Hospital - Cornell University Medical Center
Award of excellence in Clinical Psychology, presented by the Cornell Medical College Department of Psychiatry Alumni Association. It represents a consensus of the Psychology Faculty, in recognition of outstanding work in Clinical Psychology.

June 1994: *Howard F. Hunt Award of Distinction*
The New York Hospital - Cornell University Medical Center
Award presented by Psychology Faculty, in recognition of excellence in research.

January 1994: *Oral dissertation defense passed with distinction.*
The Catholic University of America

2002, 2003: *Co-Secretary*, Connecticut Neuropsychological Society
2005: *President*, Connecticut Neuropsychological Society

**PROFESSIONAL MEMBERSHIPS AND ORGANIZATIONS**

American Academy of Clinical Neuropsychology
Academy of Rehabilitation Psychology
National Academy of Neuropsychology
American Psychological Association

- Division 12: Society of Clinical Psychology
- Division 22: Rehabilitation Psychology
- Division 40: Clinical Neuropsychology

Academy of Spinal Cord Injury Professionals

**CURRENT POSITIONS**

9/95 - present:

Department of Psychology: Director of Postdoctoral Training and Research
Hospital for Special Care (New Britain, CT)

Provide neuropsychological and rehabilitation counseling services for the spinal cord injury rehabilitation program and various hospital services. Outpatient Clinic responsibilities include neuropsychological evaluation and treatment. This encompasses individual and/or couple's counseling, often for individuals with neurodevelopmental disorders, brain injury, spinal cord injury, or dementia. Coordinate multi-agency community support services for individuals with brain injury through the Acquired Brain Injury Medicaid Waiver Program. Director of the Hospital for Special Care Postdoctoral Residency program in Rehabilitation Psychology. Clinical supervisor for practicum students from the University of Connecticut and the University of Hartford's doctoral programs in Clinical Psychology. Site Co-Investigator for collaborative research projects with the New England Regional Spinal Cord Injury Center, a national Spinal Cord Injury Model System center which is grant-funded through 2016 by the National Institute on Disability and Rehabilitation Research. Research interests also include the development of rehabilitation software applications to optimize accuracy in complex diagnostic and prognostic decision-making tasks.

4/10 – present

Consulting Neuropsychologist
Liberty Mutual Insurance Company (Rocky Hill, CT)

Medical record reviews and provider contact to provide analysis of issues related to diagnosis, associated impairment, and need for occupational restrictions and/or limitations

06/14 – present:

Yale University / Connecticut Mental Health Center (New Haven, CT)

Clinical supervisor to postdoctoral residents and interns in Clinical Neuropsychology.

**PREVIOUS CLINICAL EXPERIENCE**

8/96 – 4/10
Independent Practice (Stratford, CT)
Pediatric and adult neuropsychological consultation services.

1/95 - 9/95:
Community Health Center
Middletown, CT
Crisis intervention and short-term psychotherapy in an urban, community-based mental health clinic. Coordinator of child and adult psychological testing services. Supervisor for mental health therapists, and consultation-liaison psychologist between the mental health and medical clinics.

7/94 - 7/96:
Comprehensive Neuropsychological Services
Cheshire, CT
Diagnostic and rehabilitation services in a group practice that specializes in the evaluation and treatment of patients with neuropsychological disorders, and their families. Also provided general outpatient psychotherapeutic services.

7/92 - 6/94:
Neuropsychology Fellow
New York Hospital - Cornell University Medical Center
White Plains, NY
Two year fellowship in clinical neuropsychology. Consultations were provided throughout the psychiatric hospital, including both inpatient and outpatient child, adult, and geriatric services. Brief neuropsychological evaluations were provided for the Department of Neurology and Neuroscience, Neurobehavioral Program. Primary affiliation with a hospital unit specializing in the treatment of anxiety and mood disorders. Secondary affiliation with a chemical dependency treatment service.

**PREVIOUS CLINICAL EXPERIENCE (continued)**

7/90 - 6/92:
Psychology Intern
New York Hospital-Cornell University Medical Center
White Plains, NY

Two year predoctoral internship. Six month rotation on an acute psychiatric treatment service. Six month rotation on hospital units specializing in extended treatment of individuals with severe and persistent mental illness. One year rotation in the outpatient adult and child psychiatry clinics. Clinical responsibilities included hospital admission evaluations, case administration, individual, group, and family therapy, and psychological assessment. Co-leader of an outpatient Dialectical Behavior Therapy Group for patients with Borderline Personality Disorder.

9/89 - 7/90:
Neuropsychology Technician
Psychology and Education Associates
Clinton, MD

Responsible for administration of the Halstead-Reitan Neuropsychological Test Battery, and tests of personality and educational achievement. This supervised position provided training in neuropsychological assessment of adults with traumatic brain injury and substance abuse.

9/88 - 8/89:
Psychology Extern
Taylor Manor Hospital
Ellicott City, MD

This externship experience consisted of psychodynamic psychotherapy with adolescents, young adults, and adults in a private psychiatric hospital. Clinical training also included family therapy, psychological assessment, neuropsychological evaluation, and participation in a weekly Tavistock Group.

9/87 - 5/88:
Practicum Student
The Catholic University of America Counseling Center
Washington, DC

This practicum consisted of individual psychotherapy with college students. Depression, social skills acquisition, and relationship difficulties were the focus of cognitive and behavioral interventions.

9/85 - 5/86:
Practicum Student
Psychology Service, Veteran's Administration Medical Center
West Haven, CT

Training in cognitive-behavior therapy for patients with anxiety and stress-related disorders, with a placement in the Health Psychology Clinic. Additional clinical experience and training in the Pain Rehabilitation Program.

**PREVIOUS TEACHING EXPERIENCE**

9/02 – 12/03:
Adjunct Professor of Psychology
Fairfield University
Fairfield, CT

Undergraduate courses: *Biological Bases of Behavior* x 2 semesters; *Abnormal Psychology* x 1 semester.

7/94 - 6/95:
Assistant Professor of Psychology
Albertus Magnus College
New Haven, CT

Eight courses across the trimester academic year, in the General Education and Continuing Education Programs: *Introduction to Psychology; Foundations of Learning; Theories and Research in Personality; Psychology of the Exceptional Child; Clinical Psychology I: Abnormal Psychology; Clinical Psychology II: Psychotherapy.*

**PREVIOUS TEACHING EXPERIENCE (continued)**

9/89 - 5/90:
Instructor
Trinity College
Washington, DC
Two courses in the undergraduate program and the Weekend College for Adult Learners: *Personality and Psychopathology* x 2 semesters

1/87 - 5/90:
Instructor
The Catholic University of America
Washington, DC
*General Psychology* x 7 semesters

9/86 - 12/86:
Teaching Assistant
The Catholic University of America
Washington, DC
Teaching assistant for an undergraduate course: *Statistical Methods* x 1 semester

**PREVIOUS RESEARCH EXPERIENCE**

7/87 - 3/88:
Research Technician
NIH-National Institute of Aging - Gerontology Research Center
Baltimore, MD
Assisted in data management and SPSS-X statistical analysis for research projects affiliated with the Baltimore Longitudinal Study of Aging.

9/84 - 8/86:
Research Technician
Hartford Hospital Neurophysiology Research Lab
Hartford, CT
Administered laboratory tests (e.g., visual evoked potential, dichotic stimulation, perceptual-motor tasks) for clinical-research projects. SAS management and statistical analyses of a database on correlates of anxiety and depression among consecutive hospital admissions.

**PREVIOUS RESEARCH EXPERIENCE (continued)**

9/82 - 5/84:
Research assistant
Psychology Laboratory, College of the Holy Cross
Worcester, MA

Collaborated in experimental design, data analysis, and presentation of student research. Laboratory projects investigated the interdependence of behavioral and neuroendocrine processes.

**CLINICAL - RESEARCH at Hospital for Special Care (in progress)**

HSC Co-Investigator, with Subramani Seetharama, MD Principal Investigator, in a collaborative partnership with New England Regional Spinal Cord Injury Center. Grant funding subaward (2011-2016) from the National Institute on Disability, Independent Living, and Rehabilitation research (NIDILRR) for various research projects related to the Spinal Cord Injury Model Systems.

Projects to develop clinical decision support software to optimize accuracy in diagnostic classification and prognostication regarding functional recovery:

Belliveau, T., Jette, A., Seetharama, A., Axt, J., Rosenblum, D., Larose, D., Houlihan, B., Slavin, M., and Larose, C. (manuscript submitted for review). Developing artificial neural network models to predict functioning one year after spinal cord injury.

Felice, K., Belliveau, T., Whitaker, C., Axt, J., & Larose, C. (clinical management grant proposal submitted). Optimal identification of amyotrophic lateral sclerosis – related cognitive and behavioral decline using home-based cognitive monitoring and artificial neural network predictive models.

**PROFESSIONAL PAPERS AND PEER PRESENTATIONS**

Belliveau, T., Axt, J., & Seetharama, M. (2015, November). Informatics support for diagnostic classification and prognostic estimation, demonstrated with neurotrauma data. Haddam, CT: Connecticut Psychological Association Convention.

Green C, Houlihan BV, Skeels SE, Zazula J, Pernigotti D, Hasiotis S, Mercier H, Brody M, Belliveau T, Rosenblum D, Seetharama S, Jette AM. (2015, November). Development of a Peer-

Led Phone Intervention for Goal-Setting Primary Healthcare Needs in Chronic Spinal Cord Injury. Poster presentation at: American Public Health Association Annual Meeting & Exposition. Chicago, Illinois.

Houlihan BV, Skeels SE, Zazula J, Pernigotti D, Hasiotis S, Mercier HW, Brody MS, Green C, Belliveau T, Rosenblum D, Seetharama S, Jette AM. (2015, October). Development of a Peer-Led Phone Intervention for Goal-Setting Primary Healthcare Needs in Chronic Spinal Cord Injury. Poster presentation at: American Congress of Rehabilitation Medicine 92nd Annual Conference. Dallas, Texas.

Houlihan BV, Everhart-Skeels S, Gutnick D, Pernigotti D, Zazula J, Brody M, Burnett M, Mercier H, Hasiotis S, Green C, Subramani S, Belliveau T, Rosenblum D, & Jette A. (2015, September). Empowering adults post spinal cord injury to manage their primary care needs: Intervention development and feasibility testing. Meeting of the American Occupational Therapy Association. Nashville, TN.

Rosenblum D, Pernigotti D, Belliveau T, Morello J, Zazula J, Vergo Houlihan B, Green C, Brody M, Seetharama S, Jette AM (2015, September). New England Spinal Cord Injury Toolkit Offers an Easy to Access and Use Education Tool to Any SCI Caregiver Poster presented at: The Academy of Spinal Cord Injury Professionals Annual Meeting. New Orleans, Louisiana.

Skeels SE, Houlihan BV, Gutnick D, Pernigotti D, Zazula J, Brody M, Mercier H, Green C, Rosenblum D, Belliveau T, Seetharama S, Jette AM. (2015, September). Novel Application of the Peer Health Coach Model to Address Health Care Management Among People with Chronic SCI. Poster presentation at: Academy of Spinal Cord Injury Professionals Educational Conference & Expo. New Orleans, Louisiana.

Skeels SE, Zazula J, Houlihan BV, Pernigotti D, Hasiotis S, Brody MS, Green C, Mercier HW, Belliveau T, Rosenblum D, Seetharama S, Jette AM. (2015, May). Development of a Novel Peer Health Coach Model in Supporting Goal Setting and Self-Management of Health Care Needs for People with Chronic SCI. Poster presentation at: The 4th ISCoS and ASIA Joint Scientific Meeting. Montreal, Canada.

Houlihan BV, Skeels SE, Zazula J, Pernigotti D, Hasiotis S, Mercier HW, Brody MS, Green C, Belliveau T, Rosenblum D, Seetharama S, Jette AM. (May, 20015). Development of a Peer-Led Phone Intervention for Goal-Setting Primary Healthcare Needs in Chronic Spinal Cord Injury. Poster presentation at: The 4th ISCoS and ASIA Joint Scientific Meeting. Montreal, Canada.

Belliveau, T., Seetharama, S., & Axt, J. (2015, April). *Optimal prediction of spinal cord injury outcomes: Progress and challenges developing clinical decision support tools based on artificial neural network analyses of the National SCI Model Systems data.* Boston, MA: Seminar presented at the Boston University School of Public Health: Health and Disability Research Institute.

Belliveau, T. (2005, February). *Case study: An amnestic soldier.* Presented at the meeting of the Connecticut Neuropsychological Society.

Belliveau, T., Axt, J., Zheng, L., Butkus, C., & Pietrzak, R. (2004, November). *Reducing uncertainty in diagnostic classification and behavioral prognosis.* Poster presentation at the meeting of the Connecticut Psychological Association, Westbrook, CT.

Sarfaty, S., Pier, J., & Belliveau, T. (2004, May). *Update on response bias assessment: VIP, WMT, and FBS.* Presented at the meeting of the Connecticut Neuropsychological Society, Cheshire, CT.

Belliveau, T.J., Stanwood, J., & Ritchotte, S. (2001, May). *Serial assessment of emotional and social behavior after brain injury.* Paper presented at the meeting of the Connecticut Neuropsychological Society, New Britain, CT.

Johnston, D.J., & Belliveau, T.J. (2000, May). *Neuropychological sequelae to carbon monoxide poisoning.* Presented at the meeting of the Connecticut Neuropsychological Society, Waterbury, CT.

Belliveau, T.J., Stanwood, J., & Ritchotte, S. (1998, May). *Convergent validity and stability of observer ratings during brain injury rehabilitation.* Poster session at the meeting of the Brain Injury Association of Connecticut, Hartford.

Belliveau, T.J. (1997, December). *Three psychometric issues: Estimating pre-injury intelligence; Stability of test scores; Verbal labels for numeric scores.* Presented at the meeting of the Connecticut Neuropsychological Society, Hartford, CT.

Belliveau, T.J. (1994). *Interpersonal perceptions and therapeutic alliance among patients with borderline personality disorder.* Ann Arbor, MI: Dissertation Abstracts International.

Michaels, A.S., Arnkoff,D.B., Glass, C., & Belliveau, T. (1990, November). *The relationship between cognitive processes, anxiety, and performance on doctoral dissertation orals.* Poster presented at the meeting for the Association for the Advancement of Behavior Therapy, San Francisco.

Lewis, J.E., Lanham, R.A., & Belliveau, T.J. (1990, August). *"Contextual" neuro-psychological toxicology investigation of phencyclidine (PCP) abusers.* Poster presented at the meeting of the American Psychological Association, Boston, MA. Abstract of proceedings in The Clinical Neuropsychologist, 4(3), 303-304.

Belliveau, T.J., Jobes, D.A., Arnkoff, D.B., Dolan, R.T., Gershefski, J.J., Glass, C.R., & Victor, B.J. (1990, April). *The process of change in psychotherapy from object-relations and*

*cognitive -constructivist perspectives*. Discussion group conducted at the Meeting of the Society for the Exploration of Psychotherapy Integration, Philadelphia.

Belliveau, T.J., Arnkoff, D.B., & Glass, C.R. (1989, November). *Internal dialogue and cognitive structures in test anxiety*. Poster session at the meeting of the Association for the Advancement of Behavior Therapy, Washington, DC.

Belliveau, T.J., & Axelson, J.F. (1984, April). *Effects of various estrogen and progesterone treatments on exercised and non-exercised female rats*. Paper presentation at the Greater Boston Undergraduate Research Paper Conference, Bridgewater, MA.

1/19/16

# Howard Grattan, MD

34969 Skogan Rd
Sandy, OR 97055
Phone/fax: (801) 849-2622 Business: (503) 382-8100
Cell: (314) 974-6555
Grattanreview@gmail.com

## Licensure

**Washington State License**
**Oregon State License**
**California State License**
**DEA, BLS, ACLS**

## Certification

**Board certification in Physical Medicine and Rehabilitation**
**Board certification in Pain Management**

## Employment

**December 2007-2012:** NMR/Elite physicians
Utilization and disability case reviewer
**September 2007-July 2008:** Pain management physician at
Inland Pain Management
San Bernardino, CA
**August 2008- 2011:** Pain Management Physician at
A&A Pain Institute
St. Louis, MO
**September 2011-present:** Pain Management Physician at
Columbia Pain and Spine Instute
Gresham, Or

## Employment Interests

I am fully trained in interventional pain procedures, EMG/NCS, and neurostimulator and intrathecal pump management, trials and implants.

## Education

**Aug '06- July '07 Fellowship:** Loma Linda University Pain Management
**Aug '03- July '06 Residency:** Loma Linda University Physical Medicine and Rehabilitation
**June '02-July '03 Internship:** Loma Linda University Internal Medicine
**Aug '98- May '02 Medical School:** Loma Linda University, MD
**Aug '94- May'98 Undergraduate:** Truman State University, Kirksville, MO

## Leadership

| | |
|---|---|
| **'02-'03** | LLU residency counsel representative for preliminary internal medicine residents (elected) |
| **2001** | Student-Interviewer Admissions Committee (selected) |
| **'00-'01** | LCME Accreditation Task Force member (selected) |
| **'99-'00** | President of LLU Medicine Student Assoc. '99-'00 (elected) |
| **'98-'99** | Freshman Class President for LLU medicine (elected) |

## Research Activities

**Sub-investigator on several sponsored drug trials.**
-Titles furnished upon request

## Academic Positions

| | |
|---|---|
| **'05-'06** | Chief Resident LLU PM&R Residency |
| **2005-6** | Freshman neuroscience small group leader |
| **2004** | Guest Lecturer: LLU freshman anatomy |
| **2004** | Freshman anatomy lab assistant |

## Community Service

| | |
|---|---|
| **2002** | **Dream Machine Foundation medical mission trip to Fiji** |
| **2001** | **Healthy Neighborhoods** |
| **'99-'00** | **Habitat for Humanity** |
| **'99-'00** | **Salvation Army Soup Kitchen** |
| **'99-'00** | **Students Teaching A.I.D.S. to Students** |
| **'98-'01** | **Students for International Mission Service**<br>Service in Mexico and Peru |

## Memberships

**American Academy of Physical Medicine and Rehabilitation (AAPMR)**
**American Association of Neuromuscular and Electrodiagnostic Medicine (AANEM)**
**International Spine Intervention Society**

## Languages

**Spanish: Basic reading and conversation**

## References

**Furnished upon request**

7E110160005

**Authorization to Release Information**
**Third Party**

I, Abolfazl Hosseinpour, hereby authorize SAFEWAY, INC.; LIBERTY MUTUAL/LIBERTY LIFE ASSURANCE COMPANY OF BOSTON; and any of their affiliated companies, to furnish attorney Julie A. Mersch and her staff with any and all information with respect to my short and long-term disability insurance claims under ~~policy~~ claim number(s) 5482725.

Information requested shall include, pursuant to 29 U.S.C. § 1024(b)(4), the following: a copy of the latest updated *summary plan description*, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or *other instruments under which the plan is established or operated.*

A photostatic copy of this authorization shall be considered as effective and valid as the original. I understand that I or my authorized representative will receive a copy of this authorization upon request.

I understand that this information will be used for the purpose of evaluating potential claims for disability benefits.

I understand that this authorization is valid up to one year from the date of signature and that I may be asked to complete an additional authorization form after that date. I or my authorized representative may revoke this authorization at any time as it applies to future disclosures by writing the Company.

Date: 4/11/16

Signature: [signature]
ABOLFAZL HOSSEINPOUR

If claimant is under 18 years of age or incapacitated, the parent or guardian must sign. If claimant is deceased, the personal representative or executor of the estate must sign.

W:\POTENTIAL CASES\HOSSEINPOUR\AuthToReleaseInfo3p.wpd

LAW OFFICE OF
JULIE A. MERSCH
701 S. 7th Street Las Vegas, NV 89101

CERTIFIED MAIL

LAS VEGAS

'16

7011 1570 0000 4717 0793

UNITED STATES POSTAGE

PITNEY BOWES

$ 006.46⁵

APR 11 2016

MAILED FROM ZIP CODE 89101

Jessica Austin
Group Benefits Disability Claims
PO Box 7213
London, KY 40742-7213

40742-721313

7E110160001

701 S. 7th Street
Las Vegas, NV 89101
www.merschlaw.com

LAW OFFICE OF
JULIE A. MERSCH

(702) 387-5868
fax (702) 387-0109
email: jam@merschlaw.com

April 11, 2016

**VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

Jessica Austin
Group Benefits Disability Claims
Liberty Life Assurance Co. of Boston
PO Box 7213
London, KY 40742-7213

| | | |
|---|---|---|
| **Re:** | **My Client/Claimant** | **: Abolfazl Hosseinpour** |
| | **Claim No.** | **: 5482725** |
| | **Plan/Policy Holder** | **: Safeway, Inc.** |

Dear Ms. Austin:

I represent Abolfazl Hosseinpour and am writing as a result of Liberty's denial of his claim for long-term disability benefits, as set forth in its letter dated March 22, 2016. Enclosed is an authorization signed by Mr. Hosseinpour allowing me to obtain information on his behalf.

Pursuant to 29 CFR 2560.503-1(g)(v)(A); 503-1(h)(2)(iii); and 503-1(h)(3)(iii) -(v), please provide the following information to me upon receipt of this letter:

1) a copy of the specific rule, guideline, protocol, or other similar criterion relied upon in making the adverse benefit determination; and

2) a copy of all documents, records, and other information relevant to Mr. Hosseinpour's claim; and

3) the name and *curriculum vitae* of all health care professionais with whom Liberty consulted prior to the adverse benefit determination. This information should also include reference to the health care professionals' experience and training, including a list of all peer review articles authored by these professionals; and

4) the identification of all medical experts whose advice was obtained on behalf of Safeway, Inc. and/or Liberty in connection with the adverse benefit determination, without regard to whether the advice was relied upon in making the determination.

Pursuant to 29 CFR 2560.503-1(m)(8), a document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information:

(i) Was relied upon in making the benefit determination;

7E110160001

7E110160001

Jessica Austin
Re: Abolfazl Hosseinpour
April 11, 2016
Page 2

(ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;

(iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination; or

(iv) In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

In addition, please forward as well the latest updated *summary plan description*, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or *other instruments under which the plan is established or operated*. The authority for this request is found at 29 U.S.C.A. §1024(b)(4).

Please forward these documents to me within the next thirty (30) days.

Very truly yours,

Julie A. Mersch

Julie A. Mersch, Esq.

JAM/rmj
Enclosure

W:\HOSSEINPOUR\LTRS\Austin.Liberty.AR Req.041116.wpd

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213

MR. ABOLFAZL HOSSEINPOUR

Liberty Mutual INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5717

March 22, 2016

Mr. Abolfazl Hosseinpour

RE: Long Term Disability (LTD) Benefits
Safeway, Inc.
Claim #: 5482725

Dear Mr. Abolfazl Hosseinpour:

We are writing in regard to your claim for disability benefits. We have completed a thorough review of your eligibility for disability benefits, and have determined that benefits are not payable. Safeway Inc.'s Long Term Disability Policy requires that to receive benefits you must meet the following definition of disability:

***"Disability"*** *or* ***"Disabled"****, with respect to Long Term Disability, means:*

*1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:*

*b. i. if the Covered Person is eligible for the 24 Month Own Occupation benefit,* ***"Disability"*** *or* ***"Disabled"*** *means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*

*ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and* Substantial Duties of Any Occupation.

In order to evaluate whether or not you met the above definition of disability, we requested medical information from your physicians, Mehrad Tafreshi, MD, Family Practice, Kelly Hawkins, Physical Therapy, Jason Garber, MD, Orthopedic Surgery, and Dynamic Futures (your psychiatric providers) and then compared your restrictions and limitations to the requirements of your occupation.

You submitted a claim for back pain, major depression, and anxiety. Your claim contains the following medical documentation:

- Records from Mehrdad Tafreshi, MD, for the period of 6/15/15-9/23/15
- Records from Jason Garber, MD, for the period of 7/16/15-9/17/15
- A physical therapy evaluation from Tim Hipkis, PTA/Vanessa Martin, MSPT dated 8/26/15
- Physical Therapy records dated 8/10/15 -12/10/15

- MRI of Cervical Spine dated 6/15/15
- MRI of the Lumbar Spine dated 7/16/15
- ECG dated 7/7/15
- A work status note from Dr. Tafreshi dated 10/27/16

In order to assess your level of capacity from a physical standpoint, on October 19, 2015, your file was referred for a review with a Board Certified physician, licensed in Physical Medicine and Rehabilitation (PM&R). This review was completed during your short term disability (STD) claim. The report concluded the following:

> *"The claimant is diagnosed with degeneration of lumbar or lumbosacral intervertebral disc, spinal stenosis of the lumbar spine, degeneration of cervical intervertebral disc, anxiety and pure hyperglyceridemia."*
>
> *"This is a 56-year-old male with a chief complaint of lower back pain, neck pain, and intermittent left arm numbness. It is also indicated that the claimant has left knee pain with prolonged walking and standing, however, the claimant has a normal gait. He has a history of panic attacks. Current medications include Tramadol, Xanax, Lyrica, and Skelaxin. Objectively sensation is intact and motor strength is 5/5. It is noted that the claimant has some decreased grip strength, however, this is not described. Gait and station is normal. There is limited range of motion. There is cervical disc degeneration present mostly notably C4-C5, C5-C6 and C6-C7. There is no evidence of definitive neural compromise on MRI of the cervical or lumbar spine. These findings are mild in severity and given the absence of any quantifiable objective measurements, instability, or findings on MRI that would place the claimant at increased risk of injury, the claimant is not functionally impaired and therefore restrictions and limitations are not supported."*
>
> *"The claimant is capable of sustaining a full time work capacity without restrictions and limitations given the absence of any significant objective evidence to support restrictions or limitations."*
>
> *"The claimant has tried Zoloft and Xanax, which did not help. He is to try Paxil. The claimant is also taking Tramadol, Xanax, Lyrica and Skelaxin. This would not be expected to impact his functional capacity."*

In order to assess your current level of functionality, and review any additional medical information for your long term disability (LTD) claim, your file was referred for an addendum. The February 25, 2016 report concluded the following:

> *"Based on the additional medical records reviewed, the claimant does have full time sedentary work capacity."*
>
> *"It was indicated the claimant rates his pain level 10/10; however, he was observed moving smoothly and with no indications of discomfort. He did not use visible assistive devices such as canes, crutches, or braces. There is also no evidence for any deformities or acute neurological features on clinical examination nor was there dangerous pathology on diagnostics. Therefor the accompanying surveillance information does contradict the review of medical documentation and conflicts with the claimant's self-reported limitations."*

The physician reviewing your file attempted to contact Dr. Garber to discuss your claim. On February 24, 2016, Lisandra, from Dr. Garber's office, stated that Dr. Garber had not seen you since

September 2015, and therefore had nothing to add.

In addition, a vocational review was also completed regarding your occupation as a Pharmacy Manager. The report indicated the following:

> *Based on a review of the job information provided, Mr. Hosseinpour's job tasks are best represented by the following description in the Dictionary of Occupational Titles (DOT): Pharmacist (074.161-010).*
> *Based on the formal LMS, this occupation spans from the sedentary and light physical demand levels. There are ample opportunities that exist at both levels.*
>
> *The Department of Labor defines sedentary work as,*
>
> *"**S-Sedentary Work** - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of walking and standing are required only occasionally and all other sedentary criteria are met."*
>
> *For the sedentary physical demand level the positional requirements are as follows:*
>
> - ***Frequent** handling, fingering and sitting*
> - ***Occasional** reaching, (reaching can be reduced or eliminated by moving objects an ergonomically correct distance from the body), walking and standing*
> - ***No** bending/stooping, climbing, twisting, kneeling, crawling and crouching/squatting*

In addition to the above definition of disability, the Policy also requires that we receive requested medical documentation within a reasonable time period:

*1. **Notice***

*a. Notice of claim must be given to Liberty within 30 days of the date of the loss on which the claim is based. If that is not possible, Liberty must be notified as soon as it is reasonably possible to do so. Such notice of claim must be received in a form or format satisfactory to Liberty.*

*b. When written notice of claim is applicable and has been received by Liberty, the Covered Person will be sent claim forms. If the forms are not received within 15 days after written notice of claim is sent, the Covered Person can send to Liberty written Proof of claim without waiting for the forms.*

*2. **Proof***

*a. Satisfactory Proof of loss must be given to Liberty no later than 90 days after the end of the Elimination Period.*

*b. Failure to furnish such Proof within such time shall not invalidate or reduce any*

*claim if it was not reasonably possible to furnish such Proof within such time. Such Proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time Proof is otherwise required.*

*c. Proof of continued loss, continued Disability or Partial Disability, when applicable, and Regular Attendance of a Physician must be given to Liberty within 30 days of the request for such Proof.*

*Liberty reserves the right to determine if the Covered Person's Proof of loss is satisfactory.*

On November 30, 2015, December 18, 2015, January 11, 2015, January 25, 2016 and February 3, 2016 we requested updated psychiatric records for the period of January 1, 2015 through the most recent date of treatment and the completion of the Functional Status Evaluation; to date we have not received a response to our requests.

In order to assess your current level of functionality from a psychiatric standpoint, your file was referred for a review with Board Certified Psychiatrist. According to the March 14, 2016 report:

*"The interim records do not include an updated assessment of the scope / severity of depressive symptoms beyond his report of depressed mood, sleep disturbance (which may also be associated with chronic pain), and cognitive problems. Although the claimant reported anxious moods with frequent panic attacks, the records do not provide any description of any associated behavioral changes or psychiatrically based functional impairment. The medical record documentation does not include any mental status or cognitive assessment data that would support the presence of cognitive impairment. No evaluation / treatment records from mental health specialists are available for review. The medical record documentation provides insufficient support for the presence of continued psychiatrically-based functional impairment or associated need for occupational restrictions / limitations beyond approximately 11/15/15."*

*"Further review may be appropriately considered if any subsequently received records (e.g., mental health evaluation / treatment records, Dr. Mark Collins since approximately December 2015) include relevant information about the scope and severity of recent depressive symptoms; the scope of symptoms experienced during panic attacks and any subsequent, associated behavioral changes; valid cognitive assessment data that would support the presence of cognitive impairment; and further delineation of the nature of any psychiatrically-based functional impairment that would necessitate occupational restrictions or limitations."*

Based on the medical information in relation to your occupation requirements, you do not meet your Policy's definition of disability, and we must deny your claim for benefits. Specifically, the PM&R peer review concluded that you have at least full-time sedentary work capacity from a physical standpoint, and since we did not receive any update psychiatric records, we are currently unable to assess your level of impairment from a psychiatric standpoint.

If you have an open FMLA or State Leave claim with Liberty Mutual Insurance, you will receive a separate notification regarding the status of your leave.

This claim determination reflects an evaluation of the claim facts and Policy provisions. We reserve the right to make a determination on any additional information that may be submitted.

Under the state of California's Fair Claims Settlement Practices Regulations you may have this matter reviewed by the California Department of Insurance if you believe you have been wrongfully denied. You may send your request for review to:

California Dept. of Insurance
Consumer Services Division
300 S. Spring Street
Los Angeles, CA. 90013
1(800) 927-4357 or (213) 897-8921

Under the Employee Retirement Income Security Act of 1974 (ERISA), you may request a review of this denial by writing to the address below:

The Liberty Life Assurance Company of Boston
Attn: Jessica Austin
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213

The written request for review must be sent within 180 days of the receipt of this letter and state the reasons why you feel your claim should not have been denied. In your request for review please include the following documentation: all office treatment notes, diagnostic test results, and procedure reports from Dr. Garber, Dr. Tafreshi from September 2015 through the present, and Dynamic Futures from January 2015 through the present date; as well as any additional information which you feel will support your claim. You may request to review pertinent claim file documents upon which the denial of benefits was based. If Liberty Life does not receive your written request for review within 180 days of your receipt of this notice, our claim decision will be final, your file will remain closed, and no further review of your claim will be conducted. Under normal circumstances, you will be notified of the final decision within 45 days of the date that your request is received. If special circumstances cause a delay in our decision, you will be notified of the final decision no later than 90 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

If you have any questions regarding this matter, please contact your assigned Disability Case Manager at the number below.

Sincerely,

Kerry Arvenitis
Disability Claims Tech Spec
On Behalf Of: Jessica Austin
Phone No.: (888) 437-7611 Ext. 16352
Secure Fax No.: (603) 334-5717

**Addendum (1) to Clinical Case Review**

| | |
|---|---|
| **Referred By:** | AUSTIN, JESSICA 096 8*731-6352 |
| **Report Date**: | 03/14/16 |
| **Insured's Name**: | Abolfazl Hosseinpour |
| **DOB**: | |
| **Claim**: | 3480001 |
| **Employer**: | SAFEWAY INC. |
| **Job Title/Occupation:** | PHARMACY MANAGER |
| **Dx**: | Major Depression |
| **DOD**: | 07/15/2015 |
| **Type of Claim:** | STD |

**Referral Questions**: Since the 10/15 report, updated records have been requested from both Dr. Tafreshi (pcp) and Dynamic Futures (therapy and psych); however only the records from Dr. Tafreshi were received.

1. In your previous report, you outlined that psychiatric impairment was substantiated through approximately 11/15/15. In your opinion, do the records on file continue to support that the claimant would be precluded from working due to psychiatric symptoms beyond 11/15/15? Please outline your rationale.

2. Please outline any medical information not in the file that if it became available, could be helpful in further clarifying the medical necessity for restrictions/limitations. Please indicate the provider/s name, etc., and the time frame for such information if known.

3. Does the accompanying surveillance information conflict with or contradict documentation in the available medical records?

4. Please outline reasonably supported barriers documented in the medical records contributing to or impacting the claimants ability to perform sustainable activities? Please comment on how these non-medical factors could impact psychiatric impairment and the necessity for restrictions/limitations.

**Response to Referral Questions**:

1. No. The interim records do not include an updated assessment of the scope / severity of depressive symptoms beyond his report of depressed mood, sleep disturbance (which may also be associated with chronic pain), and cognitive problems. Although the claimant reported anxious moods with frequent panic attacks, the records do not provide any description of any associated behavioral changes or psychiatrically based functional impairment. The medical record documentation does not include any mental status or cognitive assessment data that would support the presence of cognitive impairment. No evaluation / treatment records from mental health specialists are available for review. The medical record documentation provides insufficient support for the presence of

continued psychiatrically-based functional impairment or associated need for occupational restrictions / limitations beyond approximately 11/15/15.

2. Further review may be appropriately considered if any subsequently received records (e.g., mental health evaluation / treatment records, Dr. Mark Collins since approximately December 2015) include relevant information about the scope and severity of recent depressive symptoms; the scope of symptoms experienced during panic attacks and any subsequent, associated behavioral changes; valid cognitive assessment data that would support the presence of cognitive impairment; and further delineation of the nature of any psychiatrically-based functional impairment that would necessitate occupational restrictions or limitations.

3. The observed behavior during surveillance doesn't convey much reliable information about the claimant's cognitive and emotional state beyond the fact that he was observed interacting with other people in the community without any outward expressions or manifestations of emotional distress. The electronic data search indicating a position as President of Hosseinpour Apartments (if accurate) is notable only if he remains actively engaged and independently operating a business concurrently during his period of disability, and if the cognitive and behavioral requirements of doing so were incongruent with the assertion of psychiatrically-based impairment that necessitates complete occupational restriction.

4. The nature of any possible non-medical factors impacting the claimant's functioning are not identifiable in the medical records available for review.

**Additional Recommendations**: See # 2 above/

**Analysis**: The scope of the following analysis is limited to consideration of the claimant's mental health / neuropsychological status. Consideration for any possible impairment related to non-psychological medical conditions (e.g., any standing / lifting restrictions due to cervical / lumbar disc disease and pain) is outside the scope of this review.

The previous medical records included information which was generally consistent with the diagnosis of Major Depression, and to a lesser extent consistent with the presence of limited symptom panic attacks, without associated agoraphobia.

The interim history is notable for the claimant's report of continued anxious and depressed moods, panic attacks, pain, sleep problems, and concentration problems. The available records do not include an updated assessment of the scope / severity of depressive symptoms beyond his report of depressed mood, sleep disturbance (which may also be associated with chronic pain), and cognitive problems. Although the claimant reported anxious moods with frequent panic attacks, the records do not provide any description of any associated behavioral changes or psychiatrically based functional

impairment. The medical record documentation does not include any mental status or cognitive assessment data that would support the presence of cognitive impairment.

**Case Summary**: Medical records of this 56 year old man indicate that in mid-July 2015 he was medically evaluated for neck and low back pain, and left arm numbness and pain, and also reported anxiety and depression. A June 2015 MRI showed multilevel moderate foraminal stenosis and lower cervical advanced degenerative disc disease. Other records refer to cervical lumbar disc bulges. He has also reported headaches, incontinence, blurred vision, and difficulty concentrating. He was referred to pain management and for physical therapy. In addition to pharmacological treatment for pain, he has been prescribed anxiolytic, sleep, and antidepressant medications. The medical records indicate that he has seen a psychotherapist and psychiatrist, but there are no mental health specialist evaluation / treatment records available for review. The medical records indicate hyperglyceridemia as a concurrent diagnosis.

**Records Reviewed**: [Please refer to the 10/19/15 report of *Clinical Case Review* for a summary of information derived from records dated between 06/15/15 and 09/23/15, and a summary of my 10/12/15 phone call with Dr. Tafreshi.]

! 07/16/15, 10/10/15 – 12/10/15 Physical Therapy Works / Vanessa Martin, MSPT; Kelly Hawkins, PT

Physical therapy evaluation and treatment notes, with listed diagnosis of low back pain, lumbago, and cervicalgia.

! 10/27/15 – 02/03/16 Mehrdad Tafreshi, MD

The 10/27/15 note indicates that his condition is unchanged, with report of depressed mood and anxiety issues, panic attacks 3 – 4 times daily (feeling hot and agitated, heart racing), and continued neck and lower back pain. There is note that Dr. Garber recommended surgery but he declined. He reported a pain level of 9/10, and reported that pain interferes with his sleep, for which he takes Ambien. Diagnosis: Pure hyperglyceridemia; spinal stenosis of the lumbar region; cervical intervertebral disc degeneration; anxiety disorder. Plan: “Needs Psych referral awaiting appointment. Psychologist appointment next wk.” He was prescribed Ambien and Xanax.

The 12/21/15 note indicates that he saw a psychiatrist (Dr. Mark Collins) and was on Remeron. ROS was positive for report of bilateral knee and hip pain, and difficulty walking / standing long. There is note of his report of persisting severe anxiety, panic attacks, and sadness / depression, insomnia, and losing concentration. Notes pertaining to exam indicate report of depressed mood. Diagnostic list included Moderate recurrent Major Depressive Disorder. Plan indicates prescriptions for Ambien and Xanax and follow-up with Psychiatry.

The 01/28/16 note indicates no changes, and report of persisting anxiety, depressed mood, panic attacks, insomnia, losing concentration, neck and lower back pain, left arm/hand weakness, and dropping things. Diagnosis: Spinal stenosis of lumbar region; Anxiety Disorder; recurrent MDD; cervical disc degeneration.

The 02/03/16 note indicates an essentially unchanged symptom profile. Prescriptions for Ambien, Xanax, Fioricet, and Tramadol were refilled. There is note of poor prognosis.

*Other*:
October 2015 CVI, Inc
Report.

10/19/15 Howard Grattan, MD
Independent Peer Review.

10/27/15 Mehrdad Tafresh, MD
Signed copy of my faxed summary of our 10/12/15 phone call, with no changes or additional comments.

10/27/15 Mehrdad Tafreshi, MD
Letter: Indicates that his condition has not improved, and in Dr. Tafreshi's opinion he is still unable to work. It's noted that he has an appointment with a therapist scheduled on 11/03/15, and that the therapist will then refer him to a psychiatrist.

11/22/15 claimant
Liberty Mutual Training – Education – Experience Form and Activities Questionnaire.

02/17/16 Amanda Voce, MA, CRC
Occupational Analysis / Vocational Review.

**References**:
American Psychiatric Association. (2013). *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition).* Arlington, VA: American Psychiatric Association.

< electronically signed >
Timothy Belliveau, PhD, ABPP
*Board Certified in Clinical Neuropsychology*
*Board Certified in Rehabilitation Psychology*
Consultant, Liberty Mutual Insurance Company

# Liberty Mutual Consulting Physician Referral
## Attendance Only

**Consulting Physician: Monti, David**

Office: 0096

Claim #: 5482725

Document Locations
- [x] Document List
- [ ] Correspondence
- [ ] Paper File

Claimant Name: ABOLFAZL HOSSEINPOUR

Date of Birth:

Claim Status: PE

Date of Disability: 7/15/2015

Date Sent: 2/26/2016

Claimant SSN:

Date Benefits Began: 1/20/2016

Product Type: LTD

Paid Through: 1/19/2018

Disability Level: Own Occupation

Policyholder/Self-Insured Plan Holder: SAFEWAY INC.

Referred By: AUSTIN, JESSICA 096 8*731-6352

Assigned Nurse Case Manager:

Diagnosis: 722.52 Degeneration of lumbar or lumbosacral intervertebral disc, 300.02 Generalized a

Questions or Issues for Physician: (Note - If a physician has viewed this claim in the past please detail the physician and the outcome.)

N/A

MLS Group of Companies, Inc.

MLS Peer Review Services

Phone: 888.657.4634 | Fax: 248.356.6757 | www.mls-ime.com

URAC ACCREDITED Comprehensive Independent Review Organization

February 25, 2016

Re: Abolfazil Hosseinpour
Claim Number: 5482725

ADDENDUM

To Whom It May Concern:

LIST OF MEDICAL DOCUMENTATION

All medical records submitted have been reviewed.

- Liberty Mutual
    - ROI 11/20/15
    - Correspondence 10/9/15 – 11/30/15
    - Employee statement 11/20/15
    - Claimant Information Form 11/20/15
    - Claimant Supplementary Statement not dated
    - Family Information Questionnaire 11/17/15
    - Training Education Experience Form not dated
- Job Description 2002
- Clinical Case Review 10/19/15
- Mehrdad Tafreshi MD progress note 8/5/15
- Claims Verification Report 10/30/15
- Kelly Hawkins PT progress note 7/16/15 – 12/10/15
- Jason Garber MD progress note 7/16/15

Abolfazil Hosseinpour
Claim Number 5482725
Howard Grattan, M.D.
February 25, 2016
Addendum - Page 2

- Meadows Medical Group correspondence 10/27/15
- MLS Independent Peer Review 10/19/15

SUMMARY OF MEDICAL DOCUMENTATION

This is a 57-year-old male with a DOB of . The claimant works as a Pharmacy Manager requiring lifting up to 20 pounds, constant sitting, frequent walking, and constant neck rotation, bending, twisting, handling and grasping. He is diagnosed with major depression, anxiety, degeneration of lumbar or lumbosacral intervertebral disc, spinal stenosis of the lumbar spine, degeneration of cervical intervertebral disc and pure hyperglyceridemia.

Clinical case review dated 07/15/15 by Timothy Belliveau, MD is noted.

On 07/16/15, Jason Garber, MD, claimant presents for complaints of neck pain and stiffness. His pain radiates to the left and right arm. He also has low back pain which has gradually worsened. On examination he is alert and orientated x3. Strength is 5/5. Coordination is normal. Gait and station are normal. He is given a referral to physical therapy.

Physical therapy note dated 08/10/15-12/10/15 states he was treated by physical therapy on multiple occasions for pain complaints. Initial evaluation on 08/10/15 notes the claimant has had severe neck and low back pain, as well as leg, and left hand numbness and tingling on the left and right wrist. Objectively he has 4+/5 strength in the lower extremity and 4/5 strength in the upper extremity. There is tenderness of the cervical and lumbar areas. Cervical spine range of motion with extension is 30°, flexion degrees and rotation is 40° left and 30° on the right. As of 12/10/15, he rates his pain level at 10/10. Physical examination findings are unchanged with the exception of mild improvement with cervical spine range of motion.

On 09/17/15, Jason Garber, MD, claimant presents in follow-up. Physical examination reveals the claimant to have 5/5 strength throughout the upper and lower extremities. MRI of the cervical spine and lumbar spine is ordered.

Independent Peer Review dated 10/19/15 is noted.

On 10/27/15, Mehrdad Tafreshi, MD indicated the claimant is still unable to work.

Investigative report dated 10/30/15; the claimant was observed moving smoothly and with no indications of discomfort. He did not use visible assistive devices such as canes, crutches, or braces. He did at one point put his hand on the small of his back. He was observed walking to the right front door of the vehicle and sat down in the right front seat without difficulty.

On a Questionnaire dated 11/20/15 the claimant reports he is able to sit 30 minutes to two hours up to 5 – 7 hours on a couch or bed. He reports being able to stand for 5 – 10 minutes up to one hour a day, walking 10 – 15 minutes up to half an hour a day. It is indicated he is able to get dressed, bathe, balance checkbook and manage finances without assistance.

PEER-TO-PEER DISCUSSION, LISANDRA FOR DR. JASON GARBER

Left detailed message on voicemail 02/22/2016 @ 10:54AM Pacific

Left detailed message on voicemail 02/23/2016 @ 11:53AM Pacific

Per Lisandra, Dr. Garber has last seen the claimant back in 06/15 and has nothing to add to the claimant's disability claim 02/24/2016 @ 10:30AM Pacific

CONCLUSION

**1. Based on the additional medical records reviewed, in your opinion does the claimant currently have full-time sedentary work capacity?**

Based on the additional medical records reviewed, the claimant does have full time sedentary work capacity.

**2. If no, please outline restrictions & limitations and likely duration.**

Not applicable.

**3. Please review the treatment plan. Please indicate whether or not it is consistent with the current standard of care. If not, please provide evidence based documentation to support your opinion**

The treatment plan which has included physical therapy, medication management and activity modification, has been consistent with the current standard of care.

**4. Does the accompanying surveillance information conflict with or contradict your review and the claimant's self-reported limitations?**

It was indicated the claimant rates his pain level 10/10; however, he was observed moving smoothly and with no indications of discomfort. He did not use visible assistive devices such as canes, crutches, or braces. There is also no evidence for any deformities or acute neurological features on clinical examination nor was there dangerous pathology on diagnostics. Therefor the accompanying surveillance information does contradict the review of medical documentation and conflicts with the claimant's self-reported limitations.

I certify that I have no Conflict of Interest with this review. I attest to having no past or present relationship or affiliation with the beneficiary of this Independent Review or a significant past or present relationship with the attending provider and/or the treatment facility under review (if applicable). I further certify that I have no familial or material, professional or business relationship with the referring entity or incentive to promote the use of a certain product or service associated with the review of this case.

I further certify that I have no direct or indirect financial incentive for a particular determination or ownership interest of greater than 5% between any affected parties. I also attest to having the appropriate license/board certification for practitioners who typically manage the medical condition/procedure/treatment or issue that is the subject of this review as well as the knowledge and clinical experience to review this case including at least 5 years full-time equivalent experience providing direct clinical care to patients.

Sincerely,

Howard Grattan, M.D.
Board Certified: American Board of Physical Medicine and Rehabilitation
Board Certified: American Board of Physical Medicine and Medicine, Pain Management
American Academy of Physical Medicine and Rehabilitation
American Association of Neuromuscular and Electrodiagnostic Medicine
International Spine Intervention Society

# PRN

5962 LA PLACE COURT STE 170
Carlsbad, CA
760-931-8310 x120
760-602-4171

## Fax Transmittal Form

To: Liberty Mutual
ATTN: Jessica Austin
Fax: 603-427-1844
From: Nancy R

Date: 2/17/16
Pages Including Cover: 32

**Message:**

Please see attached Medical and Billing Records for Abolfazl Hosseinpour along with invoice for your convenience .If you have any questions please feel free to call.

KELLY HAWKINS PHYSICAL THERAPY WORKS
www.kellyhawkins.com

THE DOCTOR'S CHOICE FOR EFFECTIVE, PERSONAL CARE.

To: Liberty Mutual
Attn: Jessica Austin
603-427-1844

Date: 2/9/16

Patient Name: Abolfazl Hosseinpour

Account #:
Claim # 548 2725

Enclosed you will find copies of the medical/billing records that your office/company has requested from our Bonanza/Buo location.

Copy charges are $.60 per page
Your record contains 31 Pages
Total fee is $ 18.60

Please remit payment to:
Kelly Hawkins Physical Therapy Works
**ATTN: Nancy**
5962 La Place Court Ste 170
Carlsbad, CA 92008

Tax ID # 56-2456868

Thank You.

*****WILL PROVIDE RECORDS ONCE PAYMENT IS RECEIVED*****

*****Will accept payment by phone w/ Credit Card*****

**PLEASE SEND ALL PAYMENTS TO THE ADDRESS LISTED ABOVE**

5962 La Place Court Ste 170 Carlsbad, CA 92008 • Tel (800) 929-4776 Ext 120 • Fax (760) 602-3275

-

# Kelly Hawkins
*Physical Therapy*

Patient Name: Abolfazl Hosseinpour
Patient Phone: ______
Date: 7/16/15 Date of Injury: ______
Date of Surgery: ______
Insurance: ______
ICD-9: 722.0; 722.4
Diagnosis: ______
Protocol / Comments: ______

***INDUSTRIAL/PRIVATE - REHAB - WORK HARDENING - SPORTS - PERSONAL INJURY***

Cervical & Lumbar

## TREATMENT PROTOCOL

- [x] EVALUATE & TREAT
- [ ] Exercise
- [ ] Manual Therapy
- [ ] Chronic Pain Program
- [ ] Posture/Position/Body Mechanics
- [ ] AROM
- [ ] PROM
- [ ] Back School
- [ ] Gait Training
- [ ] McKenzie Program
- [ ] Aquatic Therapy
- [ ] Neuro Re-education
- [ ] Home Program
- [ ] Orthotics

## MODALITIES & PROCEDURES

- [ ] Cold Packs
- [ ] Hot Packs
- [ ] Electrical Stimulation
- [ ] Ultrasound
- [ ] Massage/Soft Tissue Mobilization
- [ ] Traction
- [ ] Cryotherapy
- [ ] Paraffin
- [ ] Iontophoresis
- [ ] Other Pilates
- [ ] IFC
- [ ] TENS
- [ ] Phonophoresis
- [ ] Whirlpool

## INDUSTRIAL REHABILITATION

- [ ] Functional Capacity Evaluation (FCE)
- [ ] Ergonomic Analysis
- [ ] Work Simulation
- [ ] Post Offer Employment Testing (POET)
- [ ] Job Site Analysis
- [ ] Work Capacity Evaluation
- [ ] Work Conditioning Program
- [ ] Work Hardening

**Frequency/Duration:** [ ] 3 x/week/4 weeks [x] 3 x/week/6 weeks [ ] Other ______

**PHYSICIAN'S SIGNATURE:** [signature]

Return to Physician Date: ______

***CIRCLE DESIRED LOCATION AND FAX TO PREFERRED OFFICE***

**CENTRAL** - *Pool Location (Charleston / Valley View)* • Phone 702-876-1733 • Fax 702-876-2018
**EAST** *(Flamingo & Burnham)* • Phone 702-737-8820 • Fax 702-737-1622
**GREEN VALLEY / HENDERSON** *(Stephanie / Warm Springs)* • Phone 702-456-2024 • Fax 702-456-0036
**NORTH** *(Ann / Decatur)* • Phone 702-396-7100 • Fax 702-396-9100
**NORTH EAST** *(Bonanza / Nellis)* • Phone 702-438-3188 • Fax 702-438-4550
**NORTHWEST** *(Tenaya / Cheyenne)* • Phone 702-869-6978 • Fax 702-869-6959
**PAHRUMP** *(Highway 160)* • Phone 775-727-3838 • Fax 775-727-3761

**PATIENT INFORMATION** VERIFIED BY: ____ DATE: ____
KELLY HAWKINS PHYSICAL THERAPY LOCATION: ____

RX DATE ____ SCHD APPT ____ TX START DATE: ____ THERAPIST: ____
NAME Abolfazl Hossein pour SOCIAL SECURITY # ____
ADDRESS ____ STATE NV
HOME PHONE ( ) ____ MOBILE ( ) ____ WORK PHONE ( ) ____ EXT. ____
DATE OF BIRTH ____ MARITAL STATUS M PATIENT SEX ____
PERSON TO CONTACT IN CASE OF EMERGENCY ____ RELATIONSHIP ____
PHONE ____
REFERRING PHYSICIAN Gas Lat ____ PHONE ____ FAX ____
DATE OF INJURY ____ DATE OF SURGERY ____ DIAGNOSIS Low back/Neck pain ICD# ____
*CAUSE OF COMPLAINT DUE TO : ☐ AUTO ☐ WORK ☐ OTHER ____

**NAME OF INSURED/POLICY HOLDER INFORMATION**
NAME Abolfazl ____ RELATIONSHIP TO PATIENT Self ____ DATE OF BIRTH ____
SOCIAL SECURITY# ____ EMPLOYER NAME ____ PHONE ____

**INSURANCE INFORMATION** **DO YOU HAVE SECONDARY INSURANCE? ☐ YES ☐ NO**

**PRIMARY** Staff Initials: ____
NAME OF INSURANCE COMPANY ____
BILLING ADDRESS ____
PHONE ( ) ____ - ____ REPRESENTATIVE ____ CALL REFERENCE # ____
POLICY/ID # ____ GROUP # ____ EFFECTIVE DATE ____
BENEFITS ____ % DEDUCTIBLE $ ____ MET $ ____ COPAY $ ____ OUT OF POCKET MAX $ ____
REQUIRES PRE-AUTH ☐ YES ☐ NO AUTH # ____ # OF VISITS AUTHORIZED ____ MED NECESS ☐
AUTHORIZED BY ____ DATE ____ PLAN LIMITATIONS ____

**SECONDARY** Staff Initials: ____
NAME OF INSURANCE COMPANY ____ PHONE ( ) ____
INSURANCE BILLING ADDRESS ____
POLICY HOLDER ____ RELATIONSHIP TO PATIENT ____
SOCIAL SECURITY/MEMBER ID# ____ GROUP# ____

**WORKERS' COMPENSATION/AUTO INFORMATION** Staff Initials: ____
NAME OF INSURANCE COMPANY ____ PHONE ( ) ____
VERIFIED CLAIMS MAILING ADDRESS ☐ ADDRESS TO SUBMIT CLAIMS ____
ADJUSTER ____ PHONE ( ) ____ FAX ( ) ____
DATE OF INJURY ____ CLAIM # ____ PREVIOUS PT/OT (This Injury) ☐ YES ☐ NO
EMPLOYER ____ PHONE ( ) ____
***AUTO PATIENTS ONLY:*** POLICY HOLDER ____ RELATIONSHIP ____
AUTO POLICY NUMBER ____ MED-PAY ON POLICY: ☐ YES ☐ NO AMOUNTS ____

**MEDICARE PATIENTS ONLY**
DO YOU HAVE MEDICARE PART A & PART B? YES ☐ NO ☐
HAVE YOU RECEIVED ANY HOME HEALTH CARE WITHIN THE LAST 2 MONTHS? YES ☐ NO ☐
ARE YOU CURRENTLY RECEIVING ANY TYPE OF THERAPY AT ANOTHER FACILITY OR HOSPITAL? YES ☐ NO ☐
HAVE YOU PREVIOUSLY RECEIVED PT/OT FOR THIS DIAGNOSIS? YES ☐ NO ☐ *IF YES WHEN: ____

**Insurance Benefits Payment Policy:** The information listed above is a description of your healthcare benefits, which was given to us by a representative of your health insurance company. It is not a guarantee or authorization of payment. Actual benefits cannot be determined until the claim has been received and processed by your insurance. We will call to verify your insurance coverage. Deductibles and co-payments are due at the time of service.

I hereby give lifetime authorization for payment of insurance benefits to be made directly to this healthcare provider for services rendered. I understand that I am financially responsible for all charges not paid by my insurance company. In the event of default, I agree to pay all costs of collection and reasonable attorneys fees. I further agree that a photocopy of this agreement is as valid as the original. I further authorize that my signature on this form constitutes assignment of benefits to the above name healthcare provider.
I consent to have this healthcare provider and/or its' affiliates provide the treatment and care prescribed by my physician(s). I understand this consent may be revoked by me at any time.

[signature] ____ 8/10/15
PATIENT'S SIGNATURE DATE

Form rev. 12/2014